# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

KARL HOLMES, HERBERT McCLAIN and LORENZO
NEWBORN,
Defendants and Appellants.

S058734

Los Angeles County Superior Court
BA092268

January 31, 2022

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Groban, Jenkins, and O'Rourke[*] concurred.

Justice Kruger filed a concurring opinion.

Justice Liu filed a dissenting opinion.

---

[*] Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. HOLMES, McCLAIN and NEWBORN

S058734


Opinion of the Court by Corrigan, J.


On Halloween night in 1993, a group of young teenagers walking home from a party were mistaken for gang members and became the target of gunfire. Three were killed. Defendants Karl Holmes, Herbert McClain, and Lorenzo Newborn[1] were each convicted of three counts of murder, five counts of attempted murder, and one count of conspiracy to commit murder.[2] Special circumstances for lying in wait and multiple murder were found true as to each murder count.[3] The jury found that Holmes was armed with a firearm in committing the offenses[4] but found firearm allegations not true as to the other defendants. McClain was convicted of an additional attempted murder, with personal use of a firearm, based on an earlier incident.[5]

After the jury failed to reach a penalty verdict, that phase

---

[1]    Two codefendants originally included in the charges, Aurelius Bailey and Solomon Bowen, were tried separately and are not parties to this appeal.

[2]    Penal Code sections 187, subdivision (a), 664, and 182, subdivision (a). Further undesignated statutory references are to the Penal Code.

[3]    Section 190.2, subdivision (a)(3) and (15).

[4]    Section 12022, subdivision (a)(1).

[5]    Sections 187, subdivision (a), 664, and 12022.5, subdivision (a).

1

was retried, and death verdicts were returned against all defendants. In addition, the court imposed life sentences on all attempted murder counts, 25-year-to-life sentences on the conspiracy counts, and five-year sentences on the firearm enhancements.[6] We affirm the judgment in its entirety.

# I. BACKGROUND

## A. *Guilt Phase*

### 1. *October 28 Attempted Murder of Robert Price (McClain Only)*

McClain was a member of the Bloods gang, P-9. Robert Price was a member of the rival gang, Raymond Avenue Crips. On October 28, 1993, McClain encountered Price, as he left the Community Arms apartment complex. The men had seen each other before but never spoken. McClain asked Price for a cigarette. When Price gave him one, McClain responded, "Thank you, Blood," then shot Price in the face with a .380-caliber handgun. As Price tried to flee, McClain fired several shots, hitting Price twice in the back.

Price survived and was interviewed at the hospital where he refused to identify his assailant. He later identified McClain from a six-person photo lineup and again during both grand jury and trial testimony. Although warned by McClain not to testify, Price did so in exchange for a promise to relocate his family.

---

[6] All of these sentences were ordered to run consecutively except that the conspiracy sentences were stayed pursuant to section 654.

## 2. October 31 Shootings

### a. Shooting of Fernando Hodges and Hospital Gathering

Three evenings later, on October 31, 1993, P-9 gang member Fernando Hodges was shot at the Community Arms basketball court, and taken to Huntington Memorial Hospital, where he died. Police believed one of the Raymond Avenue Crips was responsible.

Holmes and Solomon Bowen joined a large crowd of Hodges's family and friends at the hospital. Around 20 to 30 people attired in hooded sweatshirts and baggy clothing gathered outside the emergency room but did not enter the hospital. A hospital security officer believed they were gang members. After an older man at the center of the group seemed to give "some direction or guidance, possibly orders," the group left.

### b. Activities Before the Wilson Street Shootings

After Bowen left the hospital, he and Newborn went to Willie McFee's house. They were armed and looking for Raymond Avenue Crips (Crips) gang member Dion Nelson, known as "Crazy D." Newborn cried and said his close friend, Hodges, had been killed. McFee declined to say where Crazy D lived. Newborn and Bowen left, joining several men running toward some railroad tracks. McFee called Crazy D to warn him.

Less than five minutes later, McFee heard multiple gunshots from near the tracks. A second series of gunshots, apparently from a different weapon, came from near Crazy D's house. Shots were also fired toward McFee's home. A bullet struck his air conditioning unit and two shell casings were found nearby.

### c.   Shootings on Wilson Street

Earlier that night, 14-year-old Reggie Crawford, 13-year-old Edgar Evans, and 13-year-old Stephen Coats attended a Halloween birthday party in Pasadena. Around 10:00 p.m., they left with Coats's brother, Kenneth, and seven other boys.[7] As they walked to the Coats home, a car carrying four or five Hispanic men sped by and turned from North Wilson Street (hereafter Wilson Street) onto Villa. Immediately afterward, four or five cars "packed full" of Black men drove down Villa toward Wilson Street. These men displayed P-9 gang signs and swerved near the curb as they passed by. One witness said three of these cars were dark-colored compacts, and another recalled that one was tan or grey. Holmes owned a grey Ford Tempo.

About three minutes later, three boys left the group of departing party goers. Crawford, Evans, and the Coats brothers continued walking down Wilson Street with Lawrence A., Lloyd S., A.A., and A.P. As they walked, Stephen and Kenneth's mother, Deborah Bush, drove by and offered her sons a ride home, but they declined. Stephen joked that Bush drove so slowly he could get home sooner on foot. As they continued on, Stephen, Crawford, and A.A. sang a song called "Gangster Lean." When the song ended, Kenneth heard a deep male voice say, "Now, Blood."

Shots erupted. Several witnesses described what happened. Lloyd heard a single boom followed by approximately 20 gunshots and saw blue sparks pass by his feet. Initially he thought the noise and sparks came from "a pack of firecrackers."

---

[7]     To avoid confusion, we refer to the Coats brothers by their first names.

He and A.A hid behind a brick barbeque. A.A. had been shot in the hand. Lawrence also hid when he heard the gunshots. When the firing stopped, he emerged and called out to his friends. No one responded, but a figure stood nearby. Gunfire resumed. Lawrence retreated to his hiding spot but was shot in the leg as he ran.

Kenneth also initially thought the gunshots were firecrackers. He and his friends kept walking until they noticed Evans holding his stomach. Evans cried, "Mama," and began crawling away. Stephen then pushed Kenneth away and said, "I'm hit." As he tried to hide, Kenneth saw the outline of two figures. One was taller and heavier and wore his hair in braids. The figures ran toward Orange Grove.

The three boys who had split from the group earlier ran back to their friends when the firing stopped. Crawford and Stephen lay unmoving. Kenneth screamed, "They shot my brother!" and "Let me to him." Evans lay on some stairs, still calling for his mother. A.P. sat in a driveway, shot in the leg.

Lloyd knocked on a nearby door and asked to use the phone. He called his mother while the homeowner called police. Bush had heard the shots as she pulled into her driveway and ran back down the street toward her sons. When she arrived at the scene, she found two boys on the ground. Crawford had no pulse. Bush saw that her son Stephen "had a bullet in his head and . . . was already gone." She never saw Evans. Kenneth ran up to her, crying "I want my brother. Please don't let this be my brother." Bush's daughter arrived and covered Stephen's body with a jacket. Paramedics and police arrived shortly thereafter.

Stephen sustained multiple gunshot wounds. Crawford was struck by three to five rounds and died from a shot to his chest. Evans died from a similar wound.

### d. Eyewitnesses

Gabriel Pina and Lillian Gonzales were walking their dog around 10:00 p.m. when four cars sped past and turned out of sight. The couple later saw most of the cars parked on a different street with a large group of people gathered nearby. The lead car reversed down the street toward them, stopped, then drove back up the street again. Pina identified the lead driver as McClain. A few minutes later, the couple heard gunshots. A gunman in a trench coat ran from Wilson Street and got into a car. Pina identified the fleeing man as Holmes.

Jessica Ramirez, who lived near Wilson Street, saw two stopped cars and a group of Black men. Shortly thereafter, she heard what she thought were fireworks or gunshots.

### e. Ballistics Evidence

Multiple nine-millimeter and .38- or .357-caliber shell casings and fragments, along with live .38-caliber rounds, were recovered from locations on Wilson Street. Expended nine-millimeter casings and a live .38-caliber round were also recovered from North Pasadena Avenue (Pasadena Avenue) near McFee's house. The live round found on Pasadena Avenue and the three live rounds collected on Wilson Street were .38-special wad cutter bullets made by PMC Company. Almost all of the nine-millimeter casings at both locations were fired from the same weapon. The bullets recovered from the bodies of Crawford and Stephen Coats were both .38- or .357-caliber, but they had been fired from different weapons.

### 3. Conduct After the Shootings

#### a. Holmes

In December 1993, Derrick Tate met Holmes while visiting a friend, Terranius "T" Pitts. Holmes wore a P-9 hat and talked about the Halloween shootings saying they were in retaliation for the Crips' killing of Hodges. He described hiding in bushes, jumping out, yelling "trick-or-treat," and opening fire on a group. He claimed he planned to get a hat made that said "trick-or-treat." Holmes said McClain was not involved in the shootings. According to Tate, McClain had suggested he and Tate leave California together. McClain was also considering "turn[ing] himself in" because "[h]e was tired of running."

Tate revealed this information while incarcerated on a joyriding charge, ultimately serving time for that offense. He was given no reward money, but his food and lodging expenses were paid during the week of his testimony. Tate had previously suffered three or four felony convictions outside California.

Tate was frightened to appear in court because he heard that a witness had been killed. A few weeks earlier, Tate's mother and girlfriend received visits from people looking for him. Someone phoned to warn his mother that Tate "had better not show up in court." The presence of Pitts's girlfriend made him nervous, and she was excluded from the courtroom during his testimony.

#### b. McClain

A day or two after the shootings, McClain told Mario Stevens that he and others had "put in some work" on some Crips on Wilson Street.

McClain visited his cousin, James Carpenter, shortly after the shootings. When Carpenter was interviewed in December

after his arrest for robbery, he said McClain spoke about shooting three Crips in retaliation for the murder of Hodges. McClain had bragged, "Boom boom pow pow pow, I can still hear the noise." During this visit, McClain and the others learned that the shooting victims had been children, not Crips. McClain then cut his hair and made immediate plans to leave town. At trial, Carpenter denied overhearing any conversation about the Halloween shooting. He did testify that McClain sold a .38-caliber gun to another cousin, Michael Thompson, who was later arrested in possession of it.

Troy Welcome corroborated a number of Carpenter's statements. Welcome saw McClain in Tulare on November 2, 1993, when McClain got into Welcome's car and placed a gun on his lap. McClain hinted, by singing along with a popular song, that the gun had been used in a shooting. He sang the same song at a park later that weekend. McClain told Welcome he was "on the run."

McClain was on parole but stopped reporting for appointments after October 25, 1993. Flying from Ontario, California to Memphis, Tennessee on November 7, he told a fellow passenger that he was traveling under an assumed identity. He said he did not fly out of Los Angeles because he believed there was additional police scrutiny there.

c. *Newborn*

Holmes's cousin DeSean[8] testified for the prosecution against Newborn. After DeSean was arrested in 1995 for burglarizing McFee's house, he and Newborn were housed in the

---

[8]     To avoid confusion with defendant Holmes, we refer to DeSean Holmes by his first name.

Wayside Jail. Newborn told DeSean that he went to McFee's house on Halloween 1993 and "got into it" with some people there. Newborn said he shot at McFee's house from across the street using a Glock nine-millimeter handgun.

Newborn also described the Wilson Street shooting. That night, he was riding around with people who said they were shooting Crips. Newborn insisted the shooting was not his fault. After they had circled the block once, a fellow passenger said, "those are the Crips right there," and shooting broke out. Newborn hoped to use a girl as an alibi, but he could not get in touch with her.

DeSean was a reluctant witness because his mother had been threatened. Newborn had also told DeSean directly that, if he ever got out of custody, he would "smash everybody that was on his list." DeSean assumed he was among them.

### 4. Defense Evidence

Holmes, McClain, and Newborn each put on a defense.

Holmes presented evidence that on Halloween he was home with his wife and infant son at 6:30 p.m., left to go to the hospital after learning of the Hodges shooting, and was home by 10:00 p.m.

McClain testified that he had turned himself in and denied any involvement with the shootings. He went to Tulare after Halloween and saw Carpenter, but only went there to sell drugs. McClain denied speaking with Welcome or telling Stevens he had "put in some work." He admitted being present when Price was shot but said he was not the shooter.

Newborn called Shawntia Blaylock, a woman who had been dating Hodges and was at the hospital the night he died.

Although she recalled seeing many people, neither Newborn nor the witness who claimed to have seen him was present. Newborn also presented evidence that he had not learned of Hodges's death until the following day.

## B. *Penalty Phase*

The first jury hung at the penalty phase. The discussion below relates evidence presented in the retrial. McClain was represented by counsel at the guilt phase and first penalty phase. As discussed further below (see *post*, at pp. 97–106) he chose to represent himself at the penalty retrial and was assisted by advisory counsel.

### 1. *Victim Impact*

#### a. *Edgar Evans*

Robert N., Evans's cousin, had taken cover during the gunfire, then ran to the injured. Crawford and Coats lay on the ground, and his cousin was on some stairs crying for his mother. Robert suffers continuing distress from the loss of his friends.

Evans's mother testified about their last conversation, when she gave him permission to go to the Halloween party. She had asked Evans to call home if he would be late, and she became concerned when she had not heard from him by 10:00 p.m. She considered calling the police but decided against it. Shortly after 11:00 p.m., another mother called to tell her about the Wilson Street shooting and suggested she go to the hospital. There, she saw Evans's feet on a stretcher and knew it was her son. A nurse gave her Bible verses found in Evans's pocket.

A cousin testified that after the murder Evans's mother was "really out of it. She didn't want to eat, couldn't sleep, just cried most of the time." Evans's older sister was also distraught. She did not understand how her brother could have been

murdered when he was just walking home from a party. She stopped attending school and became afraid to leave the house. Evans's father also took the death poorly, losing business and retreating socially.

Neighbors remembered Evans as a kind and helpful child who attended church with his mother. He was a talented writer and had won an essay contest on Dr. Martin Luther King, Jr.'s "I Have a Dream" speech.

### b. *Stephen Coats*

Kenneth Coats described the immediate aftermath of the shooting. When the gunfire stopped, he left his hiding place to look for Stephen. His mother, sister, and aunt approached as he reached his brother's body. Kenneth wanted to pick him up and take him home, but his mother explained that the police needed to investigate. Stephen's body was partially wrapped around a tree, and Crawford's lay partially in the street. Kenneth implored his friends to get up before realizing they were dead.

Stephen's mother testified about seeing her son with the other youngsters just moments before his death. When she pulled into her driveway and heard gunshots, she ran back toward the children. She saw Stephen's body lying on the ground with a head wound. He had no pulse. She recalled telling Kenneth not to move his brother's body and holding her 12-year-old daughter. She knew she should leave the scene so the investigators could work, but explained, "I had to virtually drag my kids home. . . . For the first time in my life I had three kids to bring home, I had to leave one behind. And that was the most difficult thing I had to do."

Stephen's father learned of the shooting later that night when his daughter called, crying and inconsolable. He felt

"disbelief, surprise, shock," and "kept thinking, well, it was Halloween, maybe they are playing a cruel joke or something." Mr. Coats went to the scene and testified that he would "never forget" the image of his son "lying on the ground . . . lifeless, ants crawling on his face, in his nose, the bullet hole in his head." Coats blamed himself for his son's death, believing the child would still be alive if he had insisted he spend Halloween at home.

Stephen enjoyed playing video games and basketball. A talented artist, he had painted a mural at Washington Middle School.

### c. Reggie Crawford

Crawford's mother had not wanted her children to go trick-or-treating because she felt it was dangerous but allowed Crawford to attend a party instead. In their last conversation, she hurried her son out the door, telling him he looked nice. She drove past the boys as they walked home later that night but continued on because the group would not fit in her car. About five minutes later she heard gunshots; then Robert N. ran in saying her son had been shot. The crime scene was blocked off, and officers told her to go to the hospital. Once there, she was not allowed to go past the waiting area even though she insisted her son had been hurt and she needed to see him. She still did not know he had died. She eventually went home to wait for news and did not learn of Crawford's death until hours later. Telling her other children was like going "through living hell" because "they didn't know how to handle it."

### d. Surviving Victims

Some of the other youngsters who were fired upon testified. Lloyd S. was 12 years old that night. He said the

12

shooting affected his life in many ways and "hurt" him. He was unable to attend school afterward and began studying at home instead.

Lawrence A. was 14 years old that Halloween. He was shot in the leg when he left his hiding place to call for his friends. His brother, A.A., and cousin, A.P., were also hit. When Lawrence saw that Coats and Crawford were on the ground and bleeding profusely, he "went into shock" because there was nothing he could do. He heard Evans moaning but stayed with his injured brother and cousin until the ambulance arrived. Lawrence said the experience taught him it is difficult to make it on the streets and "[y]ou never know who is coming."

A.A., then 13 years old, was shot in the hand and experienced lingering problems from the injury. He recalled seeing his friends' bodies on the ground and hearing a woman screaming. He described removing a bandana from one friend's head to keep as a memento.

### 2. Aggravating Conduct

#### a. Holmes

Holmes had been arrested on August 3, 1990, for having a loaded gun in his pocket at a carnival.

When the guilty verdict in this case was announced, Holmes yelled at the jury: "Fuck you, you motherfuckers. P-9 rules."

#### b. McClain

McClain had felony convictions for grand theft auto and three instances of possessing a firearm as a felon. The prosecution also presented evidence of several unadjudicated violent offenses.

On July 27, 1989, Raquel Flores was parked in front of her home when McClain approached and asked if a certain person lived there. When she said no, McClain reached forward, pulled the chains from around her neck, and ran away. Flores identified McClain in a field show-up half an hour later.

On August 9, 1990, Bernard Rowe and Bryant Cook stood in Rowe's front yard when McClain and another man approached with handguns and stole a Mustang from the driveway. They were stopped by police 10 minutes later, and Rowe identified McClain as the thief.

In 1995, while incarcerated, McClain tried to attack another inmate. Afterward, McClain was found with a jail-made stabbing implement, or shank.

During this trial, after witness Joseph Petelle testified and was leaving the courtroom, McClain said, "I'll kill you." McClain also threatened deputies. McClain asked a deputy why his belt was warm and learned it was because the deputies had just tested it. When Newborn noted that his belt was cold, McClain said, "if you do one of us, you'll have to do us all." Newborn then said, "if you push one button . . . ." When a deputy asked what had been said, Newborn repeated McClain's threats and added, "If you push one button, then you better push all three, because you know what I'm going to do." McClain then said, "Don't get within two feet of me or I'll kill you, and I'll [*sic*] have weapons this time." (See further discussion, *post*, at pp. 111–113.)

### c. *Newborn*

Newborn was involved in two fights in 1986 while a ward at California Youth Authority. In the first, he was the "clear[] aggressor," striking a fellow ward after an argument. In the

second, he broke away from a supervisor while being disciplined, hopped over a barrier, and started fighting with another ward.

The jury heard evidence of domestic violence Newborn committed against several partners. Arguing with Tanchell Anderson shortly after their relationship ended in 1991, name-calling escalated to an exchange of blows. Anderson told police Newborn had knocked her to the ground and punched her in the face about 30 times.

When Newborn was dating Aneadra Keaton in 1992, he once broke into a house she was visiting and assaulted her, pushed her down a stairway, and forced her to leave. Another time, Newborn hit Keaton several times during an argument.

Detrick Bright was driving a car in August 1992 when Newborn kicked in her car window, injuring her with broken glass. In 1993, he took her pager and hit her several times. When police arrived, Newborn resisted and had to be subdued with mace. Later that year, Newborn sprayed the then-pregnant Bright in the face with household cleaners.

In November 1992, Rochelle Douglas had been dating Newborn for over three years and was eight-and-a-half months pregnant with his child. One day they argued, and Newborn asserted the child was not his. He told her not to "put the baby in his name" when it was born or he would hurt her. He then hit her several times in the face.

Two other incidents were introduced. In 1992, Newborn threatened Louise Jernigan with a gun during an argument. In May 1993, he resisted arrest. Officers responding to reports of an armed man asked to search Newborn and directed him to place his hands on his head. He refused to comply, yelling curses and attempting to incite a nearby crowd.

### 3. *Mitigation*

#### a. *Holmes*

Holmes presented evidence to cast doubt on the guilt verdicts. An officer with the Pasadena Police Department gang unit testified that he did not personally see whether any P-9 members were present at the hospital on Halloween night. Eyewitness Gabriel Pina conceded that his description of the cars on Wilson Street was vague and partially inaccurate. A detective testified that, in photographs, Holmes did not appear to have a ponytail or to be "fat and flabby," as Kenneth Coats described the two men who fled from the shooting.

Holmes's father had raised Holmes and his three siblings, after his wife's sudden death. His early childhood was uneventful until his mother's passing when Holmes was 14 or 15 years old. An aunt testified that the mother's unexpected death had a profound impact on Holmes and the entire family. The family was close, and Holmes's execution would affect them all.

#### b. *McClain*

McClain's advisory attorney testified that, as witness Petelle passed by counsel table McClain actually said: "You're a dickhead," not "I'll kill you."

The mother of McClain's daughter testified that it would sadden her and all her children if McClain were executed. McClain's mother testified that it would be hard for the family to deal with her son's execution because they believed him to be innocent.

c. *Newborn*

Newborn disputed Jernigan's testimony, asserting he did not brandish a weapon or speak to her at all.

Newborn's mother testified that he was born when she was in high school and already had another child. During the five years she was married to Newborn's father, he abused her. After the divorce, Newborn's relationship with his father was hostile. He was close to two of his brothers until one was killed and the other incarcerated. Fernando Hodges then became a close friend and remained so until his death.

Newborn suffered various physical and intellectual infirmities. He walked with a noticeable limp and was teased by his peers. As a child, he repeatedly ate laundry detergent if it was not stored properly. In his early teen years he wet the bed. He was hospitalized with three childhood head injuries but treated only with aspirin. Newborn was sent to juvenile camp at age 13 and California Youth Authority at age 15. Suffering from a learning disability and speech impediment, he was ultimately labeled intellectually disabled. Of the 500 students at the California Youth Authority, his I.Q. ranked 490th. He was medicated for being "hyper" and developed a tolerance. After he received increasingly higher doses, it was "like he just wasn't [t]here."

## II. DISCUSSION

### A. *Guilt Phase*

#### 1. *Pretrial Issues*

##### a. *Joinder/Severance*

###### i. *Joinder of Crimes*

McClain contends the court erred in failing to sever the attempted murder of Price from the Wilson Street shooting charges.[9] The court acted within its discretion.

The law favors trying all charged offenses together. (*People v. O'Malley* (2016) 62 Cal.4th 944, 967 (*O'Malley*).) Section 954 provides in pertinent part: "An accusatory pleading may charge two or more different offenses . . . of the same class of crimes or offenses, under separate counts." Murder and attempted murder, both of which are "assaultive crimes," are

---

[9] As all three defendants have done with regard to virtually every claim, McClain asserts "that the error violated his rights to a fair trial and reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the California Constitution. In most instances, defendant[s] failed to make these constitutional arguments in the trial court. Nevertheless, unless otherwise indicated, we consider the merits of these newly raised arguments because either (1) the appellate claim is of a kind that required no objection to preserve it, or (2) the claim invokes no facts or legal standards different from those before the trial court, but merely asserts that an error had the additional legal consequence of violating the Constitution. [Citation.] In those circumstances, defendant[s'] new constitutional arguments are not forfeited on appeal. [Citations.] Where rejection of a claim of error on the merits necessarily leads to a rejection of the newly asserted constitutional objection, no separate constitutional analysis is required and we have provided none." (*People v. Virgil* (2011) 51 Cal.4th 1210, 1233–1234, fn. 4.)

offenses " ' "of the same class" ' " and may be joined for trial. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1128; see *People v. Miller* (1990) 50 Cal.3d 954, 987.) A denial of severance is reviewed for abuse of discretion. (*Zambrano*, at p. 1128.) " 'The state's interest in joinder gives the court broader discretion in ruling on a motion for severance than it has in ruling on admissibility of evidence.' " (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221.) Where, as here, the statutory requirements for joinder are met, the defendant must make a clear showing of prejudice to demonstrate that the trial court abused its discretion. (*Ibid.*)

In reviewing such a ruling, we consider: "(1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case." (*O'Malley*, *supra*, 62 Cal.4th at p. 968.) McClain contends each of these factors supported severance, making joinder of the charges an abuse of discretion.[10]

" ' "[T]he first step in assessing whether a combined trial [was] prejudicial is to determine whether evidence on each of the

---

[10] He also maintains the court failed to exercise its discretion at all. The record reveals otherwise. The court reviewed the motion and opposition documents, all of which comprehensively argued the opposing positions on severance. It then ruled on the motion. Its care was evident in its express acknowledgment that facts might later emerge warranting reconsideration of that decision.

joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled." ' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 948.) Although cross-admissibility is not "a precondition to joinder of charges" (*O'Malley*, *supra*, 62 Cal.4th at p. 968, citing § 954.1), its existence negates prejudice. (*Jenkins*, at p. 948.) McClain asserts that evidence of the charges was not cross-admissible because there were no common elements between offenses and the offenses did not relate to one another. That is not the case. Evidence of the attack on Price *would* likely have been admissible in a hypothetical separate trial on the Halloween charges because it was relevant to prove McClain's state of mind. Evidence of uncharged crimes may be admitted when relevant to prove a disputed fact, like a defendant's intent or motive. (Evid. Code, § 1101, subd. (b).) Like the Halloween shootings, the Price attack was clearly gang-motivated, as evidenced by Price's testimony that McClain said "thank you, Blood" when handed a cigarette. McClain concedes this was a gang-related insult, because Price was a member of the Crips. But the connection between the shootings surpasses simple gang enmity. The shootings appeared to be connected in a sequence of retaliatory violence. (See *People v. Price* (1991) 1 Cal.4th 324, 388–389 (*Price*).) Three days after Bloods member McClain shot Crips member Price without provocation, a Crips member shot and killed Bloods member Hodges in the same apartment complex. The Wilson Street shootings took place within hours. Holmes and McClain told others the shootings were in retaliation for the Hodges killing. Someone was heard to say: "now Blood," right before the gunfire began. Newborn told his cousin he shot at McFee's house and later rode with others looking for Crips to shoot. Even McClain, then

representing himself, agreed this "chain of events" made defendants "look guilty."

McClain next asserts the Halloween charges were unduly inflammatory, rendering joinder with the Price charge improper. Although the Halloween shootings garnered significant media attention, both crimes were demonstrably cruel. (See *Price*, *supra*, 1 Cal.4th at p. 390.) Price was shot in the face at close range, his kind act for a stranger repaid with gunfire. Indeed, McClain concedes the gang aspect of the Price shooting rendered it "inherently inflammatory." The Halloween shootings were in the same vein. As in the *Price* case, the incidents were "different in their particulars," but "equally abhorrent." (*Id.* at p. 390.)

Nor is there a concern that joinder could improperly enhance a weak case. Strong evidence implicated McClain in both offenses. Price selected McClain's image from a photographic lineup before he knew McClain's name. He testified emphatically and consistently that McClain shot him. A great deal of evidence also confirmed McClain's involvement in the Halloween shootings. McClain admitted his involvement to Stevens and showed Welcome a gun he had used in a shooting. He changed his appearance, failed to meet with his parole officer, and fled the area days after the crimes. He told a fellow passenger he was traveling under an assumed identity and feared police detection. Given the strength of the evidence of McClain's involvement with both the Price and Halloween crimes, failure to sever did not lead to two separate, weak cases becoming one in the minds of jurors, as McClain claims.

Finally, the fact that this is a capital case does not demand a different outcome. "Even where the People present capital

charges, joinder is proper so long as evidence of each charge is so strong that consolidation is unlikely to affect the verdict." (*People v. Ochoa* (2001) 26 Cal.4th 398, 423; accord, *O'Malley*, *supra*, 62 Cal.4th at p. 969.) That standard was met here.

## ii. *Joinder of Parties*

Each defendant moved repeatedly to sever his case from those of his codefendants. Defendants now argue the court's refusal to grant severance resulted in error under *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), violating their right to confront and cross-examine witnesses against them. There was no error.

### 1) *Legal Principles*

The law of joinder and severance is settled. "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they *must* be tried jointly, unless the court order[s] separate trials." (§ 1098, italics added.) The Legislature has " ' "expressed a preference for joint trials" ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 378 (*Bryant, Smith and Wheeler*)), which promote efficiency " 'and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." ' " (*Id.* at p. 379, quoting *Zafiro v. United States* (1993) 506 U.S. 534, 537 (*Zafiro*).) We review a denial of severance for abuse of discretion, considering the facts as they appeared at the time of the ruling. (*Bryant, Smith and Wheeler*, at p. 379.) If the ruling was proper when made, a reviewing court may reverse only upon a showing that joinder " ' " 'resulted in "gross unfairness" amounting to a denial of due process.' " ' " (*Ibid.*)

The confrontation principles applicable in joint trials are also well established. A criminal defendant has a Sixth Amendment right to confront and cross-examine adverse witnesses. (*Pointer v. Texas* (1965) 380 U.S. 400.) "A problem arises when a codefendant's confession implicating the defendant is introduced into evidence at their joint trial. If the declarant codefendant invokes the Fifth Amendment right against self-incrimination and declines to testify, the implicated defendant is unable to cross-examine the declarant" about the confession. (*People v. Lewis* (2008) 43 Cal.4th 415, 453 (*Lewis*).)

The United States Supreme Court addressed this concern in *Bruton*. It held that when a nontestifying codefendant's confession is admitted and implicates the defendant, the defendant's right to cross-examination is violated. (*Bruton, supra*, 391 U.S. at pp. 127–128.) A jury instruction to disregard the codefendant's statement in assessing the defendant's guilt will not cure the violation. (*Id.* at pp. 135–137.) "The high court reasoned that although juries ordinarily can and will follow a judge's instructions to disregard inadmissible evidence, 'there are some contexts in which the risk that the jury will not, or cannot, . . . is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.' " (*Lewis, supra*, 43 Cal.4th at p. 453.) We had reached a similar conclusion in *Aranda*, explaining that if the prosecution seeks to introduce a statement in which one codefendant implicates another, the trial court may address the request in one of three ways. It may:  (1) admit the statement but ensure it is redacted to eliminate references to codefendants; (2) grant severance if redaction is impossible; or (3) exclude the statement. (*Aranda, supra*, 63 Cal.2d at pp. 530–531.)

The high court has continued to refine these rules. In *Richardson v. Marsh* (1987) 481 U.S. 200, 211, it explained, "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." In *Gray v. Maryland* (1998) 523 U.S. 185, 192 (*Gray*), however, it clarified that when the redaction "simply replace[s] a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indication[] of alteration," the resulting statement must be excluded as indistinguishable from the statements in *Bruton*. "When, despite redaction, the statement obviously refers directly to the defendant, and involves inferences that a jury ordinarily could make immediately, even [where] the confession [is] the very first item introduced at trial, the *Bruton* rule applies and introduction of the statement at a joint trial violates the defendant's rights under the confrontation clause." (*People v. Burney* (2009) 47 Cal.4th 203, 231.)

2) *Discussion*

a) *Claims Related to DeSean Holmes's Testimony*

McClain and Holmes moved for severance before trial, arguing Newborn had made statements after his arrest that implicated them.[11] The prosecution proposed to redact the

---

[11] Newborn had previously sought severance based on general *Aranda/Bruton* concerns. The court denied the motion without prejudice, assuring the parties it would exclude "anything that looks like or smells like *Aranda/Bruton* issues."

statements to avoid the implication, and the motions were denied. The motions were renewed before DeSean Holmes was called to testify about incriminating statements Newborn made during their joint incarceration. Previously, the prosecution had agreed that DeSean would not be required to testify about his cousin, Holmes. McClain protested that DeSean's examination would result in the presentation of "half-truths" and inferences that would not be subject to cross-examination. He and Holmes sought severance and a mistrial. The motions were denied.

DeSean testified that Newborn said he had shot at McFee's house on Halloween and also rode around with people who were shooting at Crips. DeSean mentioned no names in his testimony and gave no evidence incriminating Holmes or McClain. Further, the court instructed that DeSean's testimony was offered against Newborn alone. Nevertheless, McClain and Holmes both contend DeSean's reference to unnamed others who committed crimes with Newborn allowed the jury to infer that they were the accomplices Newborn identified. No *Aranda*/*Bruton* error occurred, and the court did not abuse its discretion in denying severance. (See *Lewis*, *supra*, 43 Cal.4th at p. 455.)

DeSean's testimony conveyed precisely the type of redacted statement *Aranda* contemplated. A defendant's confrontation right is not violated if a codefendant's statement can be redacted to eliminate a specific reference. (*Aranda*, *supra*, 63 Cal.2d at pp. 530–531.) Although the high court later held that the right to confrontation is offended when a redaction refers directly or by clear inference to a given defendant (*Gray*, *supra*, 523 U.S at p. 192), the redaction here comported with *Gray*'s holding. There was ample evidence that a sizable group was involved in the Wilson Street attack. DeSean's testimony

referred to unspecified and unenumerated "others" who had accompanied Newborn. This group could have included anyone. Neither McClain nor Holmes was implicated by this purposefully vague reference, and no prejudice resulted from the statement's introduction.

McClain argues to the contrary, raising two concerns unrelated to Newborn's statements. First, McClain complains he was erroneously prevented from cross-examining DeSean about DeSean's invocation of the privilege against self-incrimination regarding a separate shooting incident. Although DeSean described himself as a crime victim in that incident, the parties later stipulated he was not, in fact, a victim. McClain asserts this limit on his ability to cross-examine DeSean, coupled with the redacted statement, allowed the jury to infer that he, McClain, was involved in both the shooting incident DeSean referred to and the Halloween shootings Newborn described. The argument is unpersuasive. The trial court appropriately guarded DeSean's invocation of his right against self-incrimination. Nothing about this ruling rendered Newborn's redacted statement suggestive of McClain's involvement with the Halloween shooting. The two simply do not relate, and McClain's efforts to conflate them fail.

Second, McClain argues it was error for the court to deny his severance motions because it had granted the prosecution's motion to sever Bowen and Bailey and there was no meaningful distinction between the cases. McClain's attorney apparently accepted the court's decision at the time, because he requested only an opportunity to revisit how redacted statements would be used before their admission. The court accommodated this request. Assuming the current argument was not forfeited, it lacks merit. Each severance denial is evaluated based on

circumstances known to the trial court at the time the decision is made. (*Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 379.) Although McClain argues the severance of Bowen and Bailey belies any concern about judicial economy, these concerns would only have *increased* with further divisions. Each successive severance would tax scarce resources, burdening both the court and witnesses who would be compelled to return to testify in multiple trials.[12] The trial court explained as much, stating, "We have severed off . . . two clients. The building is bankrupt; the county is bankrupt. Separate trials for every defendant would be unacceptable to everyone." Even considering the severance of two other codefendants, the court did not abuse its discretion in denying McClain's motion; he has not shown that the resulting consolidated trial was grossly unfair. (See *People v. Turner* (1984) 37 Cal.3d 302, 313.)

Holmes's claims are also unavailing. DeSean testified that he saw Holmes with Hodges and others in October 1993. To the extent this testimony implicated Holmes in a crime, it did not offend the confrontation clause because DeSean was available for cross-examination. (See *Bruton*, *supra*, 391 U.S. at pp. 127–128, 135–137.) Moreover, the jury was given CALJIC No. 2.07, telling them to consider DeSean's testimony only against Newborn. Jurors are generally presumed to follow instructions. (*People v. Sandoval* (2015) 62 Cal.4th 394, 422.)

Holmes also contends the joint trial prevented him from cross-examining DeSean about his statements in a telephone conversation with defense counsel. DeSean claimed Newborn's

---

[12] We note that the guilt phase lasted well over four months, including jury selection. It involved 73 witnesses and 173 exhibits, including lengthy audiotapes.

attorney called him and said he "had the right not to say anything and . . . do what Fuhrman did in the O.J. trial."[13] Newborn's attorney disputed DeSean's account, noting that Holmes's attorney had also participated in the call. Although Holmes's attorney agreed the conversation "did not go the way [DeSean] is saying," he was uncomfortable about potentially becoming an impeachment witness. Newborn insisted it was important to impeach DeSean. Ultimately, DeSean asserted that it was counsel for Holmes, not Newborn, who told him he could decline to testify and invoke the Fifth Amendment. He was not challenged on the point during his testimony.

Holmes claims his attorney's efforts to examine DeSean were "completely ineffective" because he could not impeach DeSean without becoming a witness. He contends the jury could have been left with the impression that he was trying to manipulate the legal system, an inference that may have been exacerbated by introduction of the agreement that DeSean would not be testifying against him. Holmes did not object on this basis at trial. Even assuming the claim is not forfeited, it fails on the merits.

---

[13] As was widely reported and televised at the time, Mark Fuhrman was a former Los Angeles Police detective and central figure in the O.J. Simpson murder trial. Fuhrman was called to testify about evidence he recovered at the Simpson estate, including a bloody glove. On cross-examination, he was asked about his history of using racial epithets against African-Americans and testified that he had not done so during the past decade. He was impeached with numerous recordings in which he used such an epithet. Asked whether he planted or manufactured evidence in the Simpson case, he invoked his Fifth Amendment privilege against self-incrimination.

Although it is true that Holmes's attorney did not examine DeSean in depth about the referenced conversation, the impeaching point was definitively made. The parties expressly *stipulated* that at no time did counsel for Holmes encourage DeSean to invoke the privilege or otherwise encourage him not to testify. The stipulation effectively impeached DeSean's testimony, and counsel could reasonably have chosen to rely on it instead of pursuing the potentially risky strategy of further probing the issue on cross-examination.

Nevertheless, Holmes claims his right to counsel was impaired by his attorney's conflict. The Sixth Amendment and California Constitution guarantee the right to loyal and conflict-free counsel. (*People v. Doolin* (2009) 45 Cal.4th 390, 417–418.) "In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest '*that affected counsel's performance* — as opposed to a mere theoretical division of loyalties.' " (*Id.* at p. 417.) An adverse impact on performance is shown by demonstrating counsel did or did not do something he otherwise might have done absent the conflict. (*Id.* at pp. 417–418.) Holmes fails to show the existence of any actual impact on his counsel's performance. Nor has Holmes shown prejudice from any such asserted conflict. To obtain relief for ineffective assistance of counsel, a defendant must show both deficient performance "and a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different." (*Id.* at p. 421.) Here, the jury was instructed that DeSean's testimony pertained only to Newborn. (See *People v. Sandoval, supra,* 62 Cal.4th at p. 422.) The parties had also stipulated, contrary to DeSean's testimony, that Holmes's attorney never advised DeSean along the lines he alleged. Thus,

the jury would have understood that DeSean's testimony did not relate to Holmes and his allegations about Holmes's attorney were agreed to be untrue.[14]

Holmes also claims the joint trial resulted in gross unfairness because DeSean's agreement not to testify against him may have implied that DeSean either feared, or was trying to protect, him. However, the agreement made clear that questions from other defendants could be limited only to the extent permitted by law. DeSean was thus aware of the possibility he would be asked about Holmes, and he agreed to answer any such questions honestly. Although DeSean indicated that he was afraid of some people, he never testified that he feared Holmes. Nor did his testimony suggest he was protecting his cousin. It is speculative to conclude the jury would have drawn the negative inferences Holmes suggests. Moreover, any such inference would have been cured by the jury's instruction to consider DeSean's testimony against Newborn alone.

> b)  *Claims Related to Derrick Tate's Testimony*

During an Evidence Code section 402 hearing, Newborn raised an *Aranda* issue concerning Derrick Tate's expected testimony that Holmes had said he, Newborn and one Ernest

---

[14]  Separately, Holmes suggests the conflict gave rise to misconduct because the prosecutor's closing argument alluded to DeSean's statement about Holmes's attorney. However, the prosecutor immediately corrected his statement after an objection was raised. The fleeting comment, immediately corrected, does not constitute prosecutorial misconduct rendering the trial grossly unfair.

Holly committed the Halloween shootings. The prosecutor responded that Tate had been instructed not to mention Newborn or McClain, and the court stressed that Tate could only refer to any of Holmes's coparticipants by generic pronouns, such as "others." The court permitted McClain to elicit that he was not among the "others" Holmes had mentioned. When Newborn objected, noting he would be unable to extract similar testimony, the prosecutor proposed a limiting instruction, to which Newborn agreed.

The jury was told that Tate's testimony "concerning the statement of Karl Holmes [was] limited to defendants Karl Holmes and Herbert McClain." When Tate testified, he did not identify the "others" Holmes had mentioned. He did agree that Holmes said McClain had not been involved.

Newborn now argues Tate's testimony implicated him by process of elimination, in violation of *Aranda/Bruton* principles. Not so. The court reasonably concluded Newborn's concerns could be sufficiently addressed by redaction and a limiting instruction. Tate was directed to refer only to "others" who joined Holmes in the shooting, and he complied with this direction. Moreover, Newborn specifically agreed to a limiting instruction that the "others" did not include McClain. There was extensive evidence that a large group converged upon the hospital after Hodges was shot and that several cars full of people flashing P-9 signs were present on Wilson Street immediately before the shooting. Any mention of "others" was broad enough to avoid the specific inference of which defendants complain. Nor did the court abuse its discretion in denying severance before Tate testified. (See *Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 379.) " '[A] trial court *must* order a joint trial as the "rule" and *may* order separate trials only as an

"exception." ' " (*People v. Cleveland* (2004) 32 Cal.4th 704, 726.)
"[I]mportant concerns of public policy are served if a single jury
is given a full and fair overview of the defendants' joint conduct
and the assertions they make to defend against ensuing
charges." (*Bryant, Smith and Wheeler*, at p. 379.) Separate trials
may be warranted under certain circumstances, including
conflicting defenses, incriminating confessions, confusing
differences in the charged counts, risks of prejudice from
association with codefendants, or possibilities for exoneration by
codefendants testifying in a separate trial. (See *ibid*.) None of
those circumstances is present here. Apart from an additional
charge against McClain, the defendants faced nearly identical
charges. There was little risk that evidence on multiple counts
would engender confusion. (See *Cleveland*, at p. 726.) Strong
cases existed against each defendant, and there is no reason to
think that any of them was prejudiced by association with any
other. Nor is there an indication any defendant would have
given exonerating testimony in a separate trial. (See *ibid*.) They
did not offer conflicting defenses, and the case did not involve a
confession by any defendant incriminating the others. (*Ibid*.) As
in *People v. Cleveland*, "this was a classic case for joint trial."
(*Ibid*.)

> c) *Claims Regarding Defendant
> McClain's Testimony*

Holmes and McClain both moved for severance before
McClain testified. Holmes worried he would be implicated by
McClain's statement to Carpenter about the shooting of people
he thought were Crips but later learned were children.
McClain's motion similarly sought to prevent the prosecution
from asking about this statement. The court denied the motions,

reasoning that the prosecution had a right to impeach McClain with prior inconsistent statements if he chose to testify.

Holmes now claims something akin to *Griffin* error occurred during McClain's testimony because, by examining McClain about his decision to testify, the prosecutor came close to commenting on Holmes's silence. In *Griffin v. California* (1965) 380 U.S. 609, 615, the United States Supreme Court held the Fifth Amendment forbids the prosecution from commenting on a defendant's silence at any phase of trial. No *Griffin* error occurred here. On cross-examination, McClain asserted that prosecution witnesses were lying, and he was telling the truth. The prosecutor challenged this assertion by asking whether McClain would "get up there and admit it" if he had killed the victims. Understood in context, this question related to McClain's *own* credibility and was not an impermissible commentary on the codefendants' silence. Indeed, McClain's response endorsed his codefendants' decision not to take the stand. He said, "my homeboys got to do what their lawyers tell them for their best interest." He explained that he was not doing the same because he did not believe his attorney had his best interests in mind. Rather than be "railroad[ed]," he wanted to take the stand to speak the truth. Jury instructions also addressed the issue. Specifically, the jury was told: (1) a question is not evidence and is useful only to the extent it helps jurors understand the response; (2) a defendant has the right not to testify and no inferences may be drawn from the decision not to do so; and (3) "[i]n deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him." Accordingly, the court had no obligation to sever Holmes's

trial from McClain's on its own motion. (*People v. Turner, supra,* 37 Cal.3d at p. 313.)

Separately, although he did not seek relief below, Newborn contends the court erred in failing to sever his case or grant a mistrial sua sponte because McClain's testimony would not have been admitted against him in a separate trial. In *Zafiro, supra,* 506 U.S. at page 539, the United States Supreme Court explained that severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants," which might occur if evidence admitted against a codefendant would have been inadmissible in a trial against the defendant alone. However, the high court *rejected* the argument Newborn makes here. It explained: "A defendant normally would not be entitled to exclude the testimony of a former codefendant if the . . . court did sever their trials, and we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant." (*Id.* at p. 540) Newborn fails to show how he could have been prejudiced. McClain asserted that *all three* defendants were innocent, that Newborn and Holmes heeded their attorneys' advice not to testify, and that he was testifying against his lawyer's advice because he felt "railroad[ed]." Finally, nothing in the record suggests the jury was "unable or unwilling to assess independently the respective culpability of each codefendant or [was] confused by the limiting instructions." (*People v. Ervin* (2000) 22 Cal.4th 48, 69; see *Zafiro,* at pp. 540–541.)

### b. *Jury Selection*

### i. *Cause Challenge*

Defendants contend the for-cause excusal of Juror No. 126 deprived them of due process and a representative jury. The claim fails.

### 1) *Background*

Juror No. 126 expressed considerable ambivalence about the death penalty in her questionnaire. Asked for her general feelings on the subject, she responded: "I'm for the death penalty I think. I never <u>really</u> thought about it. — Ambivalence — " When asked whether California should have the death penalty, she checked both the "yes" and "no" boxes and wrote, "I think so, but I don't know at this time." She marked "yes" when asked whether it would be difficult for any reason to sit on a case where she would be called upon to impose the death penalty, adding, "who would not find it difficult to make a decision regarding someone's life." Although stating it would not be impossible for her to vote for either outcome, she acknowledged she would not like the responsibility of casting a vote that would cause someone to be executed. She did not know whether she might refuse to find special circumstances true, regardless of evidence, to avoid having to consider penalty. She explained: "I'm really not sure how I feel about the death penalty. I gues[s] it would be ambivalence. On <u>one hand</u> I believe in time and with help people can change. These [*sic*] way of life, how they see and do things. On the <u>other</u> maybe there are some people who will never change, who have no conscious, remorse or any feelings of guilt."

During voir dire, Juror No. 126 repeated that her position toward the death penalty was best described as "ambivalent."

When the court explained the jury's role in evaluating penalty phase and asked whether Juror No. 126 was capable of participating in those deliberations, she replied she was "not certain" she could. The court asked whether there were any circumstances in which she could impose the death penalty, observing that if she and her fellow jurors voted in favor of death, they are "actually . . . the one[s] putting that person to death." Given additional time to consider her feelings, the juror explained she had given it a great deal of thought and remained uncertain whether imposing the death penalty was something she could do. The court then asked if Juror No. 126 would feel more comfortable not sitting on a death penalty case, and she responded, "I am sure we all would. Yes, I would." The court then indicated its intent to relieve her of service. McClain's attorney asked to inquire further, but the court denied the request. In a chambers conference immediately afterward, the court explained that it had asked enough questions and did not think further inquiries were needed. The court concluded the juror's "heart" would make her unable to serve in a capital case. The court offered defense counsel an opportunity to make a record of questions she would have asked, but counsel submitted the matter and raised no objection to the dismissal.

### 2)     *Discussion*

Defendants contend the court improperly refused to permit defense questioning and improperly excused the juror. Assuming the claims were preserved, they lack merit.

In a capital case, particular circumstances may support the excusal of a potential juror for cause. (*People v. Cash* (2002) 28 Cal.4th 703, 720.) The test is whether the juror's views toward capital punishment would " 'prevent or substantially

impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*).) A juror's bias need not be demonstrated with " 'unmistakable clarity' " (*ibid*.), however, and "deference must be paid to the trial judge who sees and hears the juror" (*id*. at p. 426). When a prospective juror has made conflicting or ambiguous statements, we accept as binding the trial court's determination on the juror's true state of mind. (*People v. Souza* (2012) 54 Cal.4th 90, 123.) An excusal for cause will be upheld on appeal " 'if supported by substantial evidence.' " (*People v. Jones* (2017) 3 Cal.5th 583, 615.)

We have also explained a party is entitled to ask questions that are specific enough to determine whether prospective jurors harbor bias, based on a fact or circumstance that may be shown by the trial evidence, and thus be unable to consider aggravating and mitigating evidence when determining penalty. (*People v. Cash*, *supra*, 28 Cal.4th at pp. 720–721.) Voir dire concerning death-qualification must thread the needle between two extremes, ensuring it is neither "so abstract that it fails to" identify jurors whose attitudes "would prevent or substantially impair the performance of their duties," and yet, not so specific as to encourage prejudgment. (*Id*. at p. 721.) Trial courts are vested with the considerable discretion necessary to accomplish this exercise. (*Id*. at p. 722)

The court was not obliged to permit further questioning on this record. (See *People v. Cash*, *supra*, 28 Cal.4th at p. 721.) Defendants challenge the court's refusal to allow inquiry about whether the juror could "shoulder the responsibility of sitting as a capital juror and render[] a judgment." But the record shows Juror No. 126 was questioned about this very subject. Defendants identify no other line of questioning they were

prevented from pursuing, and the record reveals none. The court said in camera that defendants could "make [their] record" and "ask questions." They declined, with McClain's counsel agreeing simply to "submit it." No error occurred.

The court's excusal for cause was within its discretion. As we have repeatedly held, the trial court is in the best position to assess the juror's demeanor. (*People v. Souza, supra*, 54 Cal.4th at p. 123.) It did so here, concluding Juror No. 126 did not wish to, and would ultimately be unable to, serve as a juror in a death penalty case. That decision is fairly supported by the record. The juror's questionnaire responses were consistently equivocal. It was clear she struggled to fully articulate her views and was uncomfortable with the death penalty and with her potential role in adjudicating it.

She provided a number of narrative responses in the questionnaire adding further reflections on capital punishment. Her views were discussed at length during voir dire. Her discomfort appeared palpable, prompting the court to twice offer her more time to reflect on her views. Both times she responded by expressing doubt that she could serve as a death penalty juror or vote for execution. Defendants' complaint that the court "short circuited" voir dire without sufficiently probing the juror's views is not well taken. A court must evaluate prospective jurors individually as they present themselves. Some are more able than others to express deeply held views and to make them understood. "[M]any prospective jurors 'simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear," ' but '[d]espite this lack of clarity in the printed record . . . there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.' ([ ]

*Witt*[, *supra*,] 469 U.S. [at pp.] 424–426 . . . .)" (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 258.) The court cannot artificially truncate the process or foreclose legitimate inquiry, but that did not occur here. The trial court carefully reviewed the juror's questionnaire responses and conducted thorough voir dire. After assessing Juror No. 126's demeanor in addition to her written and verbal responses, it concluded she was not qualified to serve. The court's decision is supported by the record, and we are presented with no reason to disturb it. (*Ibid.*)

### ii. *Peremptory Challenges*

Defendants contend the prosecution's use of peremptory challenges violated *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258. The trial court found there was no prima facie showing of discrimination. Although we find this issue to be close, we conclude there was not a prima facie showing on this record.

Three hundred and three panelists reported for evaluation as potential jurors. After excusals for hardship or cause, a group of 83 remained.[15] Of that number it appears from the judge's notes that at least 16 panelists were African-American women. The prosecution had exercised 12 challenges when the defense made a *Batson/Wheeler* motion challenging its use of peremptories against African-American women, "a cognizable

---

[15]    Our colleague in the dissent focuses on the 64 panelists actually examined rather than the total number in the venire. The discrepancy is significant. It is accurate to say that 64 panelists were examined. However, an advocate takes into account all those who may come into the box for consideration. All panelists are in play until the jury is finalized.

subgroup" for purposes of this analysis.[16] (See *People v. Clair* (1992) 2 Cal.4th 629, 652.) Of the 12 panelists excused at that point, six were members of the identified group. In ruling on the prima facie showing, the court stated it found nothing: "in the nature of bias or prejudice" in the excusals, in light of the jurors' questionnaire and voir dire responses. It concluded the prosecution had "a right to preempt those people they have done so far."

The law is clear and firmly established. " 'Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race.' " (*People v. Parker* (2017) 2 Cal.5th 1184, 1210 (*Parker*).) " 'Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution.' " (*Id.* at p. 1211.) The law also recognizes " 'a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination.' [Citation.] 'A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima

---

[16] Although at trial defendants challenged only the excusal of African-American women, some briefing mentions panelists from other protected categories. Our review is limited to the motion actually made. (See *People v. Bolin* (1998) 18 Cal.4th 297, 317.) Accordingly, we examine the propriety of the prosecution's excusal of panelists from the group identified at trial. (See *People v. Rhoades* (2019) 8 Cal.5th 393, 429, fn. 14.)

facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination. [Citation.] "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant]." ' " (*Ibid.*)

When this jury was selected in 1995, there was some confusion as to the nature of the required prima facie showing. In *People v. Johnson* (2003) 30 Cal.4th 1302, 1306, we held: "to state a prima facie case, the objector must show that it is more likely than not the . . . challenges . . . were based on impermissible group bias." The United States Supreme Court subsequently disapproved the "more likely than not" formulation as setting too high a threshold. Instead, it explained that *Baston*'s first step is satisfied if the objector produces sufficient evidence to support an inference that discrimination occurred. (*Johnson v. California* (2005) 545 U.S. 162, 170.) For cases tried before *Johnson v. California*, we have "adopted a mode of analysis under which, rather than accord the usual deference to the trial court's no-prima-facie case determination, we 'review the record independently to determine whether the record supports an inference that the prosecutor excused a juror on a prohibited discriminatory basis.' " (*People v. Rhoades*, *supra*, 8 Cal.5th at pp. 428–429.) We apply that analytical approach here and consider " 'all relevant circumstances' " in doing so. (*Id.* at p. 429.)

"A court may . . . consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel

any inference of bias." (*People v. Scott* (2015) 61 Cal.4th 363, 384.) Here, the trial court found no prima facie case of discrimination, and the prosecution was not asked to provide any reason for its challenges. Accordingly, our review is necessarily circumscribed.

In conducting our review "[w]e have identified certain types of evidence as 'especially relevant.' " (*People v. Rhoades*, *supra*, 8 Cal.5th at p. 429.) These include: whether a party has struck most or all of the members of the identified group from the venire; has used a disproportionate number of strikes against the group; or has only engaged the panelists in desultory voir dire.[17] (*People v. Rhoades*, at p. 429.)

Our independent review does not reflect the court erred. First, the court was well aware of, and sensitive to, the issue.

_____

[17] *People v. Rhoades* also noted as "especially relevant" factors " 'whether the defendant is a member of [the identified] group, and whether the victim is a member of the group to which a majority of remaining jurors belong.' " (*People v. Rhoades*, *supra*, 8 Cal.5th at p. 429.) Those factors are not implicated here. All three defendants and all victims are African-American males. As we discuss in greater detail below, 10 of the empaneled jurors were equally divided among African-Americans and Whites, with the remaining two jurors being of Hispanic descent. *Flowers v. Mississippi* (2019) 588 U.S. __, 139 S.Ct. 2228, 2243, a third stage *Batson* case, mentions two additions to the list of especially relevant factors: comparing panelists who were excused against those who were not, and evaluating whether the prosecutor misrepresented the record in defending the strikes. Because this is a first stage case, and the prosecution was not asked to defend its strikes, these relevant third stage factors are not at play here. Further we note that defendants do not assert they were precluded from presenting additional evidence or arguing the relevance of the *Flowers* factors based on the record.

Indeed, during a later in-chambers discussion of another issue, the court turned to the question of peremptory challenges, inviting both sides to consider the appearance that their pattern of challenges might convey to an observer. The court told both sides to "be careful," and elaborated: "I think your peremptories are proper, but you are giving the appearance of [bias]. I am not admonishing you. I'm just saying I'm sensitive to that on both sides."[18]

Turning to the pertinent "especially relevant" factors, the record reveals the following. African-American women comprised at least 19 percent of the 83 available potential jurors. When the motion was made, African-American women made up 26 percent of the 34 panelists who had been questioned. Yet the prosecution used six of its first 12 challenges to excuse them, a rate of 50 percent.[19] Those numbers are important and reflect an obvious disparity. But, as with most relevant factors, they must be considered in context. (See *Parker*, *supra*, 2 Cal.5th at p. 1212.) African-American women comprised 33 percent of the jurors ultimately seated, a proportion which slightly exceeded their representation among the 34 panelists who had been questioned when the motion was lodged.

---

[18] When the selected jurors were ultimately sworn the defense had excused nine Whites, two African-Americans, three Asian-Americans and one Hispanic. We emphasize that one party's *Batson/Wheeler* violation in no way excuses similar misconduct by the other side. (See *People v. Reynoso* (2003) 31 Cal.4th 903, 926.) We note these figures only to provide context for the court's observations.

[19] The other prosecution excusals were three White women, one Asian-American man, one Hispanic man, and one Hawaiian woman.

Defendants rely on *Williams v. Runnels* (9th Cir. 2006) 432 F.3d 1102, 1107. While not binding precedent, opinions from other jurisdictions may provide useful analytical approaches. In *Runnels* "the prosecutor used three of his first four peremptory challenges to remove African-Americans from the jury. In addition, it appears that only four of the first forty-nine potential jurors were African-American." (*Ibid*.) Defendants contend the strike rate in this case was greater than the 75 percent seen in *Williams v. Runnels*, and greater than that in several other circuit court decisions. (See *Paulino v. Castro* (9th Cir. 2004) 371 F.3d 1083, 1090 [83 percent]; *Fernandez v. Roe* (9th Cir. 2002) 286 F.3d 1073, 1078 [57 percent removal rate]; *Turner v. Marshall* (9th Cir. 1995) 63 F.3d 807, 812–813 [56 percent]). Defendants are mistaken. As described above, the strike rate here was 50 percent, not the 75 percent seen in *Williams v. Runnels*, or the higher figures in the other federal decisions. Far more tellingly, in *Runnels,* the state excluded three out of four African-Americans, a rate over 9 times[20] their representation among panelists who had been examined. The numbers here are not nearly as stark. It is true that, when the motion was made, the district attorney had excused African-American women at a rate higher than their representation among those called to the box. That fact certainly is noteworthy, however context remains informative.

Even a high exclusion rate does not invariably demonstrate excusals were motivated by discriminatory animus; other factors may also be relevant. In *People v. Sánchez*

---

[20] Calculated by dividing the 75 percent strike rate by the eight percent representation rate, yielding an exclusion rate of 9.4.

(2016) 63 Cal.4th 411, 439, the prosecution exercised four of 10 peremptory challenges against an identified group, only six of whom were present in the venire, i.e., a 40 percent strike rate, and a two-thirds removal rate. (*Ibid.*) After the defendant challenged another juror from that group, six of 32 group members, or 19 percent, remained in the venire, and only one served on the jury. (*Ibid.*) Here as in *Sánchez* the rate of removal was two-thirds:  four of six jurors in that case, and six of nine here.  We also note the 40 percent strike rate in *Sánchez* was marginally lower than the 50 percent rate here.  Despite these similar figures, we reasoned in *Sánchez* that even if the strike rate "[c]onsidered alone . . . might suggest a discriminatory purpose," under the totality of the circumstances, the suggestion was unsupported. (*Ibid.*)

While the exclusion rate is important, considered in context it does not give rise to an inference the excusals were motivated by racial bias for purposes of our independent appellate review. (See *Parker, supra*, 2 Cal.5th at p. 1212.) Here the prosecution ultimately accepted a jury with four African-American women, a statistically higher figure than this subgroup's representation in the box. " 'While acceptance of one or more black jurors by the prosecution does not necessarily settle all questions about how the prosecution used its peremptory challenges, these facts nonetheless help lessen the strength of any inference of discrimination that the pattern of the prosecutor's strikes might otherwise imply.' [Citations.] We have previously held that the prosecutor's acceptance of a jury panel including multiple African-American prospective jurors, 'while not conclusive, was "an indication of the prosecutor's good faith in exercising his peremptories, and . . . an appropriate factor for the trial judge to consider in ruling on a *Wheeler*

objection . . . ." ' " (*People v. Johnson* (2019) 8 Cal.5th 475, 508; see also *People v. McDaniel* (2021) 12 Cal.5th 97, 124 ["Despite the relatively high rate of strikes against Black jurors at the time of the motion, the final racial composition of the jury was diverse and contained more Black jurors than jurors of any other race"]; *People v. Lenix* (2008) 44 Cal.4th 602, 610, fn. 6.)

The rate of strikes *following* a *Batson/Wheeler* motion is also a relevant consideration. (See *People v. Johnson, supra,* 8 Cal.5th at p. 507.) In *People v. Reed* (2018) 4 Cal.5th 989, 1000–1001, we explained: "the prosecutor's decision to strike one black juror while accepting another who replaced her suggests that nonrace related differences between the jurors, rather than race, explain the prosecutor's actions." Similarly here, after defendants' motion, the female African-American panelist who had been excused was replaced in the jury box by an African-American woman who ultimately served as a juror.[21] Although the prosecution excused two African-American women after the *Batson/Wheeler* motion, this case is quite different from *Miller-El v. Dretke* (2005) 545 U.S. 231, 250, where the prosecution merely made a "late-stage decision to accept a [single] black panel member." After the defendants' *Batson/Wheeler* motion here, the prosecution exercised four peremptory strikes before passing the jury, leaving 19 strikes unused.[22] As we have

---

[21]     Two of the African-American women ultimately seated on the jury had been members of the panel from an early point in the jury selection process and were never the subject of a strike.

[22]     California Code of Civil Procedure, section 231, subdivision (a) provides that, in a capital case, codefendants are entitled to 20 joint challenges and 5 individual challenges each, and the People are entitled to an equal total number. Here the prosecution used 16 challenges and the defense 15.

previously concluded, "the fact that the prosecution accepted a panel with [four African-American female] jurors when it had enough remaining peremptory challenges to strike them suggests that the prosecutor did not harbor bias against [the identified group of] jurors." (*People v. McDaniel*, *supra*, 12 Cal.5th at p. 124.) The prosecution also repeatedly excused jurors who were not members of the identified group rather than excusing a number of African-American women then in the box. Also relevant in dispelling any inference of discriminatory motive was the prosecutor's repeated passing of two African-American women who had been present in the box from nearly the beginning of the selection process, and who ultimately served on the jury. (See *People v. Clark* (2011) 52 Cal.4th 856, 906.) When advocates pass a challenge they evince a willingness to accept the panel as constituted.  The prosecutor here passed the challenge when the group of 40 panelists seated or excused contained several African-American women.  (See *People v. Reed*, *supra*, 4 Cal.5th at p. 1000.)

We have also observed:  the selection of a jury is a fluid process, with challenges for cause and peremptory strikes continually changing the composition of the jury before it is finally empaneled. As we noted in *People v. Johnson* (1989) 47 Cal.3d 1194:  "[T]he particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box. It may be acceptable, for example, to have one juror with a particular point of view but unacceptable to have more than one with that view. If the panel as seated appears to contain a sufficient number of jurors who appear strong-willed and favorable to a lawyer's position, the lawyer might be satisfied with a jury that includes one or more passive or timid appearing jurors. However, if one

or more of the supposed favorable or strong jurors is excused either for cause or [by] peremptory challenge and the replacement jurors appear to be passive or timid types, it would not be unusual or unreasonable for the lawyer to peremptorily challenge one of these apparently less favorable jurors even though other similar types remain. These same considerations apply when considering the age, education, training, employment, prior jury service, and experience of the prospective jurors." (*Id.* at p. 1220.)

We are mindful that the prosecution's passing on the jury as a whole did not occur until after the trial court's statement to the parties that, while their use of peremptories had been proper, the court was aware the defense had accepted the jury three times. It noted the defense had accepted some White panelists and excused some African-American panel members, "seven Black people [were] left on the jury,"[23] and the case involved three African-American defendants. The judge continued, "In my court I want the appearance of fairness," and alerted the parties they were "on notice" that "[t]he appearance of justice is as important as justice."

This statement did not immediately follow the *Batson/Wheeler* motion. It occurred during the in-chambers discussion described at page 44, *ante.* Between the defendants' motion and the in-chambers statement, several panelists were excused: a White woman (by the defense); a Hispanic man (by the prosecution); a for-cause excusal, race not reflected; an

---

[23] The trial court appears to be mistaken about this fact; only four African-American people, all women, were present on the jury at the time the court addressed the parties.

African-American woman (by the prosecution, following defense acceptance); a Hispanic woman (by the prosecution, following defense acceptance); an Asian man (by the defense); an African-American woman (by the prosecution), and a White man (by the defense).[24] After the court's later in-chambers comment, it excused one more juror for cause, the defense exercised one further peremptory challenge and all parties accepted the panel.

The court explicitly noted it considered all the peremptories exercised by both sides to have been proper. We need not question the trial court's perspective in this regard; as we have noted, in this unique context of review we are required to consider the record independently. (*People v. Rhoades*, *supra*, 8 Cal.5th at pp. 428–429.) Here, the group of seated jurors included four African-American women, one African-American man, three White women, two White men, one Hispanic woman, and one Hispanic man. As noted, the defense did not renew a *Batson*/*Wheeler* motion after the prosecution's excusals of Panelist Nos. 107 or 109 or after it had passed on the jury. Nor did the defense object to the composition of the jury as finally constituted.

---

[24] The last two African-American women excused were Panelists Nos. 107 and 109. The former had been seated as a juror on both felony and misdemeanor cases. These included a capital case which hung 9–3 in the guilt phase and a child molestation case the year before this one, which hung 8–4. Panelist No. 109 was a court clerk in another department. The judge began the colloquy by saying he knew her well and told the group about her employment. Neither party asked her any questions. The defense passed the challenge and the prosecution excused her. The defense did not object to the use of either peremptory.

*People v. Battle* is instructive by way of contrast. (*Battle*, *supra*, 11 Cal.5th at p. 774.) There, an African-American defendant was convicted by an all-White jury. His victims were White and mitigation evidence was offered to prove defendant was, himself, the victim of life-long discrimination. Here, all defendants and victims were African-American, as were a number of witnesses, along with five of the seated jurors. In *Battle*, we found the jury's composition "serve[d] as standalone evidence to inform our step-one analysis," and that it was "particularly germane where the case was racially charged." (*Ibid.*) Even so, in light of the other circumstances, we concluded the defendant's "showing [did not] suffice to give rise to an inference that discriminatory intent motivated [a juror's] excusal." (*Id.* at p. 775.)

As in *People v. Johnson*, *supra*, 8 Cal.5th at page 510, footnote 7, "[W]e need not resort to examining the record for obvious race-neutral reasons for the prosecutor's peremptory strikes that would ' "necessarily dispel any inference of bias." ' " After independently examining the entire record, including the trial court's observations and the final jury composition, we conclude the court acted within its discretion in denying defendants' *Batson/Wheeler* motion.

### 2. Evidentiary Issues

#### a. Admission of Hearsay

Newborn and Holmes argue the court erred in allowing Bowen's girlfriend, LaChandra Carr, to relate hearsay when cross-examined about an inconsistent statement. Carr told the grand jury she saw Newborn and Holmes at the hospital the night of the murders. At trial, however, she claimed she spent the entire night at home with Bowen's mother. Admitting she

told the grand jury something different, she stated: "The truth is I really wasn't there." Asked to explain her prior testimony, Carr said she "knew they were there from when [Bowen] called [her] from the hospital. I just knew everyone who was there." The court denied defendants' motion to strike these statements as hearsay. Instead, it gave a limiting instruction that Carr's grand jury statements could be considered only for the purpose of showing inconsistency with her current testimony.[25]

During further cross-examination, Carr repeated that Bowen had called her from the hospital and said Newborn was also there. The defense moved for a mistrial, arguing this testimony related double hearsay. The court disagreed, explaining that jurors would have to decide "whether what she said is true, whether she was at the hospital" or not. It instructed, however, that Bowen's "alleged statements" to Carr could not be used against any defendant.

Defendants renew their hearsay arguments here. A trial court's ruling on the admissibility of evidence, including "on the hearsay nature of the evidence in question," is reviewed for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) The court's rulings were within that scope.

---

[25] Under some circumstances, a prior inconsistent statement may be admissible not only for its impeachment value, but for its truth. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1144 ["Prior inconsistent statements are admissible under [Evidence Code section 1235] to prove their substance as well as to impeach the declarant]; see Simons, Cal. Evidence Manual (2021) § 2:42, pp. 134–137; CALCRIM No. 318.) That general rule would not apply here to encompass hearsay statements Carr attributed to Bowen.

Carr's testimony to the grand jury was admissible as a prior inconsistent statement. A witness's out-of-court statement "is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 770." (Evid. Code, § 1235.) Evidence Code section 770, subdivision (a) in turn, requires that the witness have "an opportunity to explain or to deny the [inconsistent] statement" while testifying. Carr's trial and grand jury testimony were in direct conflict as to where she was on Halloween night and what she knew, or did not know, about the whereabouts of others. She was given an opportunity to explain the inconsistency. In doing so, she related additional out-of-court statements from Bowen. Defendants' complaint, that these later statements were hearsay, fails because it appears they were not admitted for their truth. They were, however, relevant to help the jury evaluate the credibility of Carr's attempt to reconcile her inconsistent accounts. She claimed that *she* relied on them to infer that Holmes and Newborn were there and, thus, explain her prior statement. The trial court gave a limiting instruction admonishing the jury it could not consider Bowen's statements "against any defendant." Accordingly, Bowen's statements were not admitted against any defendant for the truth of their content. They were only to be considered as to Carr's credibility.[26]

---

[26] Defendants also challenge the admission of Carr's testimony that Bowen had told her he was present at the Wilson Street shootings "but he was no driver and he was no shooter." They contend this testimony violated *Bruton, supra*, 391 U.S. 123. The objection was not raised below and is not well taken now. *Bruton* addressed "the powerfully incriminating extrajudicial statements of a codefendant" who is jointly tried and not subject to cross-examination. (*Id.* at p. 135; *id.* at p.

### b. *Eyewitness Testimony*

Holmes and McClain argue the admission of Gabriel Pina's eyewitness testimony violated their rights to due process. No error appears.

On the night of the shootings, Gabriel Pina saw both the driver of the lead car racing toward Wilson Street, and a man who ran from the scene and got into a car. Pina later went to the police and was shown several photo arrays. He picked a picture of McClain as the driver in one group of photos but acknowledged that the photograph showed his head tilted at a different angle. He was then shown an image of McClain in a newspaper, "folded . . . up" and "pretty far away," and confirmed the identification. Pina also picked Holmes's photo as the man who ran to a car after the shooting. He recognized Holmes because of his facial features and scarring. Defendants each unsuccessfully moved to suppress these identifications.

To determine whether the admission of identification evidence violates due process, "we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances,

---

136.) Here, the jurors knew that not all perpetrators were being tried together. Indeed, Bowen had been severed from the case and was not a codefendant. His statement, related during Carr's testimony, inculpated only himself. Further, testimony at trial indicated that multiple cars carrying African-American men drove through Wilson Street that night, dispelling any inference that if Bowen neither drove nor shot defendants necessarily did. There was no reason that Carr's testimony about Bowen's involvement could have prejudiced defendants. For the same reasons, any error in admitting the testimony was harmless. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989; *Manson v. Brathwaite* (1977) 432 U.S. 98, 104–107; *Neil v. Biggers* (1972) 409 U.S. 188, 199–200.) We note, however, that in a recent decision evaluating the propriety of a jury instruction concerning witness certainty, we observed "[t]here is [now] near unanimity in the empirical research that ' "under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy." ' " (*People v. Lemcke* (2021) 11 Cal.5th 644, 665.) A procedure is unfair if it suggests in advance the identity of the person police suspect. (*People v. Ochoa* (1998) 19 Cal.4th 353, 413 (*Ochoa*).) We defer to the trial court's factual findings but independently review its determination whether an identification procedure was unduly suggestive. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 943.) Reversal is not warranted unless there is a "substantial likelihood of irreparable misidentification." (*Manson*, at p. 108.) "In other words, '[i]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' " (*Ochoa*, at p. 412.)

Holmes first challenges the procedure because the photo arrays shown to Pina included two photographs of him. The photographs showed Holmes at different ages and with different haircuts, however. Pina selected only one of the photographs, failing to identify Holmes in the other. Holmes also contends the procedure was unduly suggestive because Pina initially made

only a hesitant identification of McClain, which he did not confirm until after he was shown a newspaper photograph.[27]

Pina contacted police after seeing the photo of a different suspect on television. He then looked through six six-packs of photographs, attempting to identify that other suspect. During the process, he saw Holmes's image, recognizing his distinctive facial features and scarring. Pina got a good look at Holmes the night of the shooting and saw him clearly. (See *People v. Cunningham*, *supra*, 25 Cal.4th at p. 989.) He was especially attentive to the men he saw given the unusual situation. He gave an accurate description of the suspects' hairstyles and distinctive features. The challenged procedure was not unduly suggestive, and it is not substantially likely that Pina misidentified Holmes, particularly in light of all the additional evidence. (See *Manson v. Brathwaite*, *supra*, 432 U.S. at pp. 104–107; *Ochoa*, *supra*, 19 Cal.4th at p. 412.)

McClain raises similar arguments. He contends the array shown to Pina was unduly suggestive because, in the group containing his picture, his photograph was darker than the others and he was the only person with a gold chain and long hair. The argument fails. In the six different photo arrays Pina viewed many men had long hair, including two in the six-pack with McClain's photo. McClain also asserts the police showed Pina a newspaper photo of him before the photographic array. This assertion is contradicted by Pina's grand jury testimony.

---

[27] Holmes asserts that Pina made no identification when he spoke to police on the night of the murders. In fact, he was never asked to do so. Pina described the several cars that drove past, but officers did not ask whether he could recognize any of the drivers.

Pina testified he saw the newspaper photo *after* he saw McClain in the lineup. Pina recognized a photograph in the array but could not be certain of the identification because the man's face was tilted at a different angle than the man Pina saw. The six-pack photograph also showed McClain's hair in a ponytail, but when Pina saw him his hair was loose. After Pina explained these factors to investigators, he was shown the newspaper photo, and immediately identified McClain.

The trial court did not err in denying McClain's suppression motion. "[F]or a witness identification procedure to violate the due process clauses, the state must, at the threshold, improperly suggest something to the witness — i.e., it must, wittingly or unwittingly, *initiate* an unduly suggestive procedure. Due process does not forbid the state to provide useful *further information* in response to a witness's request, for the state is not suggesting anything." (*Ochoa, supra*, 19 Cal.4th at p. 413, italics added.) *Ochoa* addressed analogous circumstances. The witness in *Ochoa* asked to see a suspect's profile after identifying him with some uncertainty from a photographic lineup. (*Id.* at p. 412.) She was shown a single image of Ochoa in profile but not shown profile views of any other individuals whose pictures were in the lineup. (*Ibid.*) She then confirmed her identification. We found no unfairness in the procedure because it did not suggest *in advance of the witness's identification* the identity of the person suspected by the police. (*Id.* at p. 413.) The same is true here. Pina was shown an additional image of McClain only after he had selected McClain's photo. Indeed, the newspaper photograph here was shown alongside other images, though Pina only paid attention

to McClain's because it was the image he recognized.[28] As in *Ochoa*, police did not suggest McClain's identity before Pina identified him. (*Id.* at p. 413.)

Moreover, even if the procedure had been flawed, the evidence was nevertheless admissible because this particular identification was reliable under the totality of the circumstances. (See *Manson v. Brathwaite, supra*, 432 U.S. at pp. 104–107.) As with Holmes, nearly all considerations support reliability. Pina testified that he had a clear view of McClain because McClain drove up and down the street and stopped directly under a streetlamp. Pina paid attention to the suspects because of their odd behavior. McClain's driving maneuvers, in particular, were unusual. Pina described him as "literally . . . reaching over the steering wheel to see" Pina and his companion. Before the shooting began, Pina told his girlfriend to hide if "something happens" and kept his focus on the cars. Although Pina identified McClain one or two months after the crimes, there was no indication the passage of time impaired his ability to recall the events or make an identification. Finally, Pina made "eye-to-eye" contact with McClain, knew the angle of McClain's head and the long, loose hairstyle he wore on the night of the murders, and observed how those particulars differed in the photographs he was shown. The defense was able to thoroughly cross-examine Pina and delve into factors bearing on the reliability of his identifications.

---

[28] It is not clear whether the other images displayed in the newspaper shown to Pina were of suspects involved in the Halloween shooting. The photograph was not offered into evidence by any party.

Accordingly, the jury was well able to properly consider the weight to give them.

### c. *Admission of Inflammatory Evidence*

Defendants raise two challenges to the admission of evidence about their uncharged misconduct. The governing law is settled.

" 'Character evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).) Evidence that a person committed a crime, civil wrong, or other act may be admitted, however, not to prove a person's predisposition to commit such an act, but rather to prove some other material fact, such as that person's intent or identity. (*Id.*, § 1101, subd. (b).)' " (*People v. Leon* (2015) 61 Cal.4th 569, 597.) "The relevance depends, in part, on whether the act is sufficiently similar to the current charges to support a rational inference of intent, common design, identity, or other material fact." (*Id.* at p. 598.) The greatest degree of similarity is required to show identity, which requires proof of enough distinctive features in common with the charged offense to support the inference that the same person committed both acts; the least similarity is necessary to demonstrate intent. (*Ibid.*)

The next step is an evaluation of the evidence's prejudicial impact. (See Evid. Code, § 352.) " 'If evidence of prior conduct is sufficiently similar to the charged crimes to be relevant to prove the defendant's intent, common plan, or identity, the trial court then must consider whether the probative value of the evidence "is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue

prejudice, of confusing the issues, or of misleading the jury.' " ' " (*People v. Leon, supra,* 61 Cal.4th at p. 599.) The trial court's decision whether to admit uncharged misconduct evidence is reviewed for abuse of discretion. (*Id.* at p. 597.)

### i.   *Unadjudicated Arrest*

McClain contends the court erred and violated his constitutional rights in admitting evidence that on September 12, 1992, he was arrested with Bowen for weapon possession.[29] Any asserted error was harmless.

The prosecution offered the evidence to demonstrate McClain's connection with other codefendants more than a year before the charged crimes. In particular, he argued the arrest showed McClain and Bowen had access to weapons. McClain countered that the arrest was for a different crime and involved different weapons from those used in the Halloween shootings. He offered to stipulate that he and Bowen were acquainted. The court admitted the evidence, explaining it was relevant, in part, to show McClain's access to weapons.

We need not discuss the merits of defendant's challenge. Even if we were to find error, admission of the evidence was not unduly prejudicial. A consideration of impermissible prejudice that might flow from otherwise relevant evidence evaluates how inflammatory the uncharged act is when compared to those charged. Whether the uncharged act was not previously adjudicated is also a relevant consideration. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) McClain's weapons possession arrest

---

[29]   McClain's related claim that the prosecutor committed misconduct during closing argument by referencing his unadjudicated arrest is addressed *post,* at pages 84 to 85.

was far less inflammatory than the murders here. (*Ibid.*) Any prejudicial impact of the evidence was further dissipated by the jury instructions that the uncharged act could not to be considered as proof of McClain's bad character or criminal disposition.

### ii. Gang Evidence

Holmes and McClain also challenge the admission of evidence regarding gang affiliation. Although conceding some of this evidence was relevant, they contend the quantity and emotional impact of the gang evidence was unduly prejudicial depriving them of a fair trial and due process. The evidence was properly admitted.

Holmes complains the evidence connecting him with the P-9 gang was more tangential than that offered against his codefendants. However, Mario Stevens identified him as a P-9 member , and Derrick Tate testified that Holmes wore a hat that said "P-9." There was some contrary evidence, including McClain's testimony that Holmes was not a member of the gang. However, the jury was equipped to weigh all the testimony and decide the question for itself.

 McClain did not dispute his membership. Instead, he now argues the introduction of gang evidence against him was cumulative and unduly prejudicial. McClain did not lodge an objection on this basis at trial. Throughout the briefing defendants raise a number of claims that were not preserved below. The general rule is that a failure to object in the trial court waives the right to asset error on appeal.[30] (See *People v.*

---

[30]    For examples of exceptions to this general rule see *ante*, page 19, footnote 9.

*Dykes* (2009) 46 Cal.4th 731, 756 (*Dykes*).) However, particularly in capital cases, we often choose to address even a waived claim on the merits. Here we will not repeat the general rule in each instance in order to avoid tedious repetition. We will note any failure to object at trial and cite authority for the waiver rule. By noting that state of the record, and citation to supporting authority, we invoke the general waiver principle.

McClain's lately-asserted challenge also lacks merit. Although evidence of gang membership carries the potential for prejudice, it " 'is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1022.) Given the circumstances of the shootings, which were clearly intended as gang retaliation, defendants' membership was highly relevant to prove their involvement, motive, and intent to kill. The prosecution had a right to present the evidence, notwithstanding McClain's failure to contest it.

Defendants also claim the court abused its discretion in allowing witnesses to testify about gang-related threats. DeSean Holmes told the jury he was afraid to testify because his life had been threatened. He described threats made to his mother, coach, and others. Derrick Tate testified about threats to his mother and grandmother and admitted he feared for his own safety. Willie McFee gave similar testimony. He had received death threats over a year and a half and believed they came from gang members. The prosecution also played a tape in

which McFee told police about receiving anonymous, threatening phone calls.

Defendants objected to some of this evidence on hearsay grounds but did not raise an objection under Evidence Code sections 1101 or 352.[31] The claims are both forfeited (*Dykes, supra*, 46 Cal.4th at p. 756) and meritless. "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible." (*People v. Burgener* (2003) 29 Cal.4th 833, 869; see Simons, Cal. Evidence Manual, *supra*, § 3.47, pp. 290–291.) Testimony about threats the witnesses and their family members received also supported the prosecution's theory that the shootings were committed by gang members and motivated by gang-related concerns. These were legitimate purposes. The evidence's probative value was not outweighed by any undue prejudice to defendants. The testimony was not particularly inflammatory, and the witnesses did not identify the people, or even the gang, making the threats.

Finally, Holmes and McClain argue expert Derrick Carter's testimony about gangs, in particular a list of P-9 gang members, was irrelevant and inflammatory. Neither objection was raised below (*Dykes, supra*, 46 Cal.4th at p. 756), and the forfeited claims would fail on the merits. Evidence about gang activity, and the defendants' gang membership, was highly relevant given the apparent gang-related motivation for the

---

[31] Defendants do not renew their hearsay arguments here. After the objection to Tate's testimony, the court admonished the jury that statements about his motivation for testifying were not offered for truth and could be considered only with regard to his state of mind.

murders. The court did not abuse its discretion in admitting expert testimony on the subject. Defendants' criticisms about the content of Carter's testimony address the weight of that evidence, not to its admissibility. The jury was entitled to consider this evidence, along with Carter's credibility, and was properly instructed how to do so. (See CALJIC No. 2.20.)

### d. Restrictions on Cross-Examination

#### i. DeSean Holmes

Newborn alleges his rights to due process and confrontation were violated on five occasions when he was not permitted to cross-examine DeSean Holmes as fully as he wished. Holmes and McClain join these claims but assert no additional arguments of their own. The rulings were within the court's discretion. Considered individually and cumulatively, these reasonable limits on cross-examination did not infringe defendants' constitutional rights.

Newborn first claims he was prevented from questioning DeSean about a prior arrest. In February 1995, DeSean burglarized Willie McFee's home. By the time DeSean was arrested for the burglary two months later, he was already incarcerated for a separate, unspecified offense. After DeSean testified to these facts, the court sustained an objection to further questioning about the offense for which DeSean was incarcerated without an offer of proof as to relevance. None was made, and Newborn's attorney moved to a different line of inquiry. Newborn now complains further cross-examination would have demonstrated the nature and magnitude of DeSean's bias. But his failure to make an offer of proof as to the impeachment evidence that might have been elicited, despite the court's express invitation to do so, forfeits the issue on

appeal. (See *People v. Valdez* (2004) 32 Cal.4th 73, 108.) Nor is there any suggestion such an offer would have been futile. Indeed, the court solicited additional information to assist its evaluation. Newborn offered none below and does not do so here. The court reasonably exercised its discretion (*People v. Quartermain* (1997) 16 Cal.4th 600, 623) to limit cross-examination on a witness's unrelated prior offense, particularly when presented with no additional offer of proof or further argument.

Newborn next claims he was unable to explore whether DeSean tried to gain favor with law enforcement by falsely attributing a double homicide to Danny Cooks and Ernest Holly.[32] Newborn tried to show that DeSean identified Cooks and Holly because he was dating Holly's ex-girlfriend. Yet the record demonstrates Newborn was able to elicit precisely the testimony he sought. After a relevance objection, Newborn rephrased his question and DeSean testified that he *had* been dating Holly's ex-girlfriend around the time he implicated Cooks and Holly in the homicides. Newborn complains he was prevented from seeking further details but identifies no ruling that so limited him. More importantly, he fails to explain how additional information about the relationship would have been probative. The essential facts establishing DeSean's asserted motive to falsely accuse someone else of murder were before the jury.

Newborn's third allegation of deficient cross-examination concerns DeSean's testimony about another shooting. In

---

[32] Cooks and DeSean were connected in criminal activity unrelated to this case. Holly was one of the men Tate accused of participating in the Halloween shootings.

response to Newborn's questioning, DeSean said he sought protective custody in September 1995 because he "was the victim of a shooting." Newborn elicited extensive testimony about the case, with DeSean twice asserting he was a "victim." In concluding this line of questioning, Newborn asked, "just for clarification, so you don't mislead the judge, the shooting case where you say you were the victim, nobody shot at you, did they?" DeSean replied, "Yes." The court denied a motion to strike but precluded further questioning on the subject. The next day, Newborn made an offer of proof that DeSean was not a victim but instead drove the car *from which* shots were fired, although he did not know his passenger intended to shoot. The shooting victim was DeSean's close friend. The prosecutor explained that DeSean felt victimized because he was surprised by the passenger's assault on his friend. The court repeated that the incident could not be probed further but noted the parties could stipulate DeSean was not a victim. This ruling was proper. The court " 'retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1188.) Newborn made his point that DeSean was not the target of gunfire, despite having characterized himself as a victim. Further questioning on this unrelated incident, and why DeSean may have felt victimized, would have consumed time on matters that were only marginally relevant. Because Newborn has not shown that the prohibited cross-examination would have produced " 'a significantly different impression of [DeSean's] credibility,' " there was no Sixth Amendment violation. (*People v. Williams* (2016) 1 Cal.5th 1166, 1192.)

Next, Newborn claims he could not examine DeSean sufficiently about an alleged carjacking and the murder of

Majhdi Parrish, a witness to that offense. DeSean claimed he was afraid to testify because Parrish had been killed after testifying in a carjacking case, and Newborn wanted to elicit that DeSean himself had committed the carjacking. The court ruled both sides could ask about the incident. Although DeSean's attorney had warned that DeSean would invoke his Fifth Amendment privilege if asked about the carjacking, Newborn pursued this line of questioning nevertheless. When DeSean said he had heard of witnesses being killed, Newborn asked if Majhdi Parrish was that witness. DeSean invoked the Fifth Amendment. The court overruled his privilege claim and instructed him to answer. DeSean testified that he had heard about Parrish's death. Newborn's attorney then sought to ask whether DeSean was "innocent or guilty" of the carjacking, whether he was concerned about Parrish's death, and whether Parrish was a "complaining victim." Objections were sustained to each question after DeSean again invoked his Fifth Amendment privilege. Newborn complains these rulings prevented him from establishing DeSean's motive to help the prosecution and avoid liability for the crime against Parrish. The claim fails because Newborn's assertions were refuted by other testimony. Detective Brown testified that Parrish had been killed while DeSean was in custody and DeSean was not a suspect in that homicide. The evidence showed DeSean's single felony conviction was for the burglary of McFee's home. To the extent Newborn hoped to show that DeSean was responsible for Parrish's death, the record is to the contrary. It is not evident that further questioning on these matters would have yielded useful impeachment evidence. No confrontation error occurred. (See *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.)

Finally, Newborn claims the court prevented him from adequately addressing DeSean's civil lawsuit against the Pasadena Police Department. DeSean testified that he was not honest in his initial police interview because he did not believe the department was trustworthy and he had a lawsuit pending against it. Newborn now complains he should have been allowed to demonstrate DeSean's motive to somehow advance this civil suit by testifying for the prosecution. It appears Newborn adequately covered the point. Although the prosecution twice objected to questions on this topic, the questions were rephrased and DeSean gave answers. Newborn's counsel chose to move on. Even if more questions had been asked, it is not clear what additional evidence could have been adduced. DeSean was unclear about the nature of the lawsuit, its existence, or the identity of his attorney. Had such a suit been filed, it would be a matter of public record. But no offer of proof was made in that regard. The cross-examination was sufficient, and Newborn suffered no constitutional deprivation in connection with it.

### ii. Robert Price

McClain argues the court improperly prevented him from asking Robert Price about a prior arrest. Price testified that McClain shot him in the face and back at the Community Arms apartment complex. He agreed on cross-examination that he was given $200 before his grand jury testimony but explained the money was for his travel and medical expenses. He also received $100 to pay for a medical evaluation of whether a bullet could be removed from his leg, potentially producing ballistics evidence. On redirect, Price was asked about his motivations for testifying. He responded that he knew one victim's parents. The killings had "touched" him, and he wanted to see those responsible convicted. On recross-examination, McClain sought

to elicit whether Price had been arrested for lewd and lascivious conduct on a minor. The court sustained a prosecution objection and prohibited further questioning about Price's arrest. This ruling was within its discretion.

A trial court abuses its discretion when it acts arbitrarily, capriciously, or absurdly, causing a miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) The court's decision here was measured. The prosecutor and McClain's attorney agreed that "an arrest is [not] evidence of anything." After hearing from the parties, the court considered the question and reasonably concluded Price's testimony did not open the door to impeachment questions based on an unrelated arrest. Moreover, Price had been amply impeached. In addition to describing the money he received before his grand jury testimony, Price admitted convictions for five felonies and membership in the Crips gang. He testified that he had been drinking on the day he was shot and initially lied to police about the shooter's identity because he wanted to retaliate personally. Additional inquiry into an unadjudicated arrest would have added little to these substantive admissions.

McClain also argues the ruling violated his right to "effective" confrontation, citing *Davis v. Alaska* (1974) 415 U.S. 308, 318. He argues for the first time here that testimony about Price's arrest could have illuminated why Price wished to implicate McClain, or why McClain shot Price. McClain had an opportunity to make an offer of proof at trial and did not do so. Indeed, his attorney *agreed* with the prosecutor that, absent an offer of proof, it was improper to impeach Price with the arrest. McClain now argues the court created a confrontation problem by permitting the prosecutor to elicit that Price was friendly with a victim's parents and wanted to see retribution for the

child's murder. However, McClain could have cross-examined on this point but chose not to. There was no confrontation violation.

### e. Witness Sequestration

Holmes and Newborn raise several claims regarding the overnight sequestration of prosecution witness LaChandra Carr. We reject them.

### i. Background

As noted, Carr's trial and grand jury testimony differed. She told the grand jury that she saw Newborn and Holmes at the hospital the night of the murders. At trial she disavowed those statements and denied being there. Carr's trial testimony was also evasive. She said she was contacted by police "a hundred million times," yet she claimed to "remember nothing" about those conversations and refused to give direct answers about her previous statements.[33] Eventually, the court interrupted the questioning and admonished Carr that "three young men are facing the death penalty." The court continued,

---

[33]   For example, questioned about one statement, Carr testified:

"A:   I said that?

"Q:   Do you recall using those words?

"A:   No.

"Q:   Do you want to look at the transcript of what you said?

"A:   It have to be there if you said it, but I don't remember saying it.

"Q:   You don't remember saying those words?

"A:   No.

"Q:   Well, could you have said those words?

"A:   I probably have."

"These jurors are here, these lawyers are doing their job and you think this is cute, so I will tell you what — ." Carr interrupted, asking, "How is it cute when I am telling the truth?" The court responded, "Listen to me: I will put you in jail. What we are going to do, we will stop the proceedings tonight. You think about how cute these proceedings are."

Outside the presence of the jury and defendants, the court held a hearing with all counsel to determine whether to detain Carr overnight, noting there was reason to think she would not return to court in the morning. Addressing Carr, the court explained, "This is a very serious case. You don't think it is. I do, and so what I am going to do is keep you in custody and make sure you return tomorrow. [¶] If you think you are helping either side here, you're not. What you are doing is acting like this is for you. [¶] . . . The defendants' lives are at stake and we have . . . three people who are already dead. [¶] . . . [Y]ou are sitting there acting like you don't care and you don't want to answer any questions, and I am not going to tolerate it." Finding good cause, the court ordered Carr into the custody of District Attorney investigators to be secured as a material witness. Carr "was placed in a motel" overnight and finished her testimony the next day.

### ii. Discussion

Holmes and Newborn first contend Carr's sequestration violated section 1332 because there was insufficient cause to believe she would fail to appear.[34] They assert the detention

---

[34] Section 1332 provides, in pertinent part, that "when the court is satisfied, by proof on oath, that there is good cause to believe that any material witness for the prosecution or defense . . . will not appear and testify . . . the court may order the

likely coerced Carr into giving testimony favorable to the prosecution. Defendants lack standing to assert violations of another person's statutory or constitutional rights.[35] (*People v. Boyer* (2006) 38 Cal.4th 412, 444.) Accordingly, we evaluate any coercive effect of the detention not by determining whether "some constitutional transgression" occurred against Carr, but by assessing whether some misconduct improperly affected the nature of her testimony. (*Ibid.*) This determination is based on the entire record, with deference to the trial court's credibility determinations where supported by substantial evidence. (*Ibid.*)

Holmes and Newborn cite no evidence of coercion, and our independent review reveals none. Carr's own testimony belies the assertion. Returning to court the next day, Carr again repudiated her grand jury testimony. She explained that she had not been at the hospital and did not know why she had ever said defendants were there. She could only surmise that she thought they were present based on Bowen's phone call. This testimony favored the defense, not the prosecution.

Defendants also argue their absence from the detention hearing was reversible error. A criminal defendant has federal and state constitutional rights to be present at a critical stage of

---

witness to enter into a written undertaking to the effect that he or she will appear and testify at the time and place ordered by the court or that he or she will forfeit an amount the court deems proper." (§ 1332, subd. (a).) "If the witness required to enter into an undertaking to appear and testify . . . refuses compliance with the order . . . the court may commit the witness . . . to the custody of the sheriff." (§ 1332, subd. (b).)

[35] We note that a witness's mere evasiveness does not constitute good cause under section 1332, and, to the extent the trial court based its decision solely on her evasiveness, it acted improperly.

the proceedings. (*People v. Perry* (2006) 38 Cal.4th 302, 311.) The proceeding must be "critical to the outcome of the case," and the defendant's presence must "contribute to the fairness of the proceeding." (*Id.* at p. 312.) Neither condition was met here. First, Carr's detention hearing was not critical to the case and in fact, had no bearing on its outcome. Defendants do not attempt to show otherwise. They focus instead on the second requirement, arguing that because they were personally acquainted with Carr they could have advised their attorneys as to how the hearing was likely to make her favor the prosecution. This argument fails as well. As discussed, Carr did *not* change her testimony in any way that favored the prosecution. Further, "a defendant may ordinarily be excluded from conferences on questions of law, even if those questions are critical to the outcome of the case, because the defendant's presence would not contribute to the fairness of the proceeding." (*Ibid.*) Defendants point to nothing in the record to suggest their attorneys were not fully equipped to detect or respond to any potentially coercive aspects of the hearing. No specialized knowledge of this witness was necessary for counsel to represent their clients' interests. Accordingly, defendants' absence from the hearing resulted in no error.

### 3. *Sufficiency of Evidence*

Each defendant makes multiple challenges to the sufficiency of the evidence supporting his convictions. When considering such a challenge, " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Edwards* (2013) 57 Cal.4th

658, 715, quoting *People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We consider " 'whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*Edwards*, at p. 715, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "[A] reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Edwards*, at p. 715, quoting *People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The same standard of review applies to the sufficiency of the evidence supporting special circumstance findings. Substantial evidence supports each of the convictions.

### a. Attempted Murder of Price

McClain argues his conviction for the attempted murder of Robert Price cannot stand because it was based entirely on unreliable testimony from Price, "a Crip gang member and convicted felon who never told the same story twice." Price testified that McClain approached him at the Community Arms apartment complex, used a gang-related slur, and shot him. He explained that he did not identify McClain when interviewed by police that evening because he had hoped to retaliate against McClain directly. Price's credibility was a matter for the jury to assess, and a reasonable trier of fact could have credited his testimony. Indeed, McClain conceded that he was at the Community Arms complex the night Price was shot. McClain's closing argument featured the same attacks on Price's credibility he now makes on appeal. The jury heard, and apparently rejected them.[36]

---

[36] McClain also argues the attempted murder conviction cannot form the basis of his death sentence in light of the special need for reliability in capital sentencing. Because we have

### b. *Conspiracy*

Holmes and McClain argue there was insufficient evidence of their conspiracy to commit murder. "A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416; *People v. Johnson* (2013) 57 Cal.4th 250, 257.) Defendants challenge the evidence supporting both the agreement and overt act requirements. The evidence was sufficient.

Both defendants assert the prosecution improperly relied on their gang membership in lieu of proving a conspiracy. Standing alone, a gang's general agreement to fight rivals may not suffice to support a particular conspiracy charge (see *U.S. v. Garcia* (9th Cir. 1998) 151 F.3d 1243, 1247). Here, the prosecution presented ample evidence that violence against the victims was both prearranged and carried out.

Holmes does not dispute that he went to the hospital after learning Fernando Hodges had been shot. He argues his mere presence there was insufficient to show that he entered a conspiracy. But the evidence was more extensive. The jury heard testimony that a crowd of 20 to 30, which included Holmes, had gathered. Most appeared to be gang members. They were quiet, seemed to be awaiting instruction, and did not attempt to go inside the hospital as ordinary visitors would do.

concluded no error infects the attempted murder conviction, nothing about this conviction requires reversal of McClain's death sentence.

The prosecution argued a plan was formulated in this group to avenge Hodges's death by killing Crips. After the crimes, Holmes told Derrick Tate that he and others committed the Wilson Street murders in retaliation for the Hodges shooting. This evidence was sufficient to support a finding that Holmes entered an agreement to find and harm members of the Crips gang. (See *People v. Morante*, *supra*, 20 Cal.4th at p. 416.)

McClain challenges the evidence supporting his entry into a conspiracy because, unlike Holmes, he was *not* at the hospital after Hodges' shooting. Even so, substantial evidence supports the jury's conclusion that McClain joined in an agreement to commit the crimes and did so. (See *People v. Morante*, *supra*, 20 Cal.4th at p. 416.) McClain testified that even before Hodges was taken to the hospital, he heard Hodges had been shot by "some Crips." While others gathered at the hospital, McClain paged his fellow P-9 members, alerting them that he planned to search for Crips to shoot. McClain now argues his assertedly *lone* search for Crips to harm does not support a finding of conspiracy. The jury may not have credited his testimony, however, in light of evidence that he was with those involved in the Wilson Street shooting. Eyewitness Gabriel Pina testified that he saw McClain peering through the front window of one of the four cars involved in the shooting. The same eyewitness saw Holmes return to his nearby car after the shots were fired. Shortly thereafter, McClain bragged that he and others had "put in some work" on some Crips at Wilson Street. The evidence showed McClain intended to go out that Halloween night to kill Crips, informed fellow gang members of that plan, and ultimately rode around with them looking for victims. These facts support a finding of conspiracy to commit murder, as the jury concluded.

Holmes and McClain also argue there is insufficient evidence of an overt act. "Under our statute, an agreement to commit a crime, by itself, does not complete the crime of conspiracy. The commission of an overt act in furtherance of the agreement is also required." (*People v. Johnson*, *supra*, 57 Cal.4th at p. 259.) There was evidence of multiple overt acts.

At some point during the evening, Newborn went to McFee's house looking for known Crips member "Crazy D." A bulge beneath his clothing suggested Newborn was armed. McFee saw four men running down the street, followed minutes later by several gunshots. Some shots appeared to come from near Crazy D's home, and one struck McFee's own residence. McFee's testimony was corroborated by his roommate, Charles Baker, and by physical evidence, including shell casings found in front of McFee's house and across the street. Ballistics evidence linked the ammunition used in this shooting with that used on Wilson Street. Newborn also told DeSean Holmes that he shot at McFee's house with a nine-millimeter Glock, consistent with the shell casings found there.[37]

Nevertheless, defendants contend the jury could not properly have found that they were involved in a 9:00 p.m. shooting at McFee's home because emergency call reports did not log a shooting complaint from that location until 1:00 a.m. They insist the McFee shooting could not have been in furtherance of the Wilson Street attack because it happened later. This argument fails. An officer testified that the log reflects when the call was made. But the log does not indicate when the shots complained of were actually fired. It does not

---

[37] Although DeSean claimed to have no direct memory of this conversation at trial, he told police about it when interviewed.

necessarily correlate with the time shots were fired. Baker, who was present at McFee's home, testified that the shooting happened around 9:00 p.m. He recalled it was "fairly early" in the evening because McFee's son was still awake. The jury could have credited this testimony and rejected the contrary timing suggested by the call log.

Additional evidence of overt acts was presented in testimony about the Wilson Street shootings. Four or five cars sped past the victims. Each car contained several Black men who displayed P-9 gang signs. One shooting victim wore a blue bandana, which caused defendants to mistake the group for Crips.[38] McClain told Mario Stevens that he and others had shot Crips on Wilson Street.[39] The Wilson Street shooters fired from behind bushes. When Holmes told Derrick Tate he had committed a murder to avenge Hodges's death, he said he had jumped from some bushes, yelled, "Trick[-]or[-]treat," and began firing. One of the victims heard an assailant say, "Now, Blood," the same epithet Robert Price testified McClain had used during the attempted murder three days earlier. The jury could have reasonably credited this evidence, which is sufficient to

---

[38] Other victims wore or carried black bandanas, not associated with the Crips gang.

[39] Immediately after Stevens so testified, McClain said, "You are a lying ass piece of shit, man. You are lying through your teeth, man." The court advised McClain that he would have an opportunity to cross-examine the statement and present evidence, if he wished, to challenge that testimony. The prosecution requested the court admonish the jury to disregard the outburst, and the court advised the jury that McClain's statements were "not evidence at this time."

demonstrate that the conspirators committed overt acts. (See *People v. Johnson*, *supra*, 57 Cal.4th at p. 259.)

### c. *Wilson Street Murders and Attempted Murders*

Holmes and McClain argue insufficient evidence supported their convictions for the murders and attempted murders on Wilson Street.[40] The evidence was sufficient.

A number of witnesses connected Holmes and McClain to both planning and motive. Their friend and fellow gang member had been killed earlier that night by a rival gang. McClain testified that he called P-9 members to tell them he intended to seek revenge. Although the victims were children, not Crips, one of them had a blue bandana, a Crips symbol, visible in his pocket when defendants saw them. Holmes concedes he was at the hospital where Hodges was taken and where a number of people, including Newborn and Bowen, gathered to discuss retaliation.

Eyewitness Pina connected both Holmes and McClain to the Wilson Street shooting. A car drove up and idled near Pina who got a good look at the driver and later described him. The lead car then drove toward the remaining cars and someone from the crowd spoke to the driver. Shots erupted moments later. Afterward, Pina saw Holmes run toward the parked cars. Some days later, he went to the police station and identified McClain as the driver of the lead car and Holmes as one of the men who ran to the parked cars after the shooting.

---

[40] The jury was properly instructed on first-degree murder (CALJIC No. 8.20) and attempted murder (CALJIC No. 8.66). Specifically, the jury was instructed that attempted murder required proof of a "direct but ineffectual act" done by a person in an effort to kill another, with "malice aforethought," meaning "a specific intent to kill."

Evidence of defendants' statements also tied them to the crimes. Derrick Tate testified that Holmes also bragged about having been involved in the shooting, saying he wanted to get a hat made to commemorate the event. Holmes had confessed his involvement to Tate, explaining the details of the crime and its vengeful purpose. The day after the shooting, McClain told Mario Stevens "him and his homeys had went down there on Wilson and shot some — some Crips."

McClain's actions after the crimes also pointed to his involvement. His cousin, James Carpenter, told police McClain had talked about committing the murders and became nervous upon learning the victims had been children. Thereafter, McClain cut his hair and left town, telling a fellow passenger he was flying under a fake name and had recently cut his hair. The passenger recalled his ticket was under the name Robert, with a last name like McCain or McClain, though he had given her a pager number with the name "Herb."

Finally, defendants raise a number of additional sufficiency arguments. All fail. McClain asserts his conviction is based on informant testimony given after deals were made. This fact alone does not render the evidence deficient. The jury was aware of agreements but remained entitled to credit the testimony. Holmes asserts that LaChandra Carr's testimony failed to connect him with the Wilson Street shooting because, although he was at the hospital gathering, no evidence indicates he spoke with Newborn and Bowen or formed a plan to retaliate for Hodges's death. However, the jury could have inferred such planning from his admitted presence, particularly in light of the ample additional evidence of his involvement. Holmes also argues Derrick Tate's testimony that he bragged about the shooting was unreliable because, though they were not

incarcerated at the time, Tate should be treated as an "inherently suspect" jailhouse informant. Putting aside the factual mischaracterization of Tate's status, this court has "consistently rejected claims that the testimony of jailhouse informants is inherently unreliable." (*People v. Hoyos* (2007) 41 Cal.4th 872, 898.) As we have explained, there must be a "legal ground for exclusion of otherwise relevant evidence." (*People v. Hovarter* (2008) 44 Cal.4th 983, 996.)[41] Holmes identifies none.

### d. Personal Use of Firearm

Holmes contends insufficient evidence supports the jury's true finding of personal firearm use. (§ 12022.5, subd. (a).) As to each count of murder and attempted murder, the jury found that Holmes "personally used a firearm, to wit, a handgun." He argues the only evidence supporting the enhancement should be discounted as unreliable. Substantial evidence supports the jury's conclusions. (See *People v. Edwards*, *supra*, 57 Cal.4th at p. 715.) Derrick Tate testified that Holmes admitted he was a killer. Holmes told Tate that he and others had "blasted" after jumping from some bushes. Holmes argues this testimony should be discounted because Tate was a felon who spoke with police to gain favor or reward money. In fact, though Tate was given transportation, lodging, and food while in California to testify, he received neither reward nor benefit in his felony prosecution. The reliability of his testimony was properly subject to jury evaluation.

The jury was likewise free to weigh the testimony of Gabriel Pina's girlfriend, Lillian Gonzales. Seconds after shots

---

[41] Holmes and McClain also assert Gabriel Pina's identification was "manifestly unreliable." We have rejected those claims. (See *ante*, at pp. 54–59.)

were fired, Gonzales saw a man wearing a trench coat and holding a gun run from Wilson Street and get into a nearby car. Gonzales acknowledged she was nearsighted, with 20/400 vision in one eye and 20/20 vision in the other but testified that she was able to see the black gun held by the man from a distance of about six houses. Pina later identified Holmes as the gunman. Holmes claims Gonzales's testimony is unreliable because, in her prior interviews and grand jury testimony, she failed to mention that the person she saw running was holding a gun. Although she had confided this fact to coworkers, she acknowledged that she did not mention it in earlier questioning.

The evidence on firearm use was sufficient; the credibility assertions Holmes makes were squarely before the jury.

### e. Special Circumstances

McClain and Newborn challenge the special circumstance findings, arguing they were not major participants in the Halloween shootings. (See *Tison v. Arizona* (1987) 481 U.S. 137.) McClain argues his role was, at most, that of a coconspirator who was elsewhere when the shootings occurred. Newborn similarly contends the evidence shows only that he was at McFee's house, not the multiple-murder site. Both arguments fail. Simply because Newborn and others were involved in a shooting at McFee's house does not mean they could not have committed other crimes that night, as McClain and Newborn seem to urge.

The multiple-murder special circumstance does not require a finding of intent to kill more than one victim. (*People v. Rogers* (2006) 39 Cal.4th 826, 892.) Here, three children perished, all shot during the same short encounter. Viewed in the light most favorable to the judgment, the jury reasonably

could have concluded that McClain and Newborn intended to kill at least one victim and were responsible for killing others. (See *People v. Maciel* (2013) 57 Cal.4th 482, 521.)

The lying-in-wait special circumstance required, at the time of the crime, that the murder be committed with intent to kill *while* lying in wait.[42] (*People v. Streeter*, *supra*, 54 Cal.4th at p. 246.) This special circumstance requires concealment of purpose, a period of watchful waiting, and a surprise attack. (*Ibid*.) Those elements were satisfied. The victims were walking down the street, unaware of hidden assailants. The first gunshots came from behind bushes where the assailants hid. In describing the night to Derrick Tate, Holmes said he hid in bushes, then jumped out and began firing. As Holmes admitted to Tate, and as others described, the assailants hid behind bushes before jumping out and firing.

Even if Newborn and McClain were not the shooters, substantial evidence supports the jury's true findings on an aiding and abetting theory under section 190.2 as it existed in 1993. Subdivision (c) of the statute then provided, "Every person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole" in a case in which a special circumstance has been found true. (§

---

[42]    First degree murder perpetrated by means of lying in wait was distinct from the special circumstance because it required only wanton and reckless intent to inflict injury likely to cause death and could be perpetrated by means of, not necessarily while, lying in wait. (*People v. Streeter* (2012) 54 Cal.4th 205, 246.)

190.2, former subd. (b).) Evidence establishing these requirements was presented against both defendants. Newborn was seen at McFee's house with a bulge under his clothing that appeared to be a weapon. Shortly after he left, shots were fired. Physical evidence connected the weapon used at McFee's house with the weapon used on Wilson Street. Similarly, McClain was seen driving the lead car and later bragged that he had shot Crips on Wilson Street. He also held a .38-caliber or nine-millimeter gun while singing lyrics that implied he had used the gun to kill someone.

### 4. *Prosecutorial Misconduct*

Defendants argue several remarks during the prosecutor's closing argument were misconduct. Improper comment by a prosecutor requires reversal if it so infects a trial with unfairness as to deny due process or " 'if it involves the use of deceptive or reprehensible methods to persuade.' " (*People v. Winbush* (2017) 2 Cal.5th 402, 480 (*Winbush*).) The remarks complained of here neither deceived the jury nor undermined due process.

McClain was arrested with Bowen for firearm possession about a year before the Halloween shootings. The prosecutor mentioned this arrest in closing argument to suggest that McClain did not intend to act innocently, or alone, on the night of the murders. McClain objected, noting the arrest was for gun possession, not for "shooting at anyone." The court allowed argument to proceed, implicitly overruling the objection. No further mention was made of the arrest. McClain now complains the prosecutor improperly argued facts not in evidence. Counsel is not permitted to "assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]"; however,

the reasonableness of inferences counsel draws from matters in evidence " ' "is for the jury to decide." ' " (*People v. Valdez, supra,* 32 Cal.4th at pp. 133–134.) McClain's prior arrest with Bowen was a fact in evidence. The prosecutor could appropriately refer to it in asking the jury to disbelieve McClain's claim that he intended to act alone on the night of the murders. These "comments did not mischaracterize or assume facts not in evidence, but merely commented on the evidence and made permissible inferences." (*Id.* at p. 134.)[43]

McClain next claims the prosecutor committed misconduct by referring to security guard Horace Carlyle's testimony that a group gathered at the hospital after Hodges's death appeared to include gang members. Defense counsel did not object below. (See *Dykes, supra,* 46 Cal.4th at p. 756; see also *Winbush, supra,* 2 Cal.5th at p. 481.) Even if preserved, the claim would fail. Carlyle testified that he believed a group gathered outside the hospital might be gang members. Although the court prevented further questioning on the subject, the testimony about Carlyle's belief was not stricken. Accordingly, the prosecutor's reference was an appropriate comment on the evidence (*People v. Leon, supra,* 61 Cal.4th at pp. 605–606), and its weight was for the jury to determine.

At one point in his argument, the prosecutor observed that witnesses had been afraid to testify and noted that defendants

---

[43] McClain also contends the prosecutor misstated the law by creating a misimpression that his use of a gun in the Price and Wilson Street shootings would permit the jury to find him guilty of both crimes. He fails to identify the precise argument he finds objectionable. In any event, he failed to raise this objection below. (See *Dykes, supra,* 46 Cal.4th at p. 756; see also *Winbush, supra,* 2 Cal.5th at p. 481.)

had the ability to retaliate against them. McClain asserts these comments were improper. The argument was fair comment. Numerous witnesses testified that they or their families had been threatened and that they were afraid to testify. The prosecutor appropriately discussed this evidence and did not improperly assert that McClain or any codefendant had threatened witnesses, jurors, or anyone else in the courtroom. The prosecutor briefly resorted to flowery rhetoric but doing so was neither deceptive nor reprehensible. (See *Winbush, supra,* 2 Cal.5th at p. 481.)

McClain next complains three of the prosecutor's comments sought to lessen the state's burden of proof or shift it to McClain. No objection was raised below, and none of the remarks constituted misconduct. First, the prosecutor noted that McClain had said P-9 members were not welcome at King's Manor because it was controlled by a rival gang. The prosecutor simply mentioned this evidence but attached no nefarious significance to it, as McClain now asserts. Second, the prosecutor acknowledged that many witnesses, including his own, belonged to gangs, had been threatened, or had received some financial incentive to testify. This was fair comment on the evidence and not, as McClain asserts, an attempt to blame defendants for the poor quality of their witnesses. Finally, the prosecutor argued that if any P-9 member had resembled McClain, McClain would have presented evidence of the fact. This stray remark, to which McClain did not object, did not impermissibly shift the burden of proof or rise to the level of misconduct. It is not misconduct to argue the absence of evidence reasonably available. (See *People v. Bennett* (2009) 45 Cal.4th 577, 596; *People v. Cornwell* (2005) 37 Cal.4th 50, 90.)

Defendants next argue the prosecutor improperly sought to rouse sympathy by referring to photographs of the victims, which had remained on display during arguments, without objection. The prosecutor noted that the photos showed "dead children; big children, but dead children." Defendants failed to object to the comment (see *Dykes*, *supra*, 46 Cal.4th at p. 756; see also *Winbush*, *supra*, 2 Cal.5th at p. 481) and the claim lacks merit. Advocates have wide latitude to comment on the evidence and may present vigorous argument to do so. (*People v. Leon*, *supra*, 61 Cal.4th at pp. 605–606.) So long as the prosecutor's argument is a fair comment on the evidence, or constitutes a reasonable inference from it, no misconduct will be found. (*Ibid*.) Here, the prosecutor's reference to the victims' photographs was a fair discussion of the evidence. "Crimes of violence . . . are almost always upsetting. Discussing the manner in which they are committed is fair comment. There is no requirement that crimes of violence be described dispassionately or with philosophic detachment." (*Id.* at p. 606.)

The prosecutor urged jurors to view themselves as "the only thing between [defendants] and their next victims." After the court sustained an objection, the prosecutor told jurors they would be sending a message by their verdict "one way or the other." Defendants again objected, and the court admonished that the jury's "duty is not to send a message but to determine the evidence in this case and make a determination in deliberation." Defendants now renew their claim that these statements constituted prejudicial misconduct. " ' "It is, of course, improper [for the prosecutor] to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or

invites an irrational, purely subjective response.' " ' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894 (*Covarrubias*).) However, any allegedly improper statements by the prosecutor must be considered in light of the entire argument. (*Ibid.*) " 'In conducting [our] inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Ibid.*)

The prosecutor's assertion that jurors were the only thing standing between defendants and their next victims improperly appealed to jurors' fear of violence, suggesting they decide the case based on this emotion rather than a critical and neutral evaluation of the evidence. But the impropriety does not violate due process when, as here, an objection was sustained and followed by a curative instruction. (*Greer v. Miller* (1987) 483 U.S. 756, 765–766.) For the same reason, the claim fails under state law. (*Winbush*, *supra*, 2 Cal.5th at p. 480.) Defendants object that the court's admonition was not sufficiently curative because, after noting that defendants had a right to a fair trial, the court added, "[B]ut also the reason they have a right to a fair trial is because we have three dead people. He has a right to comment on it." However, defendants ignore the court's unequivocal condemnation of the prosecutor's statement as "a patent appeal to passion and prejudice. It is improper; it is misconduct." In light of this clear and contemporaneous rebuke, the prosecutor's statement would not have so inflamed the jury's passions or infected the trial with unfairness that due process was denied. (See *ibid.*) Indeed, the prosecutor may have undermined his own credibility by employing a strategy firmly condemned by the court.

In a related point, McClain and Holmes contend it was misconduct for the prosecutor to urge the jury to solve the social

problems of gangs and violence by returning convictions. Again, no objection was interposed. (See *Dykes*, *supra*, 46 Cal.4th at p. 756; see also *Winbush*, *supra*, 2 Cal.5th at p. 481.) Had it been properly preserved, the prosecutor's comments were tantamount to comparing the jury to " 'the conscience of the community,' " a practice we have routinely upheld as proper. (*People v. Gamache* (2010) 48 Cal.4th 347, 388–389.)

Finally, defendants argue it was misconduct for the prosecutor to request convictions so that the victims could rest in peace. Again they did not object (see *Dykes*, *supra*, 46 Cal.4th at p. 756; see also *Winbush*, *supra*, 2 Cal.5th at p. 481), and the assertion fails on the merits as well. Viewed in context of the closing argument as a whole, the statement did not constitute inflammatory rhetoric designed to provoke a thoughtless emotional response. (*Covarrubias*, *supra*, 1 Cal.5th at p. 894.) It was fair comment on the crimes committed and the jury's role in dispensing justice.

### 5. *Instruction Issues*

#### a. *Consciousness of Guilt (CALJIC No. 2.03)*

Holmes argues the consciousness of guilt instruction, CALJIC No. 2.03,[44] was improperly argumentative, constituted an improper pinpoint instruction, and lessened the prosecution's burden of proof. He acknowledges we have consistently rejected

---

[44] As given, CALJIC No. 2.03 provides: "If you find that before this trial defendant made a willfully false or deliberately misleading statement concerning the crime for which is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

similar claims (see, e.g., *Covarrubias*, *supra*, 1 Cal.5th at p. 922; *People v. Holloway* (2004) 33 Cal.4th 96, 142), and offers no reason to reconsider these holdings.

### b. *Suppression of Evidence (CALJIC No. 2.06)*

Evidence was presented that McClain cut his hair and Newborn disposed of a weapon shortly after the Halloween shootings. Accordingly, the court gave CALJIC No. 2.06, concerning defense suppression of evidence.[45] Holmes and McClain argue the instruction was unnecessary, argumentative, and permitted the jury to draw irrational inferences.

We review of an instructional error claim by evaluating whether the jury could have applied the challenged instruction in an impermissible manner. (*People v. Smithey* (1999) 20 Cal.4th 936, 963.) " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not . . . from a particular instruction." ' " (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)

There was no error. The instruction invites the jury to consider the significance of a defendant's alteration of physical appearance and destruction of evidence. (See *People v. Adams* (2014) 60 Cal.4th 541, 571.) It was not improperly

---

[45] As given, CALJIC No. 2.06 provided: "If you find that a defendant attempted to suppress evidence against himself herself [*sic*] in any manner, such as by the intimidation of a witness, by an offer to compensate a witness, by destroying evidence[,] by concealing evidence, by cutting hair, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

argumentative, nor did it permit the jury to draw irrational inferences. (*People v. Stitely* (2005) 35 Cal.4th 514, 555.)

> #### c. *Other Crimes (CALJIC Nos. 2.50, 2.50.2, 2.50.2)*

Over McClain's objection, the jury was given CALJIC Nos. 2.50,[46] 2.50.1,[47] and 2.50.2[48] regarding other crimes evidence as

---

[46]  As given, CALJIC No. 2.50 provided: "Evidence has been introduced for the purpose of showing that a defendant committed a crime other than that for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove the defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:  The defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged, [¶] The existence of a conspiracy. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in this case. [¶] You are not permitted to consider such evidence for any other purpose."

[47]  As given, CALJIC No. 2.50.1 provided: "Within the meaning of the preceding instruction, the other crime purportedly committed by the defendant must be proved by a preponderance of the evidence. You must not consider such evidence for any purpose until you are satisfied that a particular defendant committed the other crime. [¶] The prosecution has the burden of proving these facts by a preponderance of the evidence."

[48]  As given, CALJIC No. 2.50.2 provided: " 'Preponderance of the evidence' means evidence that has more convincing force and the greater probability of truth than that opposed to it. If the evidence is so evenly balanced that you are unable to find [] the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it. [¶] You should consider all of the evidence bearing upon every issue regardless of who produced it."

proof of conspiracy. McClain renews his arguments here, but they lack merit.

McClain first argues the instructions lessened the prosecution's burden of proof. We rejected a similar claim in *O'Malley*, *supra*, 62 Cal.4th 944. Challenging the same three instructions, O'Malley argued the jury could have misconstrued the instructions to permit conviction of conspiracy to commit murder of one victim simply by finding by a preponderance of the evidence that he had assaulted and robbed someone else. (*Id.* at p. 991.) We concluded there was no suggestion the jury was confused about what other crimes it could consider, or how those other crimes were to be analyzed in relation to the charged offenses. (*Ibid.*) The same is true here. An instructional error claim is reviewed in the context of the record and instructions as a whole to determine whether there is " ' "a reasonable likelihood that the jury was misled to defendant's prejudice." ' " (*Ibid.*) We assume that jurors are intelligent and well able to understand and integrate all the instructions given. (*Ibid.*) The instructions made clear that the uncharged acts could *only* be considered in connection with the conspiracy charge. CALJIC No. 2.50.1 informed the jury that the evidence could not be considered unless it had been proven by a preponderance of the evidence. There is no reasonable likelihood jurors were misled.

McClain next argues the instructions failed to harmonize the different burdens of proof, permitting conviction of conspiracy on a constitutionally deficient standard. That is not so. Taken together, the instructions explain that the other crimes cannot be *considered at all* unless they were proven by a

preponderance of the evidence. If the jury concluded that threshold showing was met, it could then determine whether those crimes, along with any other evidence, established *beyond a reasonable doubt* that McClain committed conspiracy. The instructions are accurate and were properly given. (See *O'Malley*, *supra*, 62 Cal.4th at p. 991; *People v. Sattiewhite* (2014) 59 Cal.4th 446, 475.)

McClain contends the other crimes instruction was erroneous because it could have been used to determine his guilt for the charged crimes. The instruction's language reveals the flaw in this argument. CALJIC No. 2.50 states that other crimes evidence "may be considered by you [*only*] *for the limited purpose* of determining if it tends to show: [¶] . . . [¶] [The defendant had knowledge or possessed the means that might have been useful or necessary for the commission of *the crime charged*;]" *the existence of a conspiracy*. (Italics added.)

Finally, McClain claims the instructions allowed the jury to find him guilty of conspiracy if they believed him to be of bad character. CALJIC No. 2.50 specifically instructed otherwise: "evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that [he] has a disposition to commit crimes." The jury was also instructed that the crime of conspiracy requires proof of an agreement and an overt act in furtherance of that agreement. (CALJIC No. 6.10.) There is no reason to believe jurors were unable to apply these instructions. (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 475.) McClain's argument that the jury was confused because it was unsure which of his "other crimes" it could consider is similarly unavailing. (See *O'Malley*, *supra*, 62 Cal.4th at p. 991.) The jury

was given CALJIC No. 2.23,[49] which explained that the felony convictions were relevant to the separate issue of credibility.

### d. Motive (CALJIC No. 2.51)

The jury received CALJIC No. 2.51: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled." McClain argues this instruction improperly shifted the burden of proof to him, lessened the prosecution's burden, and impermissibly allowed the jury to determine guilt based upon motive. We have previously rejected similar claims and do so again.

*People v. Prieto* (2003) 30 Cal.4th 226, 254, explained that CALJIC No. 2.51 does not concern a standard of proof, but rather addresses motive. Because there was no reason a jury could or would confuse a motive instruction with a reasonable doubt instruction, we concluded CALJIC No. 2.51 does not violate the defendant's right to due process. (*Prieto*, at p. 254.) McClain argues the jury should have been cautioned that motive alone is insufficient to establish guilt. *People v. Snow* (2003) 30 Cal.4th 43, 97–98, rejected this contention, explaining: "If the challenged instruction somehow suggested that motive alone

---

[49] As given, CALJIC No. 2.23 provided, "The fact that a witness has been convicted of a felony, if such be a fact, may be considered by you only for the purpose of determining the believability of that witness. The fact of such a conviction does not necessarily destroy or impair a witness' believability. It is one of the circumstances that you may take into consideration in weighing the testimony of such a witness."

*was* sufficient to establish guilt, defendant's point might have merit. But in fact the instruction tells the jury that motive is not an element of the crime charged (murder) and need not be shown, which leaves little conceptual room for the idea that motive could establish *all* the elements of murder." (*Ibid.*) The trial court did not err by giving CALJIC No. 2.51.

### e. Burden of Proof (CALJIC Nos. 1.00, 2.01, 2.51, 2.52)

Holmes argues the court violated his rights to due process and a fair trial by instructing the jury with CALJIC Nos. 1.00,[50] 2.01,[51] 2.51, and 2.52[52] because those instructions impermissibly discussed guilt and innocence. Holmes contends these instructions violated his state and federal constitutional

---

[50] CALJIC No. 1.00, titled "Respective Duties of Judge and Jury," provided in pertinent part, "You must not be biased against the defendant because he has been arrested for this offense, charged with a crime, or brought to trial. None of these circumstances is evidence of guilt and you must not infer or assume from any or all of them that he is more likely to be guilty than innocent."

[51] CALJIC No. 2.01, titled "Sufficiency of Circumstantial Evidence — Generally," provided in pertinent part, "Also, if the circumstantial evidence as to any particular count is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt."

[52] CALJIC No. 2.52, entitled "Flight After Crime," provided, "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

rights because they suggested the jury's decision was between guilt and *innocence* rather than whether there was a reasonable doubt as to his guilt. As Holmes acknowledges, we have rejected similar arguments. (See, e.g., *People v. Streeter*, *supra*, 54 Cal.4th at p. 253; *People v. Kelly* (2007) 42 Cal.4th 763, 792.) Likewise, here. "Each of these instructions ' "is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof." ' " (*Streeter*, at p. 253.)

### f.   Special Circumstance Instruction

Newborn and McClain argue the jury was erroneously instructed with the 1993 version of CALJIC No. 8.80.1,[53] which

---

[53]   "If you find the a [*sic*] defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances:  is true or not true: that a defendant committed one or more murders in addition to first degree murder and a murder was committed while lying in wait. [¶] The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true. [¶] If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor or co-conspirator, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree. [¶] You must decide separately as to each of the defendants the existence or nonexistence of each special circumstance alleged in this case. If you cannot agree as to all the defendants, but can agree as to one or more of them, you make your findings as to the one or more upon which you do agree. [¶] You must decide separately each special circumstance alleged in this case as to each of the defendants. If you cannot

did not inform jurors of the constitutional requirement that each defendant be "a major participant" in the homicidal conduct alleged and that each defendant harbor either an intent to kill or a mental state of reckless indifference to human life. (See *Tison v. Arizona, supra,* 481 U.S. 137.) They assert *Tison* established the level of personal involvement required for an aider and abettor to be eligible for the death penalty. They misread the decision. *Tison* instead addressed "the proportionality of the death penalty in . . . midrange felony-murder cases." (*Id.* at p. 155.) Those issues are not involved here. Defendants' challenge to CALJIC No. 8.80.1 is unfounded. (See *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 298, fn. 16.)[54]

## B. *Penalty Phase*[55]

### 1. *Pretrial Issues*

#### a. *Issues related to McClain's Counsel*

McClain argues he was denied his right to counsel during the penalty retrial by various rulings. No error occurred.

---

agree as to all of the special circumstances, but you can agree as to one or more of them, you must make your findings as to the one or more upon which you do agree. [¶] In order to find a special circumstance alleged in this case to be true or untrue, you must agree unanimously. [¶] You will state your special finding as to whether this special circumstance is or is not true on the form that will be supplied." (CALJIC No. 8.80.1.)

[54] The language defendants argue should have been included was later added to CALJIC No. 8.80.1 in felony-murder cases. We recently held this language is flawed because it permits "the jury to find the multiple-murder special circumstance true without finding defendant intended to kill a human being." (*Covarrubias, supra,* 1 Cal.5th at p. 929.)

[55] Holmes contends guilt phase errors individually and collectively rendered the trial unfair and had the additional

*i. Background*

On March 15, 1996, a little over a month after the first jury deadlocked, the prosecution announced its intent to retry the penalty phase. A week later, Newborn and McClain requested a continuance, arguing they needed additional investigation and time to prepare for a retrial of "the entire case." The request was denied. The court found no good cause for the delay because counsel "could anticipate this was going to go to trial again."

The next day, McClain's attorney Elizabeth Harris moved to continue the penalty retrial for 60 days due to persistent health issues. The court relieved Harris, and appointed Richard Leonard, an experienced death penalty advocate, as replacement counsel. The other alternative was for McClain to represent himself, but the court advised against that. The court adjourned to contact Leonard regarding the appointment.

When the parties returned to court, McClain said he had met with Leonard but preferred to represent himself. The court told McClain to make that request in writing within 10 days, taking into account that it was a death penalty case and addressing "some of the behavior that we have had." It cautioned that McClain would be "fighting for [his] very life" handling a death penalty case, which very few lawyers are

---

effect of poisoning his penalty phase defense. No such prejudice could have attached because the jury that convicted these defendants failed to agree on a penalty verdict. The penalty phase was ultimately retried before a new jury, which returned a verdict of death. To the extent any errors occurred during the guilt phase, none could have affected the penalty determination reached by a different jury that heard newly presented evidence and received its own instructions.

equipped to do. Leonard could remain involved as standby counsel, however, if McClain proceeded in propria persona.

A few days later, McClain filed a "Motion to Represent Self in Pro Per or to Appoint New Counsel," citing both *Faretta v. California* (1975) 422 U.S. 806, 807 (*Faretta*) and *People v. Marsden* (1970) 2 Cal.3d 118. The prosecutor argued McClain should be permitted to represent himself, with standby counsel and with a continuance to allow standby counsel time to prepare. Tackling McClain's *Faretta* motion first, the court probed whether McClain had engaged in any acts of violence against law enforcement that might affect his self-representation decision. Because McClain had been in an altercation with a fellow inmate, the court requested additional briefing on what safety measures would be appropriate if he were to proceed in propria persona.

The matter was continued to April 9, 1996. That same day, McClain filed a "Petition to Proceed in Propria Persona," listing numerous advisements and admonitions about the right of self-representation. The court reviewed these admonitions with McClain. It also clarified the specific security measures that would be employed, explaining that McClain would not be able to leave the confines of a small area while conducting his defense. The court stated: "I will allow you to stand. You will be wearing a belt, and that is because of the past activities. [¶] . . . I will make it so you look presentable, but you will not go past a certain area. Understand? [¶] There will be a podium. You can use that." McClain indicated his assent. The court also informed McClain that if it allowed him to proceed in propria persona, "we will have Mr. Leonard, who has been appointed by the supervising judge, as standby counsel." Leonard added that McClain preferred he serve in the role of advisory counsel

instead, and McClain confirmed that was his wish. The court accepted McClain's waivers and granted his propria persona request. McClain indicated readiness to proceed to trial a week later, but the court granted a continuance until June 28, 1996, a period of over 10 weeks. The case was then continued once more, to August 12, 1996. As a result, Newborn received additional preparation time, as he had requested on March 15.

### ii. Discussion

McClain first contends the court arbitrarily and unreasonably denied attorney Harris's request for a continuance, ultimately depriving him of the right to effective assistance of counsel. The court relieved attorney Harris due to her medical condition. McClain argues Harris requested only a 60-day continuance to recuperate. He asserts the denial of this request resulted in his loss of counsel and a much longer trial delay. The record does not bear out McClain's assertions.

When Harris appeared in court after the first continuance request was denied, she told the court in stark terms that her health prevented her from continuing to represent McClain: "Your honor, the court has mentioned my health; and I am very serious when I say this: I can't try this case, judge. I literally cannot do it." Initially, the court responded, "I don't feel like I want to do it either," and "we are just going to have to do it." However, the next day Harris filed a formal motion to continue the case for 60 days due to her ongoing health problems. In fact, Harris's illness prevented her from appearing at the hearing on this motion. The court noted its awareness of Harris's health issues and commented, "The new rules of court are that we do not grant any continuance on a [section] 1050 without good cause. [¶] . . . [¶] So the question is do we relieve Miss Harris."

Having reviewed declarations from Harris and her doctors, the court appeared persuaded that Harris might need considerably more than 60 days to recover sufficiently and proceed to trial. To that end, the court asked the attorney standing in for Harris to recommend substitute counsel, and Leonard was suggested.

*People v. Mungia* (2008) 44 Cal.4th 1101, 1119, held it was not an abuse of discretion for a court to replace counsel, rather than grant a requested continuance so that an attorney could recover from a heart attack. We reasoned that there was no guarantee the attorney would have actually recuperated by the date projected. (*Ibid.*) Similarly here, although Harris requested a 60-day continuance, her moving papers did not indicate that that her health condition would necessarily be resolved by then. Trial courts enjoy broad discretion with regard to continuances, and "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." (*Morris v. Slappy* (1983) 461 U.S. 1, 11−12.) The request here was further complicated by the fact that the trial involved two other codefendants whose rights were also implicated. As in *Mungia*, "the court did not abuse its discretion by declining to wait for more information." (*Mungia*, at p. 1119)

McClain next contends the trial court denied his *Marsden* motion without a hearing in violating his rights to a fair trial and the effective assistance of counsel. He asserts the court was obliged to permit him to "put on the record instances of [his asserted] misconduct" and its failure to do so was an abuse of discretion. Not so. McClain sought substitution of counsel only if the court denied his *Faretta* motion. He asked for "an order . . . to act as his own counsel, . . . *or in the alternative* to appoint new counsel." (*Italics added*.) The court determined this motion

was in reality a *Faretta* motion, not a *Marsden* motion, a hearing on which would have required the prosecutor's exclusion. Because the court granted McClain's *Faretta* motion, it had no occasion to consider the alternative request for substitution of counsel. At no time did McClain object to attorney Leonard's participation as advisory counsel. McClain cannot be heard to now complain that the court granted his request as he framed it. The court did not violate his constitutional rights by failing to address an alternative motion that had become moot.

Finally, McClain argues his waiver of the right to counsel was not knowing, voluntary, or intelligent. Of course, criminal defendants have a constitutional right to the assistance of counsel during all critical stages of the proceedings. (See *Faretta*, *supra*, 422 U.S. at p. 807; *United States v. Wade* (1967) 388 U.S. 218, 223–227.) This right may be waived, however. "An effective waiver requires that the defendant possess the mental capacity to comprehend the nature and object of the proceedings against him or her, and waive the right knowingly and voluntarily. [Citations.] There is no prescribed script or admonition that trial courts must use to warn a defendant of the perils of self-representation. But the record as a whole must establish that the defendant understood the 'dangers and disadvantages' of waiving the right to counsel, including the risks and intricacies of the case. [Citations.] If a defendant validly waives the right to counsel, a trial court *must* grant the request for self-representation." (*People v. Daniels* (2017) 3 Cal.5th 961, 977–978, italics added (*Daniels*).) "Where a trial court has granted a defendant's request for self-representation, the question on appeal is 'whether the defendant knowingly and intelligently waived the right to counsel.' " (*People v. Burgener*

(2016) 1 Cal.5th 461, 471 (*Burgener*).) "We review a *Faretta* waiver de novo, examining the entire record to determine the validity of a defendant's waiver." (*Daniels*, at p. 978.)

McClain first asserts that the trial court failed to "fully and accurately inform him of his legal options with regard to counsel" because it suggested his only options were self-representation or representation by attorney Leonard. He claims the court simply elicited responses to boilerplate questions and did not conduct the probing inquiry required by *Faretta*. (See *Moran v. Godinez* (9th Cir. 1994) 57 F.3d 690, 705.) The record reflects otherwise.

The court carefully and thoroughly advised McClain of his constitutional rights and the consequences of waiving them. McClain expressly confirmed, both orally and in writing, "I understand that I have the right to be represented by a lawyer at all stages of the proceedings and, if I do not have funds to employ counsel, one will be appointed for me by the court." To this end, McClain successfully asked the court to appoint Leonard to serve as his "advisory counsel." McClain affirmed that he understood his constitutional rights, that he wished to act as his own lawyer, and that he would be "giving up the right to be represented by a lawyer appointed by the court." Asked if he understood that he would "have to conduct [his] own defense by [him]self and without the aid of a lawyer," McClain said he did and was "willing to do that." The court also warned that he might not be allowed to change his mind and have a lawyer appointed, depending on the stage of the proceedings. McClain assured the court he understood. These warnings, and many others, were also contained in McClain's own "Petition to Proceed in Propria Persona" executed on April 9, 1996. There is no basis to McClain's assertion that he was not fully or

accurately informed of his legal options. Indeed, he identifies no specific fact that was kept from him, or about which he was ignorant. The trial court read from his own petition to ensure McClain understood what he had signed, and it probed beyond the form to assess McClain's willingness and ability to serve as his own counsel. (*Burgener*, *supra*, 1 Cal.5th at p. 465.) The record reflects the waiver was freely given.

McClain next contends the court failed to apprise him, either in the petition or orally, of his Eighth and Fourteenth Amendment rights to have the penalty jury consider his character, record, and the circumstances of his offense. However, a waiver of the right to counsel is valid so long as the defendant understands "the nature and object of the proceedings against him or her" and relinquishes "the right knowingly and voluntarily." (*Daniels*, *supra*, 3 Cal.5th at p. 977.) No magic words are required, so long as the record demonstrates the defendant was aware of "the 'dangers and disadvantages' of waiving the right to counsel, including the risks and intricacies of the case." (*Id.* at p. 978.) The court need not inform a defendant of attendant rights a valid waiver also relinquishes. Nor does the failure to advise about specific constitutional provisions defeat an otherwise valid waiver. (*Ibid.*) This record demonstrates McClain was sufficiently advised. The court warned McClain on numerous occasions of the dangers associated with self-representation, particularly in a capital case. Nevertheless, it was satisfied that he understood the risks of doing so. McClain's complaint that he was not fully aware of arguments that could be made to a penalty-phase jury does not render his waiver invalid. When a defendant knowingly and intelligently waives the right to counsel he assumes the role of attorney in full. The court is not obligated to coach him how to

conduct the defense he has taken upon himself. We note also that McClain had participated in the initial penalty phase trial, at which all defendants presented a case in mitigation. Thus, the arena into which he chose to enter was not completely *terra incognita.*

Finally, McClain contends his lack of education, the complexity of a multi-defendant capital case, and the highly specialized nature of penalty-phase litigation combined to render his *Faretta* waiver invalid. In determining whether to permit a *Faretta* waiver, we have suggested "the court provide advisements falling into three general categories: (1) ensuring the defendant's awareness of the ' "dangers and disadvantages" ' [citation] associated with self-representation; (2) inquiring into the defendant's intellectual capacity; and (3) informing the defendant that he or she cannot later claim inadequacy of representation." (*Daniels*, *supra*, 3 Cal.5th at p. 978; see *People v. Lopez* (1977) 71 Cal.App.3d 568, 572–574.)

McClain now argues his failure to graduate from high school and his work as a brick layer and store clerk "hardly prepared him to defend himself in a capital penalty phase." But the court warned him of the difficulty of presenting such a defense, sharing its opinion that "very few lawyers" were qualified to handle death penalty cases. The court also expressly inquired into McClain's educational background, previous employment, and experience with self-representation. The court explained that McClain would be expected to follow all the technical and substantive rules of criminal procedure and evidence and was required to uphold the dignity and standards of the court. It further explained that McClain would be expected to select a jury, make preliminary motions, give an opening statement and closing argument, and cross-examine

witnesses. McClain indicated he understood and was prepared to undertake these tasks. After again asking whether McClain was certain he wanted to represent himself, the court was satisfied with his representations and granted him propria persona status.

As in *Daniels*, "[t]he record as a whole supports the court's conclusion" that McClain was competent to waive his right to counsel. (*Daniels, supra,* 3 Cal.5th at p. 980.) Despite the court's strong warnings that McClain was fighting for his life and should do so with the assistance of a competently trained lawyer, McClain repeatedly made clear he wished to represent himself. McClain's waiver "reflects his personal preference to control his own defense — which, no matter how ill advised, he was entitled to do under *Faretta*." (*Ibid.*)

We also note that, in ruling on a *Faretta* motion the court confronts a particularly delicate determination. A defendant has a right to counsel *and* a right to represent himself. These critical rights stand side by side, but do not intersect. If a defendant knowingly and voluntarily waives the first, the court must grant an otherwise valid request to exercise the second, unless the defendant is unable to competently pursue it.

### b. *Joinder*

Holmes and Newborn frequently sought to sever their trials during the penalty phase, generally due to McClain's conduct. The court denied each request. Defendants now contend the rulings deprived them of due process and a reliable penalty determination. We conclude to the contrary.

### i. *Background*

During a pretrial hearing, Newborn and Holmes sought severance based on McClain's "obscenities and profanities"

during the guilt phase trial. The court denied the motion, noting that Newborn himself had engaged in similar behavior the week before.[56] The court explained, "They are all together. They told the court this and the jury, they're P-9's they're damn proud of it. [¶] They won't be severed. I don't find any rationale for that argument at all." A little over a week later, Holmes moved to sever his penalty trial from Newborn's and McClain's. The motion was denied. Representing himself, McClain's opening statement was laden with profanity and he was admonished several times for his argumentative style. He also admitted his gang membership. McClain's codefendants did not renew their motions for severance at that point.

Newborn sought severance again after McClain threatened witness Joseph Petelle. Petelle told the court that, when he left the stand and walked past counsel table, McClain had whispered, "I'll kill you." McClain's advisory counsel disputed this account, explaining that he understood McClain to say, "You're a dick head." The court allowed the prosecution to present evidence of the threat under section 190.3, factor (b). The court denied Newborn's severance motion but gave a limiting instruction that the statement to Petelle was offered against McClain only.

Newborn and Holmes sought severance again near the end of the trial when McClain threatened a deputy. (See *post*, at pp. 118–121.) The motion was denied. Newborn sought

---

[56] When the prosecutor announced an intent to retry the penalty phase, Newborn turned to him and said, "Fuck you." He then added, "Fuck you. Suck my dick." The court added, "For the record" that Newborn "was facing the court when he said, 'Fuck you,' and was also giving a P-9 sign."

severance a final time when he unsuccessfully moved for a mistrial before closing argument.

### ii. Discussion

The law governing severance is settled. As noted earlier (*ante*, at pp. 19, 20) joint trials are preferred. (See § 1098; *People v. Sánchez*, *supra*, 63 Cal.4th at pp. 463–464 (*Sánchez*); *Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 378.) They "promote efficiency and help avoid inconsistent verdicts." (*Sánchez*, at p. 464; see *Zafiro*, *supra*, 506 U.S. at p. 537.) Further, " '[i]mportant concerns of public policy are served if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against [the] ensuing charges.' " (*Sánchez*, at p. 464.) Review is for abuse of discretion based on the facts before the trial court at the time it ruled. (*Ibid*.) If the denial of severance was proper at the time, we may reverse only upon a showing "that the joint trial caused gross unfairness that denied due process." (*Ibid*.)

Generally, severance may be appropriate "if there is an incriminating confession, prejudicial association, likely confusion due to evidence on multiple counts, conflicting defenses, or the possibility that a codefendant might provide exonerating testimony at a separate trial." (*Sánchez*, *supra*, 63 Cal.4th at p. 464.) Some of these factors have less force here because defendants had already been found guilty. Newborn and Holmes argue they were prejudiced by association with McClain, whose repeated outbursts and use of profanity may have influenced the jury to impose the death penalty on all of them. Holmes asserts the court recognized this disadvantage when it warned McClain his presentation style could negatively impact his codefendants. "Prejudicial association might exist if

'the characteristics or culpability of one or more defendants [is] such that the jury will find the remaining defendants guilty simply because of their association with a reprehensible person, rather than assessing each defendant's individual guilt of the crimes at issue.' " (*Ibid.*) Although prejudicial association may justify severance in some circumstances, that is not the case here.

We rejected a similar claim of prejudicial association based on a codefendant's self-representation in *Bryant, Smith and Wheeler*. There, we explained, "no authority holds that severance is required simply because self-represented and attorney-represented codefendants have been joined for trial. To the contrary, many courts have held there is no per se bar against joint trials in these circumstances. (See, e.g., *U.S. v. Celestin* (1st Cir. 2010) 612 F.3d 14, 21; *U.S. v. Veteto* (11th Cir. 1983) 701 F.2d 136, 139.) . . . It is always possible that a codefendant or, for that matter, another attorney might engage in inappropriate behavior. Protection against that possibility is found not in severance, but in the court's duty to control the proceedings and ensure each defendant receives a fair and reliable trial. A court, of course, may take appropriate measures to prevent and sanction misconduct. (See, e.g., *Veteto*, at pp. 138–139 [suggesting various precautionary steps].) Severance is not required simply as a preemptive measure based on an assumption that the court will be unable to control the proceedings." (*Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 385.)

The trial court here took repeated and appropriate steps to manage the courtroom. Although McClain's presentation was confrontational and replete with profanity, the court frequently admonished him and instructed the jury. The court made clear

that McClain did not speak for the other defendants and that what he said while questioning or during outbursts was not evidence against them.

Newborn and Holmes also argue severance was warranted because the evidence they presented in aggravation and mitigation differed from McClain's. They rely on a distinguishable Massachusetts federal district court decision *permitting* but not requiring penalty phase severance where mitigation evidence for one defendant constituted aggravating evidence for another. (See *U.S. v. Green* (D.Mass. 2004) 324 F.Supp.2d 311.) This situation was different. McClain's statements about wanting to avenge Hodges's death did not undermine the other defendants' presentations. Holmes presented lingering doubt evidence, and both he and Newborn introduced considerable evidence of their backgrounds. The mitigation and aggravation evidence differed, as it will for all jointly tried codefendants, but that fact alone did not require severance.

We likewise found joinder proper in *Sánchez, supra*, 63 Cal.4th at page 465, despite an argument that the defendant was prejudiced by his codefendants' presentation of stronger mitigation cases than his own. We observed, " '[I]t is not surprising that different defendants presented different mitigating evidence regarding their backgrounds. That circumstance alone clearly cannot establish that the jury failed to give each defendant individualized consideration.' " (*Ibid.*) So too here. Each defendant presented their own mitigation evidence. As in *Sanchez*, nothing in this record suggests that "the jury failed to give individualized consideration to [each] defendant's proper sentence." (*Ibid.*)

### c. *Restraints*

All three defendants contend the court improperly required them to wear stun belts during the penalty phase retrial. They also complain it was error to admit testimony disclosing that restraints were in use. Although the question is close, we reject defendants' claims.

### i. *Imposition of Restraints*

Based on hostile conduct defendants exhibited during the guilt trial, bailiffs suggested they wear restraints in the penalty phase. After Mario Stevens testified, McClain had said, "You are a lying ass piece of shit, man. You are lying through your teeth, man." After witness Joseph Petelle testified during the penalty retrial and was leaving the courtroom, McClain said, "I'll kill you." McClain also made a lewd gesture when the guilty verdicts were read, displaying his middle finger. Holmes reacted to the verdicts with hostility, telling the jury, "Fuck you, you motherfuckers. P-9 rules." In addressing the severance motion, Newborn's counsel observed Holmes commented on the jurors' intelligence; maligned their values, and heritage; and suggested they were sexually perverse. In 1995, while incarcerated, McClain tried to attack another inmate. Afterward, McClain was found with a jail-made stabbing implement.

At the first penalty trial, the court ordered defendants to wear stun belts after the bailiffs requested they do so "based on some activity." Defendants were given documents explaining what the belts were and how they could be used. The court cautioned that the belts were "capable of delivering an impulse of 50,000 volts" when activated, and activation could occur if defendants "attempt[ed] to escape," made "sudden or hostile movements," tampered with the stun belt, or failed "to comply

with verbal commands." Defendants all acknowledged their understanding of these terms, though McClain objected. We need not and do not decide the propriety of the court's imposition of restraints at the first penalty trial.

Defendants wore the belts without incident during that phase. After the prosecutor stated there would be a retrial, Newborn turned to him and said, "Fuck you." When the prosecutor asked that the record reflect the statement, Newborn responded, "Fuck you. Suck my dick." The court then noted, "We will have to probably have to use the restraints again," adding "[f]or the record" that Newborn "was facing the court when he said, 'Fuck you,' and was also giving a P-9 sign." In declining to sever McClain's penalty retrial from his co-defendants', the court noted they all "told the court . . . and the jury, they're P-9s, they're damn proud of it. . . . I am not happy with their attitude. They are not going to run this court." Finding manifest need for restraints at the penalty retrial "based on [defendants'] conduct," and "act[ing] up in th[e] courtroom," the court ordered defendants wear stun belts, noting the decision was entirely the court's, not that of the bailiffs'. No defendant objected to this decision.

Trial courts have " ' "broad power to maintain courtroom security and orderly proceedings." ' " (*Covarrubias*, *supra*, 1 Cal.5th at p. 870.) However, the court's discretion to impose physical restraints is constrained by constitutional principles. Under California law, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290–291.) Similarly, the federal "Constitution forbids the use of visible shackles . . . unless that use is 'justified by an essential

state interest' — such as the interest in courtroom security — specific to the defendant on trial." (*Deck v. Missouri* (2005) 544 U.S. 622, 624, italics omitted.) " 'We have held that these principles also apply to the use of an electronic 'stun belt,' even if this device is not visible to the jury.' " (*Covarrubias*, at p. 870.)

In determining whether a stun belt is justified, the court must examine several factors, including the nature of the security risk posed by the defendant, whether the defendant is a flight risk, and whether the defendant will be disruptive. (*Covarrubias*, *supra*, 1 Cal.5th at pp. 870–871.) Verbal outbursts merely detrimental to a defendant's own case, without more, may not constitute sufficient justification. (See *People v. Mar* (2002) 28 Cal.4th 1201, 1223, fn. 6.) A formal hearing is not required, but the record must reflect that the court based its determination that restraints were warranted " ' "on facts, not rumor and innuendo." ' " (*Covarrubias*, at p. 871.) The decision to impose restraints is reviewed for abuse of discretion. (*Id.* at p. 870.) " 'The imposition of physical restraints without evidence of violence, a threat of violence, *or other nonconforming conduct* is an abuse of discretion.' " (*Id.* at p. 871, italics added.)

The court did not abuse its discretion by requiring that defendants wear stun belts during the penalty phase retrial. The record shows each defendant engaged in substantial " 'nonconforming conduct' " justifying employment of the belts. (*Covarrubias*, *supra*, 1 Cal.5th at p. 871.) Holmes called the jurors "motherfuckers;" and subjected them to the ad hominem attacks described above. McClain threatened a witness and made a lewd gesture toward the jury. Newborn confronted the prosecution with an expletive-laden outburst which, like Holmes's, made reference to the P-9 gang. This obscene, disruptive, and threatening behavior was sufficient to justify

the use of restraints, particularly considering the collective risk posed by three individuals intent on emphasizing their membership in a violent gang. The court was confronted with a trio of volatile defendants. They had been convicted of conspiring to commit, and then committing, exceptionally violent crimes, subjecting them to life in prison or execution. Under these circumstances there may be well-founded concern that disruptive conduct by one will spur an outburst and escalation by the others. The court's decision to impose restraints was not arbitrary, capricious, or patently absurd. (See *Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 390; *People v. Lomax* (2010) 49 Cal.4th 530, 559.)

Defendants also argue the court improperly delegated to bailiffs its decision regarding the need for security. The record is to the contrary. Although bailiffs had suggested using stun belts before the first penalty phase, the court made clear that the decision to do so was its own. When explaining to McClain the bounds of his self-representation, the court noted that McClain would be wearing a stun belt "because of the past activities." Toward the end of the retrial, in discussing a late severance motion, the court repeated that its decision to require stun belts was "based on [defendants'] conduct," a great deal of which occurred in the court's presence. The court stressed it had made that decision for everyone's benefit. There was no error.

### ii. Disclosure of Restraints

During the penalty retrial, the trial court was informed that McClain had threatened the bailiffs. Deputy Browning testified in limine that McClain had threatened to kill him. As Browning placed a stun belt on McClain in the holding cell, McClain asked why the belt was warm. Browning explained it

was warm because the belts were tested each morning. Newborn then asked why the belts were tested. Browning said it was departmental policy to ensure the belts were operational. In response, McClain yelled from the cell, "If you do one of us, you'll have to do us all." Browning said: "What?" and Newborn repeated McClain's comment. Then McClain said, "Don't get within two feet of me or I'll kill you. *We'll* all have weapons this time."

Holmes moved for severance and alternatively requested that the incident, if admitted, be "sanitized" to avoid prejudicing him. During the penalty retrial, Deputy Browning testified only against McClain. He related that one morning, while placing "an electronic device on each one of the defendants," McClain said, "Don't get within two feet of me or I'll kill you. I'll [*sic*] have weapons this time." After the defense requested a limiting instruction, the court told the jury that the devices are used to "assure tranquility in the court, security for everyone. It does not mean that [defendants] are guilty or not guilty," and specifically admonished that Browning's testimony was not to be considered against Holmes or Newborn.

Defendants now complain Browning's testimony improperly disclosed to the jury that they wore stun belts. No error is apparent. The jury learned only that electronic devices were placed on the defendants. The particular nature of the devices, or any reason for their use, was never specified, nor did the jury ever see one of the belts. Moreover, the court gave a limiting instruction explaining that the devices did not imply the defendants were "guilty or not." Holmes and McClain contend this instruction was insufficient to cure the error, but they failed to object or seek additional, or different, instructions.

The court's instruction carefully refrained from mentioning that the devices were used for restraint or immobilization.

Finally, despite Holmes's current arguments, his attorney was not ineffective in dealing with the evidence. We have concluded the imposition of restraints was supported. Holmes's attorney asked the court to "sanitize" Deputy Browning's testimony to avoid prejudice to Holmes. The court did so. Although Deputy Browning testified in limine that McClain said, "*We'll* all have weapons next time," he told the jury McClain said, "*I'll* have weapons next time." (Italics added.) The court also provided a limiting instruction that Browning's testimony constituted aggravating evidence against McClain only. Holmes does not argue, much less establish, that " ' "counsel's representation fell below an objective standard of reasonableness under prevailing professional norms" ' " or that, " ' "but for counsel's failings, the result would have been more favorable." ' " (*People v. Rices* (2017) 4 Cal.5th 49, 80.) The jury was not permitted to consider the fact that Holmes wore an electronic device as a factor in aggravation against him. The record does not reflect prejudice.

### 2. *Evidentiary Issues*

#### a. *Video of Holmes's Outburst*

When the jury returned its guilty verdict against Holmes, his rude retort and mention of P-9's supremacy (see *ante*, at pp. 14, 113) was recorded on videotape. The prosecution sought to introduce this tape during the penalty retrial. Holmes objected that his outburst merely expressed displeasure with the verdict and did not evince P-9 affiliation or other aggravating conduct under section 190.3. The court admitted the tape. It acknowledged that, while the "P-9 rules" statement

might be prejudicial, it was also "highly probative" on penalty phase issues. The videotape was played for the jury, with expletives removed. The prosecutor also read Holmes's full statement.

During argument, the prosecutor read a portion of McClain's testimony explaining that he went looking for rival gang members to kill. The prosecutor argued, "That's what Herb McClain did with his homeys, Lorenzo [Newborn] and Karl Holmes. They went out to smoke and kill Crips and you are here today as a result of that. [¶] Why did they do it? Because they are P-9 gang members intent on retaliating for the death of a fellow P-9." The prosecutor then played the expurgated tape of Holmes's outburst. During deliberation, the jury asked to review the videotape.

McClain and Newborn now complain the court should have instructed that Holmes's outburst should be considered as a factor in aggravation against Holmes alone, a request they failed to make below. The court properly admitted it as to all three, concluding there was evidence they were all P-9 members. No defendant ever disputed P-9 membership, which was amply proven.

Defendants next argue the court erred by admitting the videotape and statement because a defendant's lack of remorse may not be admitted in aggravation unless and until the defendant puts the question of remorse in issue. The arguments fail to persuade. The evidence was not offered, nor argued, to show lack of remorse. While there was substantial guilt phase evidence about the P-9 gang, the tape was played at *retrial* to a newly empaneled jury. Defendants' gang membership was a relevant circumstance of the crime, " 'admissible at a penalty

retrial . . . under section 190.3.' " (*People v. Banks* (2014) 59 Cal.4th 1113, 1195; *People v. Carter* (2003) 30 Cal.4th 1166, 1194–1196.) "Thus, at least in cases in which the jury that decides the penalty did not adjudicate the defendant's guilt, we have said it ' " 'is certainly the rule that if the evidence would have been admissible on the trial of the guilt issue, it is admissible on the trial aimed at fixing the penalty.' " ' " (*Banks*, at p. 1195.)

### b. *McClain's Threats to Deputies*

McClain argues the court erred under section 190.3, factor (b) by admitting evidence that he threatened Deputy Browning. (See *ante*, at p. 115.) No error occurred. Deputies David Admire and Les Tranberg gave similar testimony. Both heard McClain tell Browning to stay away and that he would have a weapon, although neither heard McClain say, "I'll kill you."

McClain first urges that the prosecution failed to provide timely notice that evidence of the threat would be introduced in aggravation. He failed to object on this basis. (See *Dykes*, *supra*, 46 Cal.4th at p. 756; see also *People v. Mills* (2010) 48 Cal.4th 158, 205.) Even if preserved, the claim fails. Although the prosecution is required to provide notice of section 190.3, factor (b) aggravating evidence, that requirement is satisfied when notice is provided as soon as the information becomes known to the prosecution. (*People v. Whalen* (2013) 56 Cal.4th 1, 73−74.) McClain did not make the threat until the retrial was nearly complete. It was then promptly brought to the attention of both the court and the prosecution. An in limine hearing provided timely and adequate notice to McClain. (See *ibid.*)

Second, seizing on comments from that hearing, McClain claims the trial court improperly assumed the role of prosecutor

"because it was irate that McClain allegedly threatened its bailiff." The record is contrary. The prosecution moved for an Evidence Code section 402 hearing and sought admission of the threat evidence. Although Deputy Browning did report the threat to the trial court, it was the prosecutor who proffered the evidence. The court fulfilled its proper role in ruling on admissibility.

Third, McClain claims Browning improperly testified that Newborn said "If you do one of us, you'll have to do us all." Because he could not cross-examine Newborn, McClain contends his right to confront the inculpatory statement was violated. (See *Aranda*, *supra*, 63 Cal.2d 518; *Bruton*, *supra*, 391 U.S. 123). That argument fails. First, the statement was not hearsay. It was not offered to prove the truth of the assertion that an action against one would, as a matter of fact, require action against all. Nor was it offered to establish the necessity to employ the belts. Instead, it was offered to prove the threat had been made. Second, Newborn was simply repeating what McClain himself said to Browning. Newborn was not making an independent inculpatory statement that tended to incriminate McClain. Indeed, McClain made no objection to Browning's testimony about Newborn's repetition. (See *Dykes*, *supra*, 46 Cal.4th at p. 756.)

Finally, McClain asserts the incident was improperly admitted as a criminal threat because there was no evidence Browning feared for his personal safety. Evidence of an uncharged crime generally cannot be presented as an aggravating factor "unless a ' "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Boyd* (1985) 38 Cal.3d 762, 778; see *Jackson v. Virginia*, *supra*, 443 U.S. at pp. 318–319.) The essential

elements of a criminal threat are: "(1) the defendant willfully
threatened death or great bodily injury to another person; (2)
the threat was made with the specific intent that it be *taken as
a threat*, regardless of the defendant's intent to carry it out; (3)
the threat was 'on its face and under the circumstances in which
it [was] made, . . . so unequivocal, unconditional, immediate,
and specific as to convey to the person threatened, a gravity of
purpose and an immediate prospect of execution'; (4) the threat
*caused the person threatened* 'to be in sustained fear for his or
her own safety or for his or her immediate family's safety'; and
(5) this fear was reasonable under the circumstances. (§ 422,
subd. (a); see *People v. Toledo* (2001) 26 Cal.4th 221, 227–228
[109 Cal.Rptr.2d 315, 26 P.3d 1051].)" (*People v. Turner* (2020)
10 Cal.5th 786, 826, italics added.)[57]

McClain focuses on statements by *the court* suggesting the
bailiffs were not gravely concerned about safety because they
often received threats. However, Deputy Browning's own
testimony was different. Browning testified that he wrote a
report after the incident requesting additional security in the
courtroom so that "court personnel . . . would not be endangered

---

[57]  At the time of trial, section 422 provided: "Any person who
willfully threatens to commit a crime which will result in death
or great bodily injury to another person, with the specific intent
that the statement is to be taken as a threat, even if there is no
intent of actually carrying it out, which, on its face and under
the circumstances in which it is made, is so unequivocal,
unconditional, immediate, and specific as to convey to the
person threatened, a gravity of purpose and an immediate
prospect of execution of the threat, and thereby causes that
person reasonably to be in sustained fear for his or her own
safety or for his or her immediate family's safety, shall be
punished by imprisonment in the county jail not to exceed one
year, or by imprisonment in the state prison." (Former § 422.)

or possibly killed." This evidence may have suggested that the death threat from a convicted murderer and admitted gang member, who had previously engaged in seriously disruptive conduct, placed Browning in sustained fear for the safety of himself and his fellow deputies. McClain protests that, with the stun belt on, he was incapable of doing harm; however section 422 does not require an immediate ability or even an actual intention, to carry out the threat. (*People v. Wilson* (2010) 186 Cal.App.4th 789, 807.) Finally, even if the "sustained fear" element was lacking, there was ample proof that McClain committed an *attempted* criminal threat (see *People v. Toledo*, *supra*, 26 Cal.4that pp. 230–231, 234), a crime involving the threat of force or violence and thus properly admitted in aggravation under section 190.3, factor (b).

### c. *Newborn's Threats to Louise Jernigan*

The prosecution called Louise Jernigan to testify about threats Newborn made against her. During the hearing to determine the admissibility of her testimony, Jernigan stated, among other things, that Newborn had cursed at her and said, "You accused me of killing your son, and we're going to get you, too." The trial court admitted her testimony as evidence of a criminal threat. At the penalty retrial, Jernigan testified that while visiting a friend's business, Newborn "came in, [and] put a gun to [her] side." Although Jernigan did not see the gun when Newborn entered, she could feel it pressing against her. She claimed Newborn "want[ed] to shoot [her] because he knew that" she knew "that he killed [her] son Keith," who had been killed only weeks earlier." The court interjected with an instruction that Jernigan's statement was offered only to show her state of mind and did not "go to the truth of the matter." Jernigan then testified that she pushed Newborn away but followed him

outside, where they argued. After Newborn left, she called the police. Additional evidence showed that during the incident Jernigan accused Newborn of killing her son and Newborn said, "Fuck you. You accused me of killing your son, and we're going to get you, too."

Newborn asserts the court erred in admitting Jernigan's statements about Newborn having killed her son. However, the evidence was admitted for a legitimate purpose. The altercation was offered to show that Newborn had made criminal threats against Jernigan (§ 422, subd (a)), actions involving "the express or implied threat to use force or violence" under section 190.3, factor (b). As discussed, a criminal threat under section 422 requires proof that the recipient feared for her safety, or that of her family, and that the fear was reasonable under the circumstances. (*People v. Toledo*, *supra*, 26 Cal.4th at pp. 227–228.) These elements require an evaluation of the victim's state of mind. (*Id.* at p. 228.) Moreover, a threat must be examined both " ' "on its face and under the circumstances in which it was made." ' " (*People v. Felix* (2001) 92 Cal.App.4th 905, 914.) Jernigan's belief that Newborn was responsible for her son's death was relevant to show her state of mind at the time and to explain the circumstances surrounding Newborn's threat; her belief was the source of the dispute with Newborn and thus provided relevant context for understanding the meaning and intent behind the threat.

Newborn next claims Jernigan's accusation was unduly prejudicial under Evidence Code section 352. The claim lacks merit. Courts ordinarily enjoy broad discretion to evaluate whether the probative value of evidence is outweighed by concerns of undue prejudice, confusion, or consumption of time. (*People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1124.) As noted,

testimony regarding Jernigan's belief and resulting accusations demonstrated the very reason for Newborn's threat and provided essential context for it. The trial court was within its discretion in determining this probative value was not substantially outweighed by the risk of undue prejudice and provided a limiting instruction to explain the proper use of Jernigan's testimony.

### d.  Holding Cell Graffiti

Over objection, the prosecution was allowed to introduce evidence of graffiti found in the courtroom's holding cell. Defendants contend this was error because the graffiti did not constitute a threat and there was insufficient evidence to demonstrate that any of the defendants produced the graffiti. Any error in admitting the evidence did not prejudice defendants.

Arguing admissibility, the prosecutor described photographs of the graffiti:  "the first photograph displays a P-9, the word 'Monsta' on top of it. Within the P [are] the words Parke Street and within the 9" are "the word[s] Nine Lives." "[T]he words P-9" were written below. "Next to it is 'Blood Gang' and beneath are the notations:  'Boom 1,' 'Sunday Shoes 1 and Monsta Herb 1.' " "Beneath these words are the words 'Anybody killa,' K-I-L-L-A, Sheriff, spelled S-H-I-R-E-F-F, police and again the word 'killa.' " Officer Carlos Lopez testified in the penalty phase that Holmes's nickname was "Boom" and Newborn's nickname was "Sunday Shoes." Although "Monsta Herb 1" was not a known nickname, McClain's first name is Herbert. He introduced himself as "Herb" to a fellow passenger as he was flying out of state. The prosecutor argued that crossing out the words "police" and sheriff" indicated police

officers and sheriff's deputies were intended murder targets of the graffiti artists. The court ruled the graffiti admissible, concluding it was "highly relevant and probative," and any prejudice was "outweighed by the fact" that the graffiti named each "of the three defendants."

Assuming without deciding this evidence was erroneously admitted, we conclude there is no reasonable possibility different penalty verdicts would have been reached had it been excluded. (See *People v. Silveria and Travis*, *supra*, 10 Cal.5th at pp. 265–266.) The reference to the graffiti was relatively vague. Particularly when considered within the context of a lengthy trial, it was relatively brief. Admission of the graffiti accomplished little more than confirm defendants were members of the P-9 gang and engaged in threatening conduct toward law enforcement, as demonstrated by other evidence. Any error in admitting the graffiti was harmless. (*Ibid.*)

### e. *Holmes's Juvenile Weapon Possession*

At age 15, Holmes was found to possess a loaded firearm, in violation of section 12031. Over objection, the court allowed the prosecution to present this juvenile adjudication as aggravating evidence. A police officer testified that after Holmes was seen at a carnival with a gun in his pants pocket, he was arrested and found to possess a loaded revolver. Holmes now argues this juvenile adjudication was inadmissible under section 190.3, factor (b). Not so.

Section 190.3, factor (b) permits evidence of a defendant's criminal activity involving "the use or attempted use of force or violence or the express or implied threat to use force or violence." Holmes argues his offense did not involve the use of force or violence because he never acted violently, cooperated fully when

arrested, and only carried the revolver to ensure his own safety. Former section 12031 prohibits "carrying a loaded firearm . . . in any public place." Although firearm possession is not a factor (b) offense in every circumstance, " '[t]he factual circumstances surrounding the possession . . . may indicate an implied threat of violence.' " (*People v. Jackson* (2014) 58 Cal.4th 724, 759.) If so, admission of the offense under factor (b) is appropriate. Here, Holmes was walking through a crowded carnival with a loaded pistol protruding visibly from his pants pocket. His demeanor and display of the weapon possession were sufficiently concerning that someone reported him to the authorities. Especially in view of the fact that similar firearms were used in committing the crimes here, "the jury legitimately could infer an implied threat of violence from all the circumstances" surrounding Holmes gun possession. (*Dykes*, *supra*, 46 Cal.4th at p. 777; see also *Jackson*, at pp. 759–760.) The court did not abuse its discretion in admitting the evidence.

### f.  *Exclusion of Former Codefendants' Favorable Dispositions*

The prosecution moved to exclude evidence that codefendants Bowen and Bailey entered into negotiated dispositions that did not include the death penalty. Defendants did not object, and the trial court granted the motion. Defendants now argue their due process and Eighth Amendment rights were violated because Bowen and Bailey were equally or more culpable but received more favorable sentences. This claim was forfeited by defendants' failure to object (see *Dykes*, *supra*, 46 Cal.4th at p. 756) and lacks merit.

"It is well established that '[t]he punishment meted out to a codefendant is irrelevant to the decision the jury must make at the penalty phase:  whether the defendant before it should be

sentenced to death.' " (*People v. Turner* (1994) 8 Cal.4th 137, 206; see also *People v. Beardslee* (1991) 53 Cal.3d 68, 111–112.) Defendants rely instead on a federal court concurring opinion, which suggested the jury should be permitted to consider an equally culpable codefendant's disposition in mitigation. (See *Morris v. Ylst* (9th Cir. 2006) 447 F.3d 735, 746–748 (conc. opn. of Ferguson, J.).) Leaving aside the persuasive value of the concurrence, which is unbinding on this or any court, the comparison is inapt. There is no evidence to establish that Bowen and Bailey were equally culpable with the defendants here. The trials were severed, and no showing was made as to the relative degree of involvement or other factors that might relate to culpability. Defendants also failed to establish that the government sought the death penalty for them but not for Bailey and Bowen. (See *id.* at p. 747 (conc. opn. of Ferguson, J.).) The prosecution reminded the court that the evidence related to Bowen and Bailey differed in significant respects from the evidence against these defendants. Unlike the defendants in *Morris v. Ylst*, the prosecution's position here was that Bowen and Bailey were not "equally guilty" compared to defendants. (*Id.* at p. 746 (conc. opn. of Ferguson, J.).). The trial court did not err in excluding the evidence.

### g.  *Lingering Doubt Evidence*

All defendants raise various claims related to lingering doubt evidence. We reject them.

### i.  *Newborn and Holmes*

Newborn and Holmes contend the court improperly prohibited them from introducing evidence from the first trial to create lingering doubt. (See *Oregon v. Guzek* (2006) 546 U.S. 517, 519.) Their claim fails because they offered none. Contrary

to their assertions, the record reflects that neither of them sought to present evidence of this nature. (See Evid. Code, § 354, subd. (a).) Newborn argues the first penalty jury received substantially more evidence concerning innocence but points to none he was prevented from introducing. Holmes complains *McClain* was prevented from offering testimony from an eyewitness expert, but he points to no evidence of *his own* that was barred. Neither defendant preserved a claim of improper evidentiary exclusion.

### ii. McClain

McClain claims the court improperly excluded lingering doubt evidence that he did seek to introduce. Although some of this evidence should have been admitted, the error was harmless.

There is no federal or state constitutional right to present lingering doubt evidence. (*Franklin v. Lynaugh* (1988) 487 U.S. 164, 173−174; *People v. Cox* (1991) 53 Cal.3d 618, 675.) However, we have held as a matter of state law that "evidence of the circumstances of the offense, including evidence that may create a lingering doubt as to the defendant's guilt of the offense, is admissible at a penalty retrial as a factor in mitigation under section 190.3." (*People v. Hamilton* (2009) 45 Cal.4th 863, 912 (*Hamilton*); see *People v. Gay* (2008) 42 Cal.4th 1195, 1221 (*Gay*).) These holdings do not mean defendants are free to relitigate a guilty verdict, even at a penalty retrial. "A defendant . . . has no right to introduce evidence not otherwise admissible at the penalty phase for the purpose of creating a doubt as to his or her guilt. [Citations.] ' "The test for admissibility is not whether the evidence tends to prove the defendant did not commit the crime, but, whether it relates to the circumstances

of the crime or the aggravating or mitigating circumstances.” [Citation.]’ [Citation.] The evidence must not be unreliable [citation], incompetent, irrelevant, lack probative value, or solely attack the legality of the prior adjudication [citations].” (*Hamilton*, at p. 912.)

McClain sought to present testimony from severed codefendants Bowen and Bailey about their plea agreement and McClain’s purported lack of involvement in the murders. He argued these men could tell the jury whether he was present or not at the shooting scene and “if they [had] seen [him] at any time during the night.” The court denied the request, explaining it was not appropriate evidence for the penalty phase. This ruling was within the court’s discretion. It was clear from McClain’s offer of proof that he was merely speculating about the evidence Bowen and Bailey might provide. He made no specific offer of proof. Neither man testified in the guilt phase trial, and McClain did not claim he was aware from any source that they were present at the crime scene. He apparently based his speculation on the men’s negotiated dispositions, but, as the prosecutor noted, they had steadfastly refused to admit guilt. Because McClain offered no basis for the court to conclude Bowen and Bailey would provide admissible evidence about the circumstances of the crime, the court did not err in excluding their testimony. (See *Hamilton, supra*, 45 Cal.4th at p. 912.)

The analysis is different for eyewitness expert Kathy Pezdek. McClain sought to present Pezdek’s testimony to refute Gabriel Pina’s identification of him as the driver of the lead car on Wilson Street. The trial court denied the request, reasoning that identity was not an issue at the penalty phase and the evidence would be irrelevant. To the contrary, the proffered testimony was relevant as to lingering doubt, and section 190.3

makes such lingering doubt evidence admissible at a penalty retrial. (*Gay, supra*, 42 Cal.4th at pp. 1219–1221.) Pezdek testified in the guilt phase. Her testimony remained relevant and should have been admitted in the penalty retrial. (*Id.* at pp. 1219-1220; see *People v. Banks, supra*, 59 Cal.4th at p. 1195.) However, the error was harmless because there is no reasonable possibility it affected the penalty verdict. (See *Hamilton, supra*, 45 Cal.4th at p. 912.) Pezdek's guilt phase testimony primarily established that eyewitnesses can be fallible. Yet Pina was thoroughly cross-examined in the penalty retrial, with similar attacks on the accuracy of his identification. Finally, significant aggravating evidence was presented against McClain. Beyond the circumstances of the crimes, which involved the gang-related murder of innocent children, there was evidence of McClain's four prior felony convictions and three unadjudicated instances of violent conduct. In light of this evidence, there is no reasonable possibility the jury would have reached a different verdict if presented with Pezdek's expert testimony on identification.

### *iii. Prosecutorial Misconduct*

Holmes and McClain argue the prosecutor committed misconduct in arguments related to lingering doubt. If prosecutorial misconduct renders a trial so fundamentally unfair that the conviction constitutes a denial of due process, it violates the federal Constitution. (*Covarrubias, supra*, 1 Cal.5th at p. 894.) " ' "[M]isconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*Ibid.*) Even if these claims had been preserved (see *Dykes, supra*, 46 Cal.4th at p. 756; see also *Winbush, supra*, 2 Cal.5th at p. 481),

they lack merit. The arguments complained of did not constitute misconduct.

Holmes asserts it was misconduct for the prosecutor to argue that jurors "must accept the verdicts and findings rendered by the jury in the guilt phase of this trial." He claims the argument required jurors to "assume the worst about the circumstances of the offense" and thus deprived him of "individualized and non-arbitrary sentencing." A prosecutorial misconduct claim is not preserved for appeal unless the defendant made a timely objection on the same ground and asked that the jury be admonished to disregard the impropriety. (*Covarrubias*, *supra*, 1 Cal.5th at pp. 893–894.) Holmes's lack of objection below forfeits the claim. Further, there was no misconduct. The prosecutor did no more than paraphrase the special instruction on lingering doubt the jury was about to receive. It stated, "as a penalty jury, you must 'accept' the guilt phase verdicts and findings." The rule strikes a balance. A guilt conviction establishes the facts were proven beyond a reasonable doubt. The fact that there may yet be a residual "lingering doubt" may be considered by the jury as a fact militating against a death sentence. That does not mean, however, that the new penalty jury is entitled to ignore a prior, and properly arrived at, guilt determination. The prosecutor's reference to this principle did not violate due process or use improper methods of persuasion.

McClain raises two misconduct claims. First, he contends the prosecutor made misrepresentations to the court about the pleas of Bowen and Bailey. When McClain proposed calling these original codefendants, the prosecutor responded that although they had pled guilty they did not admit guilt. He said both men had "consistently denied being present at the shooting

scene or having any involvement in the shooting," and expressed doubt about how they could testify to McClain's absence from the scene. McClain disagreed but did not object to the prosecutor's comments. (See *Dykes*, *supra*, 46 Cal.4th at p. 756; see also *Winbush*, *supra*, 2 Cal.5th at p. 481.) On the merits, the statement was not misconduct because it merely reflected the prosecutor's good faith belief about the codefendants' plea agreements. In fact, the court was already aware of these agreements. McClain has not shown that the prosecutor's statements about Bowen and Bailey were false, and there is no reasonable likelihood the court was misled by his argument.

Second, McClain asserts it was misconduct for the prosecutor to assert in closing argument that McClain had failed to present lingering doubt evidence. After McClain objected that he was not given the opportunity to present such evidence, the prosecutor clarified that the defense had no burden, "but they [did] have the opportunity." This argument was neither reprehensible nor deceptive. (*Covarrubias*, *supra*, 1 Cal.5th at p. 894.) Other than testimony from eyewitness expert Pezdek (see *ante*, at p. 128), McClain did not attempt to present lingering doubt evidence. Contrary to his assertions, the court did not preclude all lingering doubt testimony. It allowed Holmes to call Gabriel Pina to challenge his eyewitness identification, and, as noted, McClain was able to elicit concessions from Pina on cross-examination. McClain offered no further evidence of his own on lingering doubt after the Pezdek ruling. A prosecutor enjoys a wide latitude in closing argument and " 'has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper.' " (*People v. Valencia* (2008) 43 Cal.4th 268, 284.) The

argument here was permissible commentary on the state of McClain's evidence.

### iv. Instructional Error

During deliberations, jurors sent a note asking whether they could review testimony from the prior trial and whether there was "any other eyewitness testimony or independent investigation." The court responded that Pina's identification "was only part of the evidence at the trial of the guilt phase." Other evidence had been presented, but the court admonished the jury not to speculate about it. It instructed: "For the purposes of your duties in this trial you must accept the fact that there was sufficient evidence beyond a reasonable doubt to convict the defendants of the charges against them." It also reread the special instruction on lingering doubt. It explained: "Lingering doubts as to guilt may be considered as a factor in mitigation. A lingering doubt is defined as any doubt, however slight, which is not sufficient to create in the mind of a juror a reasonable doubt."

McClain now complains this instruction was ambiguous and open to erroneous interpretation because the court prevented him from presenting evidence to support a lingering doubt defense. The premise of this argument fails because, apart from one witness, the court did not erroneously exclude lingering doubt evidence or prevent McClain from offering it. Nor is the instruction itself constitutionally infirm. The instruction here resembles one given in *Hamilton*, which stated that " 'lingering doubts . . . on the question of guilt may be considered by [the jury] in determining the appropriate penalty. [¶] A lingering doubt is defined as any doubt, however slight, which is not sufficient to create in the minds of the jurors a

reasonable doubt.' " (*Hamilton, supra,* 45 Cal.4th at p. 949, italics omitted.) *Hamilton* held that this instruction, coupled with counsel's argument, was sufficient to inform the jury of the role lingering doubt could properly play in its penalty determination. (*Id.* at pp. 948–949.)

The jury in *Hamilton* also sought clarification about lingering doubt, asking " 'if we have questions, however slight, "lingering doubt," about the conviction for murder (in the 1st trial) is that appropriate? In other words is that to be considered as mitigating <u>or at all</u>.' " (*Hamilton, supra,* 45 Cal.4th at p. 949.) The court directed jurors to the lingering doubt instruction, and Hamilton claimed this response was inadequate. (*Ibid.*) We concluded otherwise, explaining that the question revealed the jury's confusion as to whether a slight doubt was enough to constitute a mitigating factor or if it had no place in the penalty deliberation. (*Id.* at p. 950.) Although the jury's question here was different, it does not cast doubt on the validity of the lingering doubt instruction. Indeed, the jurors' question revealed no uncertainty about the instruction at all. It simply asked whether the jury was permitted to obtain additional evidence and, if so, what that evidence might be. The court properly directed the jury's attention away from evidence presented at the first trial and, as in *Hamilton,* instructed on the role lingering doubt might play in their deliberations, based on the evidence they heard. The instruction was not erroneous or ambiguous, and the court did not err in giving it.

### h. *Character Evidence Elicited from Clarence Jones*

McClain asserts several errors in connection with the testimony of his witness Clarence Jones. No error occurred.

McClain called Jones, a county jail inmate and longtime acquaintance. In aggravation, the prosecution had offered evidence that, in 1995, McClain had tried to attack another inmate and was found in possession of a shank. It appears McClain called Jones to counter that evidence. After Jones was sworn, McClain stated: "I called you today to get a better understanding from your point of view on the tiers." He then asked about "an incident [that] occurred involving a shank or some type of an assault on the tier in 3100," and whether Jones saw "any weapons in anybody's hand?" Jones said he remembered the incident but saw no weapon. McClain then asked: "Would it be uncommon, particularly in a racial incident, for someone else to throw a weapon out on the tier?" The prosecution objected that the question called for speculation and lacked foundation.

The court then asked several foundational questions. These established that Jones had been the county jail for about a year, had been there before, and had seen similar incidents. He knew what a shank is and how they are made. Following these answers, the court said: "The gentleman is an expert in, I guess, what you [McClain] are asking." McClain made no objection to the court's questioning or its conclusion. McClain then asked: "So would it be unusual, say, for one race person to be involved in an altercation with a person of another race and somebody would take it upon themselves to throw some type of weapon as an aid to that person?" Jones nodded and McClain said: "No further questions." The court confirmed that Jones intended his nod as affirmation.

McClain now complains the court improperly elicited character evidence from Jones and failed to act impartially by questioning the witness. The claim is forfeit (see *Dykes*, *supra*,

46 Cal.4th at p. 756) and meritless. "Evidence Code section 775 ' " 'confers upon the trial judge the power, discretion and affirmative duty . . . [to] participate in the examination of witnesses whenever he believes that he may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause.' " [Citations.] [¶] The constraints on the trial judge's questioning of witnesses in the presence of a jury are akin to the limitations on the court's role as commentator. The trial judge's interrogation "must be . . . temperate, nonargumentative, and scrupulously fair." ' " (*People v. Harris* (2005) 37 Cal.4th 310, 350 (*Harris*).) The court adhered to those requirements. It merely helped the self-represented McClain lay a proper foundation for the questions he wanted to ask.

The question about whether something might be "unusual" in a jail setting called for information beyond the common experience of jurors. Accordingly, it was appropriate to establish that Jones had "special knowledge, skill, experience, training, or education" to permit him to give the expert opinion McClain sought on the presence of weapons in jail, how they might be deployed, by whom, and under what circumstances. (Evid. Code, § 720, subd. (a).) The court's questions did not call for, or elicit, character evidence about McClain.

McClain urges that questioning by the court is improper when attorneys are performing competently. His failure to lay foundation for his questions and make their significance clear, was not competent performance. The court has the authority and obligation to appropriately control and expedite proceedings. (*Harris, supra,* 37 Cal.4th at p. 348.) Its conduct

reflected no bias. On the contrary, it was an efficient way for the court to help McClain examine a witness effectively and advance the proceedings.

McClain also objects to aspects of cross-examination. Inquiry established that, contrary to his direct testimony, Jones was not present when the incident in question occurred and that he knew nothing about the circumstances. Jones also asserted that he had never been involved in an attack on an inmate or deputy. Questioning then turned to the witness's conviction history. It revealed that he had recently been convicted of robbery and carjacking and sentenced to prison. Jones asked: "Am I on trial or what? Then said: "I take the 5th." He did not give answers about other felony convictions. The prosecutor turned to the relationship between Jones and McClain, eliciting that they had known each other for 10 to 20 years. After ultimately securing admissions that Jones suffered other felony convictions, the examination ended.

McClain chose to conduct a redirect examination. This colloquy ensued:

"Q [by McClain]: Mr. Jones, I brought you here to give the jury a better - - another point of view of exactly what goes on the tier, not for you to be put on trial, right?

"A [by Jones]: Right.

"Q: Just so you don't feel uncomfortable, I just want to pass that to you.

"A: Right."

McClain said he had "no further questions." However, Jones sought to say more, relating in part: "I've been knowing this guy for quite a long time and as far as, you know, my opinion

of him, he's a good guy and he's not what these people claim that he is. And I feel, you know, further down life's road that his innocence will be proven, that he is really innocent of the crime he is being, you know, placed under." McClain did not object, or ask the statements be stricken. The court asked if there was additional recross-examination. Jones interjected: "I am not finished your honor." He went on to say that the death penalty was pursued unevenly and that "I don't think it's fair, you know, for the young brother, you know, to be found guilty on a D.P." Again, McClain made no motion to strike, electing to let the testimony stand. Recross questioning turned again to one of Jones's felony convictions and McClain objected as "outside the scope." The court overruled the objection, explaining: "You brought him here. He is giving a character reference for you. The court let him answer your questions." In response to further questions Jones gave a number of rambling answers, during which he asserted the following. He repeatedly insisted he was "treated unfair every time I went through the court system." He was convicted of robbery because "my counsel didn't represent me right. I was forced to go in pro per. And that's the only reason why I sat in the jury trial and got convicted." In connection with his assertion of repeated unfair treatment, the prosecution asked about other cases in which Jones was convicted but given probation with minimal or concurrent sentences, and whether he considered those dispositions unfair. Jones agreed that during one appearance he had been shackled but insisted it was "for no reason." There was no indication that he was currently shackled. The examination ended with the following exchange:

"Q [by the prosecution]: You are not a dangerous man, are you?

"A [by Jones]: No."

There was no objection, and all the answers were allowed to stand. Again, McClain chose to probe further and the following exchange took place:

"Q [by McClain]: I mean it's obvious the way they bring you in here with all those chains, they are trying to paint a picture you are some dangerous dude.

"A [by Jones]: Exactly. . . . From my understanding, as far as this black thing around here [apparently referring to a stun belt] this is a zapper, and this is not supposed to be exposed to the jury. . . . I told the sheriff downstairs that the picture that they are painting, you know, for the jury on me, you know.

"Q: Would inadvertently reflect on me?

"A: Yes, exactly."

At this point the prosecutor said: "I would ask the court to admonish the jury that nothing concerning this shackling should reflect upon Mr. McClain."

McClain's assertion of error fails on this record. A witness's credibility may be impeached with evidence of felony convictions. (Evid. Code, § 788.) As relevant here, in evaluating credibility, the fact finder is also permitted to consider the witness's demeanor while testifying and the manner in which he testifies; the character of his testimony; his opportunity to perceive any matter about which he testifies; the existence or nonexistence of a bias, interest, or other motive; and his attitude toward the action in which he testifies or toward the giving of testimony. (Evid. Code, § 780, subds. (a), (b), (d), (f), (j).) The vast majority of the cross-examination questions addressed these factors or followed up on statements that the witness gave during direct. To the extent some of the colloquy may have strayed off course, much was solicited by questions McClain

himself asked, by his own comments, and by his other tactical choices. His only objection during the cross-examination was to questioning "beyond the scope." He declined to ask that any answer be stricken and repeatedly gave his witness an opportunity to speak further. The court gave him very broad latitude in presenting the witness, permitting McClain to made declaratory and argumentative statements, comment on the proceedings and ask leading questions. No error appears.

The prosecutor's questions about a previous shackling were asked to probe Jones's repeated assertions that he had been treated unfairly "every time [he] went through the court system." The questions were unobjected to. At no time did the prosecutor suggest or allude to the fact that Jones was shackled during his testimony here.

Finally, McClain argues the court erred by forcing Jones to appear in shackles. Because McClain never objected on this ground the claim is forfeited. (See *Dykes, supra*, 46 Cal.4th at p. 756; see also *People v. Stankewitz* (1990) 51 Cal.3d 72, 95.) The record does not indicate that any shackles or restraints were observable by the jury. Before Jones was called, there was some testimony and a discussion about exhibits, all of which took place in the jury's presence. McClain was then asked if he was ready to present a witness or witnesses. The court inquired if a break was needed. The bailiff indicated that the witness was "outside in the hall," and they were ready to proceed. Whereupon there was a "pause in the proceedings," after which Jones was sworn and examinations began. It appears it was *McClain* who brought Jones's restraints to the jury's attention. On redirect examination, McClain pointed out that Jones was shackled. After Jones was dismissed, the court admonished the

jury that the fact that Jones was "shackled and brought here with deputies has no reflection on Mr. McClain."

To the extent there was any irregularity, McClain cannot be heard to complain. "Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212.) Moreover, it was unlikely McClain suffered prejudice from the shackling of his witness. "[A]lthough the limitation on physical restraints applies to defense witnesses as well as defendants, 'the *prejudicial effect* of shackling defense witnesses is less consequential since "the shackled witness . . . [does] not directly affect the presumption of innocence." ' " (*People v. Allen* (1986) 42 Cal.3d 1222, 1264–1265, quoting *People v. Duran*, *supra*, 16 Cal.3d at p. 288, fn. 4.) The court appropriately dispelled any potential prejudice from Jones's appearance with its admonition following his testimony.

### 3. *Restriction on Closing Argument*

Newborn argues the court improperly restricted his attorney's ability to argue the appropriate role of mercy in capital sentencing. The court committed no error.

During closing argument, Newborn's attorney addressed CALJIC No. 8.85, factor (k) evidence and explained that the jury should not simply weigh factors in aggravation and mitigation as if "keeping score." He argued, "If you had only factors in aggravation and little, if any, factors in mitigation, something as little and simple as mercy, you could still vote life without parole." The court sustained an objection that the argument misstated the law and suggested Newborn's attorney "argue it another way." Newborn's attorney then quoted from CALJIC

No. 8.85 that the jury could consider " 'any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any other sympathetic or other aspect of the defendant's character.' " He added, "That is what I am trying to say. And I am asking you to consider all of these things, including everything that everybody has said, including mercy; because mercy is twice blessed. That is an old saying and I hope you don't find it corny." The court overruled the prosecutor's objection and explained that counsel was permitted to explain the concept of mercy. Newborn's attorney continued, explaining that "twice blessed" means mercy "is blessed by the person receiving it, but it is also . . . a blessing to the person who gives it."[58]

Newborn argues the court erred when it sustained the prosecutor's first objection, leaving jurors with a misimpression about the role of mercy in capital sentencing. Not so. Counsel's argument was confusing and potentially suggested that the jury could ignore aggravating and mitigating factors and base its penalty decision entirely on a decision to exercise mercy. We disapproved an instruction along analogous lines in *People v. Lewis* (2001) 26 Cal.4th 334, 393. For similar reasons, we have repeatedly held it is not error for courts to omit the word " 'mercy' " in jury instructions. (*People v. Ervine* (2009) 47 Cal.4th 745, 801.) The court here did not err in sustaining an objection to argument that encouraged jurors to decide penalty based on "an emotional response to the mitigating evidence

---

[58] The reference appears to be a paraphrase of Shakespeare: "The quality of mercy is not strain'd / It droppeth as the gentle rain from heaven / Upon the place beneath:  it is twice blest; / It blesseth him that gives and him that takes." (Shakespeare, The Merchant of Venice, act IV, scene 1, lines 184–187.)

instead of a reasoned moral response." (*Id.* at p. 802; see also *People v. Boyce* (2014) 59 Cal.4th 672, 707.) Moreover, despite the one sustained objection, the court permitted Newborn's counsel to explore the concept of mercy in detail, and it was mentioned several times throughout the argument. The court's ruling was an appropriate exercise of its discretion and not error. (See *People v. Simon* (2016) 1 Cal.5th 98, 147.)

### 4. *Instruction Issues*

#### a. *Sentencing Discretion (CALJIC No. 8.88)*

McClain and Holmes contend CALJIC No. 8.88[59] is unconstitutional in various respects. We have repeatedly

---

[59]    CALJIC No. 8.88 provided in part: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on each defendant. [¶] After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality

rejected similar claims. The instruction is legally sound and provides appropriate guidance on how the jury should approach its task in determining the appropriate penalty. " '[T]he instruction is "not unconstitutional for failing to inform the jury that: (a) death must be the appropriate penalty, not just a warranted penalty [citation]; (b) [a sentence of life without the possibility of parole] is required, if it finds that the mitigating circumstances outweigh those in aggravation [citation] or that the aggravating circumstances do not outweigh those in mitigation [citation]; (c) [a sentence of life without the possibility of parole] may be imposed even if the aggravating circumstances outweigh those in mitigation [citation]; [and] (d) neither party bears the burden of persuasion on the penalty determination." ' " (*People v. Garton* (2018) 4 Cal.5th 485, 523; see also *People v. Linton*, *supra*, 56 Cal.4th at p. 1211.)

### b. *Failure to Define Life Without the Possibility of Parole*

McClain and Holmes argue the trial court had a sua sponte duty to instruct the jury on the meaning of life without the possibility of parole. We have previously rejected similar claims, explaining "the term has a plain meaning that does not require further explanation." (*People v. Watson* (2008) 43 Cal.4th 652, 700.) Defendants do not persuade us to hold otherwise.

---

of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

### 5. *Challenges to Death Penalty Statutory Scheme*

Defendants raise a number of challenges to California's death penalty law, each of which we have previously rejected. We decline to reconsider our holdings as follows:

- Section 190.3, factor (a), which permits a jury to consider circumstances of the offense in sentencing, does not result in arbitrary or capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution. (*People v. Simon*, *supra*, 1 Cal.5th at p. 149.)
- California's death penalty scheme does not violate the federal Constitution for " 'failing to require . . . unanimity as to aggravating factors [and] proof of all aggravating factors beyond a reasonable doubt,' " and *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Ring v. Arizona* (2002) 536 U.S. 584 do not alter this conclusion. (*People v. Lopez* (2018) 5 Cal.5th 339, 370; see *Lewis*, *supra*, 43 Cal.4th at p. 533.)
- The lack of written jury findings in the penalty phase does not violate due process or the Eighth Amendment, nor does it "deprive a capital defendant of meaningful appellate review." (*Winbush*, *supra*, 2 Cal.5th at p. 490.)
- "Intercase proportionality review, comparing defendant's case to other murder cases to assess relative culpability, is not required by the due process, equal protection, fair trial, or cruel and unusual punishment clauses of the federal Constitution." (*Winbush*, *supra*, 2 Cal.5th at p. 490.)
- The jury's consideration of unadjudicated criminal activity as a factor in aggravation under section 190.3, factor (b) does not violate due process or the Fifth, Sixth, Eighth, or

Fourteenth Amendments, or render the death sentence unreliable. (*People v. Spencer* (2018) 5 Cal.5th 642, 695.)

- The use of adjectives in the list of mitigation factors, including the terms "extreme" and "substantial," do not prevent the jury's consideration of mitigation in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 519.)

- The jury need not have been instructed that factors in mitigation could be considered solely for purposes of mitigation. (*People v. Landry* (2016) 2 Cal.5th 52, 123.)

- The trial court was not required to delete inapplicable sentencing factors from CALJIC No. 8.85. (*People v. Jackson* (2016) 1 Cal.5th 269, 372.)

- " 'California's death penalty law does not violate equal protection by treating capital and noncapital defendants differently.' " (*People v. Anderson* (2018) 5 Cal.5th 372, 425.)

- California's death penalty statute does not violate international law. (*People v. Anderson*, *supra*, 5 Cal.5th at p. 425; see also *Sánchez*, *supra*, 63 Cal.4th at p. 488.)

- " 'California's death penalty law "adequately narrows the class of murderers subject to the death penalty" and does not violate the Eighth Amendment.' " (*People v. Lopez*, *supra*, 5 Cal.5th at p. 370.)

- Finally, "California's grant of discretion to prosecutors to decide in which cases to seek the death penalty is constitutional." (*People v. Gamache*, *supra*, 48 Cal.4th at p. 406; see also *People v. Rundle* (2008) 43 Cal.4th 76, 199; *People v. Tafoya* (2007) 42 Cal.4th 147, 198.)

### C. *Cumulative Error*

McClain and Holmes contend the cumulative prejudicial effect of errors in the guilt and penalty phases of their trials require reversal of their convictions and sentences of death. We have rejected the vast majority of their assignments of error. In the few instances in which we have found or assumed error, we have determined no prejudice resulted. Whether the claims are considered separately or together, no prejudicial error resulted at either stage of the proceedings.

## III. DISPOSITION

We affirm the judgment.

**CORRIGAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**GROBAN, J.**
**JENKINS, J.**
**O'ROURKE, J.\***

---

\*       Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. HOLMES, McCLAIN and NEWBORN

S058734


Concurring Opinion by Justice Kruger


The defendants in this case appeared without physical restraints at the guilt phase of their joint trial. At the first penalty phase, however, the trial court required all three defendants to wear stun belts "based on some activity." The court then reimposed the stun belt order for the penalty retrial, in apparent response to a verbal outburst made by one of the defendants at the close of the first penalty trial. The majority upholds the order as within the trial court's discretion. Based on the record before us, I cannot agree.

## I.

A trial court, of necessity, has "broad power to maintain courtroom security and orderly proceedings." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269.) But requiring a defendant to wear physical restraints at trial can pose significant risks of unfairness. For that reason, California law holds that "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290–291 (*Duran*).) The federal Constitution similarly "forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is 'justified by an essential state interest' — such as the interest in courtroom security — specific to the defendant on trial." (*Deck v. Missouri* (2005) 544 U.S. 622, 624.) In *People*

1

*v. Mar* (2002) 28 Cal.4th 1201, we held that the same standard applies when a court requires the defendant to wear an electronic stun belt, " 'even if this device is not visible to the jury.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 870.)[1]

In determining whether there is a manifest need to physically restrain a particular defendant, " ' "the trial court may 'take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.' " ' " (*People v. Covarrubias, supra,* 1 Cal.5th at p. 870.) A trial court may not impose restraints merely because of the nature of a defendant's charged crimes, even in capital cases. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 389–390 ["facts that the defendant is an unsavory character and charged with a violent crime are not sufficient to support a finding of manifest need"]; *People v. Hawkins* (1995) 10 Cal.4th 920, 944 [the defendant's "record of violence, or the fact that he is a capital defendant, cannot alone justify his shackling"]; see also *Duran, supra,* 16 Cal.3d at p. 293 [that the "defendant was a state prison inmate who had been convicted of robbery and was charged with a violent crime did not, without more, justify the use of physical restraints"].) " 'The imposition of physical restraints without evidence of violence, a threat of violence, or other nonconforming conduct is an abuse of discretion.' " (*Covarrubias,* at p. 871.) Finally, " '[a]lthough the court need not hold a formal hearing before imposing restraints, "the record

---

[1]    This case was tried before *People v. Mar*. But "[e]ven though *Mar* was the first California opinion to hold *Duran*'s manifest need standard applicable to stun belts, we have applied the standard to cases tried before *Mar* was decided." (*People v. Jackson* (2014) 58 Cal.4th 724, 739.)

must show the court based its determination on facts, not rumor and innuendo." ' " (*Ibid.*)

The question now before us is whether the trial court made the requisite individualized determination of need with respect to each of the three defendants in this case, and whether those determinations were based on substantial evidence in the record. (*People v. Gamache* (2010) 48 Cal.4th 347, 368.) Our task is complicated by the fact the trial court never made express findings of manifest need, nor otherwise explained the basis for its decision to impose restraints on each of the defendants. The only indications of the court's thinking in the record are elliptical and not clearly rooted in security concerns. After allowing the defendants to appear unrestrained at the guilt phase, the trial court ordered them to wear stun belts at the penalty phase "based on some activity." The court did not explain what the "activity" in question was. The court then announced its intention to reimpose the order at the conclusion of the first penalty trial, which had ended in a hung jury. When the prosecutor declared he would retry the penalty phase, defendant Newborn gave him the finger and cursed at him in vulgar terms. In response, the court noted: "We will have to probably use the restraints again." The court reiterated its intent in the following court session, when Newborn's counsel moved for severance from McClain because of admissions and profanities during McClain's guilt phase testimony. The trial court responded: "And then they shouldn't be saddled with your client's loudmouth remarks last week. They are all together. They told the court this and the jury, they're P-9's, they're damn proud of it. They won't be severed. . . . I am not mad at you. I am not happy with their attitude. They are not going to run this

court.  I am going to run this trial.  Have you got the word?  And you will be belted."

In the absence of any express findings or explanation for the basis of the stun belt order, the majority does the only thing it can do, which is to comb the record for facts that would support an inference that the trial court made the necessary determinations of manifest need.  The majority ultimately finds what it is looking for in Newborn's vulgar statement to the prosecutor and other similar instances of what it terms "nonconforming behavior" by the other defendants.  Holmes, the majority emphasizes, had also reacted inappropriately at an earlier stage of the proceedings, responding to the reading of the guilty verdicts by saying, " 'Fuck you, you motherfuckers.  P-9 rules.' " (Maj. opn., *ante*, at p. 111.)  (The majority also suggests that Holmes subjected the jurors to other "ad hominem" attacks (*id.* at p. 113), but no other verbal outbursts by Holmes appear on the record.[2])  And as for McClain, the majority says he had "threatened a witness and made a lewd gesture toward the jury." (*Ibid.*)  The lewd gesture is supported by the record, but the witness-threatening is not.[3]  The record instead shows that

---

[2]     The confusion stems from a comment made by counsel rather than anything Holmes said or did:  When seeking severance for purposes of the penalty retrial, one of the defense lawyers referred to Holmes's response to the guilty verdict as an attack on jurors' intelligence, values, and sexual perversion.  This was a florid description of Holmes's guilty-verdict outburst, not a reference to additional incidents.

[3]     The majority asserts that McClain said, " 'I'll kill you' " to a witness as he was leaving the stand.  (Maj. opn., *ante*, at p. 111.)  McClain's words to the witness do not appear on the record.  And while the witness accused McClain of threatening him, standby counsel testified that McClain had instead called the witness a "dick head."  The trial court ultimately made no

McClain had disrupted the guilt phase proceedings to accuse a witness of lying, flipped off the jury when the guilty verdicts were announced, and cursed at the prosecutor in a hearing shortly after the first penalty phase ended in mistrial.

At bottom, with " ' "rumor and innuendo" ' " stripped away (*People v. Covarrubias, supra*, 1 Cal.5th at p. 871), what we have is a series of seemingly isolated incidents in which one or another defendant spoke out of turn in the courtroom, using vulgar and highly inappropriate terms.  The statements and gestures were directed at other individuals in the courtroom, but there is no indication in the record that the trial court regarded the incidents as threatening.  To the contrary, at one point the trial court observed that the defendants' behavior was not so uncommon and the jurors did not appear shocked, having heard other people use profanity on the stand.  As for defendant Holmes, the Attorney General defends the trial court's decision to admit a videotape of Holmes's outburst as evidence against all three defendants by vigorously denying that Holmes's statement to the jury was threatening; a viewing of the

---

finding that McClain threatened the witness, nor did it otherwise indicate it regarded the incident as presenting a security concern.  Instead, the court explained to McClain: "Listen, I am not going to chastise you.  You bring things on yourself sometimes because you don't really understand the proceedings.  Anything you say to any witness can come back to hurt you. . . .  I know sometimes you just do it because you are unsophisticated or some other reason, but you can't do it.  It will come back."  In any event, the incident occurred during the penalty retrial — well after the trial court decided to impose restraints — and so could not have played any part in the trial court's determination of manifest need.

videotape, which is in the record before us, supports the Attorney General's characterization.

The law is clear that, at least standing alone, isolated verbal outbursts — even "expletive-laden" ones (maj. opn., *ante*, at p. 113) — do not establish manifest need to restrain defendants by means of a device capable of delivering "debilitating electric shock" (*People v. Mar, supra*, 28 Cal.4th at p. 1204).  As we said in *Mar*, "a stun belt may not properly be used, over a defendant's objection, to deter a defendant from making verbal outbursts that may be detrimental to the defendant's own case." (*Id.* at p. 1223, fn. 6.)

It is true, of course, that our cases have said that a determination of manifest need for restraints can be based on a showing of " 'violence, a threat of violence, or *other nonconforming conduct.*' "  (*People v. Covarrubias, supra*, 1 Cal.5th at p. 871, italics added.)  The majority opinion places considerable emphasis on that final phrase in upholding the trial court's order based on the defendants' verbal misbehavior. But the reference to "nonconforming conduct" in our cases is not a catchall that sweeps in every instance of vocalized disrespect. Rather, as our precedent makes clear, the type of nonconforming conduct sufficient to justify restraint must be the sort of conduct indicative of a current risk of escape or physical danger or behavior that " 'would disrupt the judicial process if unrestrained.' "  (*People v. Cox* (1991) 53 Cal.3d 618, 651.)

To appreciate the difference between the "nonconforming conduct" in this record and the type of showing our precedent requires, consider prior cases.  We have upheld trial courts' restraint orders where there is "evidence that the defendant has threatened jail deputies, possessed weapons in custody,

threatened or assaulted other inmates, and/or engaged in violent outbursts in court." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1031; see also *People v. Williams* (2015) 61 Cal.4th 1244, 1259 [same]; *People v. Young* (2019) 7 Cal.5th 905, 934 [same].) We have also pointed to cases involving escape efforts and violent threats. (*People v. Mar*, *supra*, 28 Cal.4th at pp. 1216–1217.) By contrast, we have found manifest need for restraints lacking when circumstances involved a significant "undercurrent of tension and charged emotion on all sides," but not "a single substantiation of violence or the threat of violence on the part of the accused." (*People v. Cox*, *supra*, 53 Cal.3d at p. 652.) In *Mar*, we similarly determined that the trial court's concern that defendant's " 'strong emotions' " might cause him to get " 'crossways with somebody in the security detail,' " without more, was insufficient to establish manifest need for a stun belt. (*Mar*, at pp. 1211, 1222.)

Again, though here the defendants' individual remarks were vulgar and inappropriate, the record does not establish that these isolated acts either "posed the type of serious security threat at trial that would justify the imposition of restraints" or that "the trial court actually determined" they did. (*People v. Mar*, *supra*, 28 Cal.4th at p. 1220; see *People v. Soukomlane* (2008) 162 Cal.App.4th 214, 232.) To the extent the trial court revealed its reasons on the record, its concern seemed to be primarily with the impropriety of the defendants' various inappropriate remarks, rather than with any security risks they posed. In the end, nothing in the court's comments "indicates it was aware that the procedural and substantive requirements established in *Duran* governed its consideration and determination" to use stun belts. (*Mar*, at p. 1222.)

Ultimately the trial court's imposition of the stun belt on defendant McClain may have been justified for a reason the majority notes but does not rely on: The court found that before the guilt phase, McClain had attempted to attack an inmate with a shank. (Maj. opn., *ante*, at p. 111.) Apparently, the trial court did not think the incident established a need to restrain McClain at the guilt phase trial, but it may well be that this violent episode played a role in the court's decision to restrain McClain at the penalty phase. The matter is unclear on this record. And the record contains no similar evidence of violence or threats of violence by Newborn or Holmes.

The majority opinion suggests the trial court was entitled to consider the defendants' verbal outbursts in view of the "collective risk" posed by "volatile defendants" associated with a violent gang and convicted of violent crimes. (Maj. opn., *ante*, at p. 114.) The majority concludes that "[u]nder these circumstances there may be well-founded concern that disruptive conduct by one will spur an outburst and escalation by the others." (*Ibid.*) Perhaps. But if, after defendants appeared unrestrained at the guilt phase, the trial court developed new concerns about their "volatility" or other courtroom dynamics at the penalty phase, the court should have made those concerns known on the record. The trial judge did comment on the defendants' attitudes and what he referred to as their "loudmouth" remarks. The trial court clearly regarded the defendants as posing a threat to the dignity of the courtroom. But it did not make a record, specific to each defendant, regarding any threat they posed to its security. (See *Duran, supra,* 16 Cal.3d at pp. 291, 293; *People v. Mar, supra,* 28 Cal.4th at p. 1220.) On the record we have, I would not uphold the trial court's stun belt order.

## II.

Whether the trial court adequately justified its use of restraints is not the end of the analysis; reversal is required only if the defendants were prejudiced by the error. (*People v. Jackson*, *supra*, 58 Cal.4th at p. 744.) Our cases have held that the unjustified use of restraints is harmless when the jury is not aware of them and there is no indication the restraint hampered the defense in any other way. (*Id.* at p. 740.) Here, there is no claim that the stun belts were ever visible to the jury or that they hampered the defense. But though the jury could not see the stun belts, it was made aware of them.

A bailiff testifying as a witness described a threat made by defendant McClain while the bailiff was placing the stun belts on the defendants. The witness began his testimony by explaining that "[e]very morning as we come in, we put an electronic device on each one of the defendants." Counsel for Holmes interrupted, asking the court to admonish the jury that "they should not use the electronic device against any of the clients; it is just basically a procedure the sheriffs use in these types of cases." In response, the trial court told the jury: "The court makes a decision, based on things the court knows, whether or not to wear this device. It is a security device to assure tranquility in the court, security for everyone. It does not mean that they are guilty or not guilty." Resuming his questioning, the prosecutor said, "So you put the security device on the defendants, right? . . . Ones who have been convicted of murder?" The bailiff then described putting the security devices on Holmes, Newborn, and McClain.

The jury would later hear more from the trial court on the subject of stun belts during an exchange with defendant

McClain. During his closing argument, McClain stated that his argument would be more "boisterous" "if I didn't have this belt on." The court remarked that "you are wearing a belt because you have acted up in this courtroom. So don't tell this jury without that belt what you might do."

It is true, as the majority says (maj. opn., *ante*, at p. 115) that the jury was not told, in so many words, that the defendants were wearing electronic stun belts. But the jurors certainly might have surmised something of the sort from the witness's reference to "an electronic device" the bailiffs placed on the defendants each day. The trial court's limiting instruction then had the perhaps unintentional effect of adding to the jury's awareness of the device. The standard admonishment directs jurors " 'not speculate as to why restraints have been used' " and that restraints may not be considered " 'for any purpose.' " (*People v. Lightsey* (2012) 54 Cal.4th 668, 721, fn. 24 [describing CALJIC No. 1.04].) The instruction the trial court gave instead told the jurors that the devices defendants wore were for courtroom security and suggested the court knew of undisclosed reasons warranting their use, as opposed to expressly discouraging speculation about what those reasons were.[4] The

---

[4] The majority faults defendants for failing to request a different instruction. (Maj. opn., *ante*, at p. 115.) But the defense did, in fact, request a different instruction from the one the trial court gave. Perhaps a further request might have prompted the trial court to clarify the instruction by noting that the devices were not to be used for any purpose, as opposed to for purposes of guilt — which was no longer an issue at the penalty phase. But it is not clear what additional comments could have dispelled the impression left by the trial court's description of the devices or their purpose. Defendants were under no obligation to ask the trial court to put the cat back in the bag. (See *People v. Perez* (2020) 9 Cal.5th 1, 7–8 [parties are

trial court would later again allude to those reasons when it told McClain "you are wearing a belt because you acted up in this courtroom."

Ultimately, however, under our precedent, I do not think these references to the stun belts constitute a basis for reversing the judgment. (See *People v. Jackson*, *supra*, 58 Cal.4th at pp. 740–741; accord, *People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 472–473 (conc. opn. of Liu, J.) [criticizing *People v. Jackson*, but recognizing it as binding precedent].) Even when a trial court fails to adequately justify the use of physical restraints, we have said that a juror's brief viewing of restraints generally does not give rise to prejudicial error. (*People v. Ervine* (2009) 47 Cal.4th 745, 774 [unjustified shackling harmless even if a juror glimpsed the restraint during voir dire]; *Duran*, *supra*, 16 Cal.3d at p. 287, fn. 2 [seeing the defendant in shackles "for only a brief period either inside or outside the courtroom" generally does not constitute prejudicial error].) Although there are limits to what jury instructions can do in this context, we have also generally held that jury instructions can at least temper any prejudice that might otherwise result from awareness of a defendant's physical restraints. (See *People v. Pride* (1992) 3 Cal.4th 195, 253–254 [assuming the jury was able to follow a penalty phase instruction to disregard visible restraints]; but cf. *People v. McDaniel* (2008) 159 Cal.App.4th 736, 747 & fn. 9 [a blanket presumption that an admonition renders harmless the

---

excused from raising issues that would have been futile]; *People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 [failure to request admonition does not forfeit an issue when it would not have cured the harm caused].)

unjustified use of restraints would undermine the trial court's obligation to find the restraints are necessary].)

Again, there is no indication the jury in this case ever saw the restraints. In visible shackling cases, we are often concerned with the "visual, psychological, and emotional response" a juror might have to seeing a defendant "restrained and differentiated from everyone else." (*People v. McDaniel*, *supra*, 159 Cal.App.4th at p. 746; see *Deck v. Missouri*, *supra*, 544 U.S. at p. 630.) Here, that particular concern was not present; the stun belts had no visual impact on the jurors, even in passing. The jury instead heard about the stun belts in passing, during brief and nonspecific exchanges in a penalty retrial that spanned a month and involved testimony from nearly 70 witnesses. (Cf. *Stephenson v. Neal* (7th Cir. 2017) 865 F.3d 956, 959 [finding the unjustified use of a visible stun belt prejudicial when the brevity of the penalty phase may have increased the negative impact of the visible restraint].) Further, the trial court did give a limiting instruction to the jury, albeit a flawed one. (Cf. *Duran, supra*, 16 Cal.3d at p. 296 [finding the unjustified and unadmonished use of restraints prejudicial when considered cumulatively with other trial errors].)

McClain argues that the trial court's comment on his stun belt during his closing argument added to the prejudice he suffered. It is true the court's remarks called additional attention to the restraint. But then again, so did McClain's comments, to which the court was responding. The prosecutor made no mention of the restraint, and the issue arose only briefly. Under our cases, reversal is not warranted.[5]

---

[5] Pointing to his remark at trial that his closing argument would have been more "boisterous" without the stun belt,

### III.

I raise one final point about the trial court's use of physical restraints: The court's failure to consider manifest need did not appear to be an isolated event. McClain claims the trial judge erred when he required McClain's witness, Clarence Jones, to appear in court wearing visible restraints. The Attorney General acknowledges that the "limitation on physical restraints applies to defense witnesses as well as defendants" (*People v. Allen* (1986) 42 Cal.3d 1222, 1264–1265), but asserts that McClain forfeited this argument because he did not object to Jones's restraints at trial. The majority agrees. Respectfully, I do not.

McClain presented testimony from Jones, a fellow inmate, to refute evidence about McClain's attempt to attack an inmate in the jail. During cross-examination, the prosecutor drew attention to the fact that Jones had been shackled in a previous criminal trial because of his outbursts towards the court and deputies. Immediately after the prosecutor's questioning, McClain stated on redirect: "I mean it's obvious the way they bring you in here with all those chains, they are trying to paint

---

McClain also suggests it is reasonable to assume the stun belt impaired his ability to think clearly and maintain a positive demeanor before the jury. Rather than assume impairment, however, our cases have required some affirmative indication in the record that a stun belt had an adverse impact on the defense. (*People v. Jackson*, *supra*, 58 Cal.4th at p. 740; accord, *People v. Mar*, *supra*, 28 Cal.4th at p. 1225.) Aside from McClain's remark about being more "boisterous," the record in this case contains no indication that the stun belt had any impact on McClain's ability to effectively question witnesses, make objections, or present his closing argument to the jury.

a picture you are some dangerous dude?" Jones answered: "Exactly. That is what I said downstairs when I come through here. From my understanding, as far as this black thing around here, this is a zapper, and this is not supposed to be exposed to the jury." McClain observed that the restraints on Jones were meant to reflect badly on McClain. The trial court later admonished the jury that the fact that Jones was shackled and brought in by deputies "has no reflection on Mr. McClain. You called him as your witness. You take your witnesses as they are, not what they are, not how they are dressed."

The majority finds McClain forfeited his claim of error because he did not object to Jones's restraints at trial. But there is no indication in the record that McClain ever had an opportunity to do so. It is unclear whether McClain was told Jones would be required to wear restraints before Jones appeared in the courtroom. And once Jones was on the stand, McClain did object in a manner, remarking that the restraints reflected poorly on him.

As for the merits, the trial judge was obligated to make a finding of manifest need for Jones's restraints. (*Duran, supra*, 16 Cal.3d at p. 291; *People v. Allen, supra*, 42 Cal.3d at pp. 1264–1265 [recognizing that the rules established by *Duran* apply to defense witnesses].) Much as in the case of defendants themselves, there is nothing in the record to indicate that the trial court made the necessary finding.

The majority concludes the record lacks evidence that Jones's restraints were visible, and suggests it was McClain who brought the restraints to the jury's attention, making revelation of the restraints invited error. I read the record differently: Although there was a " 'pause' " in the proceedings before Jones

entered the courtroom (maj. opn., *ante*, at p. 139), the bailiffs had stated there was no need to take a break before bringing Jones in to testify and the jury was not dismissed before Jones was escorted into the courtroom in shackles and a stun belt. McClain's comment that Jones was brought to the courtroom "in all those chains," and Jones's comment that he thought the jury was not supposed to see the stun belt, suggest that the jury did indeed see the restraints.

The trial court's errors with respect to Jones were of a piece with its errors respecting the restraints on defendants Holmes, McClain, and Newborn. In each case, the law required a finding of manifest need for restraints based on record evidence, and in each case the trial court ordered the restraints without either making explicit findings or making implicit findings that are discernable on this record. While the errors may not have been prejudicial under our precedent, I would forthrightly acknowledge that the trial court did not make an adequate record to justify the use of restraints at the penalty phase of this trial. Thus, while I join the majority opinion in other respects, on the issue of restraints I concur in the judgment only.

**KRUGER, J.**

PEOPLE v. HOLMES, MCCLAIN AND NEWBORN

S058734


Dissenting Opinion by Justice Liu


The court today affirms a judgment of death for three Black men that followed a trial in which the prosecutor used half of his peremptory strikes to remove Black women from the jury box. At the time of the defense's motion objecting to the prosecutor's strikes, the prosecutor had used six of twelve peremptory challenges to dismiss two-thirds of the Black women called into the box, eliminating them at a rate nearly twice their representation among jurors who had been questioned. These figures "are important and reflect an obvious disparity." (Maj. opn., *ante*, at p. 45.) Yet today's opinion holds that defendants failed to establish a prima facie case of discrimination in light of the fact that the seated jury included four Black women.

We have said that " 'acceptance of one or more black jurors by the prosecution' " may " 'help lessen the strength of any inference of discrimination that the pattern of the prosecutor's strikes might otherwise imply.' " (*People v. Johnson* (2019) 8 Cal.5th 475, 508.) But the " 'low threshold' showing required for *Batson*'s first step . . . is satisfied simply by evidence sufficient to permit us to draw an inference that discrimination *may* have occurred." (*People v. Battle* (2021) 11 Cal.5th 749, 773 (*Battle*).)

Here, the jury's final composition reflected the prosecutor's pattern of strikes and was reached only after the trial court warned counsel about the appearance of impropriety in their strikes. Considered in context, the final composition

does little to lessen the inference that the prosecution sought to limit the number of Black women — a group well known to be a frequent target of prosecutors' peremptory strikes in capital jury selection.  Defendants have met the low bar for establishing a prima facie case under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).  In reaching a contrary judgment, today's opinion weakens the role of appellate review in rooting out improper discrimination in jury selection.

Today's opinion also holds that the trial court did not err in ordering each defendant to wear a stun belt — "a device that . . . delivers an eight-second-long, 50,000-volt, debilitating electric shock when activated by a transmitter controlled by a court security officer."  (*People v. Mar* (2002) 28 Cal.4th 1201, 1204 (*Mar*).)  I agree with Justice Kruger that no " 'manifest need' " (*id.* at p. 1217, italics omitted) appears in this record for ordering a shock device whose activation " 'causes temporary debilitating pain' " and " 'may also cause immediate and uncontrolled defecation and urination,' " " 'may leave welts on the wearer's skin requiring as long as six months to heal,' " and " 'may cause some wearers to suffer heartbeat irregularities or seizures' " (*id.* at p. 1215).  I do not agree, however, that this unlawful use of the stun belts was harmless beyond a reasonable doubt at the penalty retrial.

I respectfully dissent.

## I.

During jury selection in 1995, the prosecutor exercised its first twelve peremptory challenges to dismiss six Black women, three White women, one Filipino man, one Hispanic man, and one Hawaiian woman.  Defense counsel raised an objection under *Batson* and *People v. Wheeler* (1978) 22 Cal.3d 258, noting

that the prosecution had struck six Black women. The trial court asked the prosecutor if he wanted to respond. The prosecutor asked whether the trial court would find a prima facie case. When the court said it would not, the prosecutor declined to state his reasons for the strikes.

After the court's ruling, the prosecutor used four more peremptory challenges, striking one Hispanic man, one Hispanic woman, and two more Black women. The trial judge then suggested he would excuse another prospective juror for cause based on her views about the death penalty and called counsel into chambers. He explained why he would prefer that defense counsel not proceed with additional questions of the prospective juror: "I think the court has asked enough questions. [Defense counsel] wants to ask questions. I don't think it is appropriate. I have been through this so many times and you have, too. . . . You can ask questions, but I can feel her heart and I don't think she wants to [impose the death penalty]. It doesn't mean she couldn't or wouldn't, but she is saying in effect that she really couldn't do that." Defense counsel agreed to submit on the issue.

The judge continued: "On that same note, the defense has accepted several, three times. There is seven Black people left on the jury. We have three defendants, Black, on trial for their life. The defendants have taken off some White people. I watch the people's reaction in the audience. You do not see this. In my court I want the appearance of fairness. I want to put you on notice: Be very careful, both of you. Be very careful. I had the opportunity one time sitting here and there were three Justices that came down to visit me and they came in chambers and commented on that. This is not apparent, but you have to be very careful. The appearance of justice is as important as

justice. I think your peremptories were proper, but you are giving the appearance. You are down to the short straws here. I think most of those people had some problems, people in jail and things. But for justice for everyone I want you to think about what we are doing here. I am not admonishing you; I am just saying I am very sensitive about that on both sides."

Once back in session, the court excused the prospective juror for cause. Defense counsel struck an additional juror, and then all counsel accepted the jury comprised of two White men, three White women, one Hispanic man, one Hispanic woman, one Black man, and four Black women.

## II.

To establish a prima facie case of a *Batson* violation, the moving party must point to sufficient facts and circumstances to "raise an inference" that the prosecutor exercised peremptory challenges to exclude venirepersons on an impermissible basis. (*Batson*, *supra*, 476 U.S. at p. 96.) This is a "low threshold." (*People v. Scott* (2015) 61 Cal.4th 363, 384.) An inference is simply "a logical conclusion based on a set of facts." (*People v. Lancaster* (2007) 41 Cal.4th 50, 74.) We review the record independently "where, as here, the trial predated *Johnson* [*v. California* (2005) 545 U.S. 162] and it is not clear from the record whether the trial court analyzed the *Batson/Wheeler* motion with this low threshold in mind." (*Scott*, at p. 384.)

"[A] 'pattern' of strikes" against a group may "give rise to an inference of discrimination." (*Batson*, *supra*, 476 U.S. at p. 97.) The moving party "may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group." (*People v. Bell* (2007) 40

Cal.4th 582, 597 (*Bell*), disapproved on another ground in *People v. Sánchez* (2016) 63 Cal.4th 665, 686, fn. 13.)  At the time of the defense's motion, the prosecutor had eliminated two-thirds of the Black women — six out of nine — seated in the box and had used half of his peremptories — six out of twelve — to strike Black women.

An elimination rate of two-thirds "is often sufficient on its own to make a *prima facie* case at Step One."  (*Shirley v. Yates* (9th Cir. 2015) 807 F.3d 1090, 1101 [defendant raised an inference of discrimination "more than sufficient to meet his 'minimal' burden" where two-thirds of the Black venirepersons not removed for cause were struck by the prosecutor].)  And it is higher than rates that courts have found sufficient to support an inference of discrimination.  (See, e.g., *Fernandez v. Roe* (9th Cir. 2002) 286 F.3d 1073, 1078 (*Fernandez*) [57 percent, noting that "[i]n a number of other cases, with less striking disparities, we have assumed the existence of a *prima facie* case"]; *Turner v. Marshall* (9th Cir. 1995) 63 F.3d 807, 812 (*Turner*) [56 percent], overruled on other grounds in *Tolbert v. Page* (9th Cir. 1999) 182 F.3d 677, 685 (en banc).)

The prosecutor's use of 50 percent of his strikes against Black women is likewise in the range that supports a prima facie case.  (See, e.g., *Price v. Cain* (5th Cir. 2009) 560 F.3d 284, 287 [defendant carried his "light burden" where prosecutor used six of twelve peremptory challenges to strike Black prospective jurors, defendant was Black, and the resulting jury was all White]; *Fernandez, supra*, 286 F.3d at p. 1078 [29 percent strike rate with 57 percent elimination rate was "enough," "standing alone, . . . to raise an inference of racial discrimination"].)  And it is significantly higher than rates we have found insufficient to raise an inference of discrimination in similar cases.  (See,

e.g., *Battle, supra*, 11 Cal.5th at p. 775 [18 percent]; *People v. Clark* (2011) 52 Cal.4th 856, 904–905 [20 percent]; *People v. Welch* (1999) 20 Cal.4th 701, 745 [27 percent].)  It is true that this court in *People v. Rhoades* (2019) 8 Cal.5th 393 (*Rhoades*) found no prima facie case where the prosecutor used four out of eight strikes against Black women.  But the defendant in *Rhoades* was White, and the court said the record disclosed "readily apparent, race-neutral grounds" for the prosecutor's challenges. (*Id.* at p. 430.)  Here, all three defendants are Black, and the record does not disclose readily apparent, race-neutral reasons to excuse the prospective jurors at issue.

Moreover, the statistical disparity remains stark when we "compare[] the proportion of a party's peremptory challenges used against a group to the group's proportion in the pool of jurors subject to peremptory challenge." (*Bell, supra,* 40 Cal.4th at p. 598, fn. 4.)  At the time of the motion, Black women were 26 percent of the jurors (nine out of 34) subject to peremptory challenges, yet the prosecutor had used half of his challenges to strike them.  "[A] challenge rate nearly twice the [representation in] the venire strongly supports a *prima facie* case under *Batson*." (*U. S. v. Alvarado* (2d Cir. 1991) 923 F.2d 253, 256.)

In sum, at the time of the *Batson* motion, the prosecutor's strikes of six Black women eliminated two-thirds of the Black women seated in the box, and they comprised half of the prosecutor's total strikes, a rate nearly twice the proportion of Black women among jurors subject to challenge.  These facts, "standing alone, are enough to raise an inference of racial discrimination." (*Fernandez, supra*, 286 F.3d at p. 1078; see *ibid.* [finding prima facie case where prosecutor used four of seven strikes to eliminate four of fourteen Hispanic jurors, where Hispanic jurors comprised 12 percent of the jurors subject

to strike]; see *People v. Sánchez* (2016) 63 Cal.4th 411, 439 ["[c]onsidered alone," prosecutor's use of four of ten challenges to strike four of six Hispanic jurors, where Hispanic jurors comprised 19 percent of the jurors subject to strike, may "suggest a discriminatory purpose"].)

On appellate review, "[p]ostruling developments can provide a basis for denying a *Batson* claim . . . if the totality of the record, including such developments, permits no reasonable inference that the prosecutor acted with discriminatory intent." (*People v. Reed* (2018) 4 Cal.5th 989, 1022 (*Reed*) (dis. opn. of Liu, J.).) None of the surrounding circumstances here refute the inference arising from these figures. After the trial court found no prima facie case, the prosecutor used two of his next four peremptory challenges to remove Black women from the jury. Thus, the rate at which the prosecutor used strikes against Black women did not change after the *Batson/Wheeler* motion. The prosecutor's pattern of strikes also continued during the selection of alternate jurors, where he used three of seven peremptories to remove three of four Black women subject to challenge.

Over the entire jury selection process, the prosecutor struck 11 of the 16 Black women he could have struck, nearly 70 percent. This rate of strikes against Black women was nearly *three times* the proportion of Black women among jurors subject to challenge (16 out of 64 total jurors, or 25 percent). This is far more pronounced than what we have found acceptable in the past. (See *Reed*, *supra*, 4 Cal.5th at p. 1000 [finding no prima facie case where prosecutor struck Black jurors at a rate of 44 percent, "barely" more than their 34 percent representation in the venire]; *People v. Thomas* (2012) 53 Cal.4th 771, 796 (*Thomas*) [prosecutor's use of 37 percent of challenges against African-

Americans who comprised 26 percent of jurors called into the box was "not significant enough, in itself, to suggest discrimination"].)

We have recognized several other factors as " 'especially relevant' " to determining "whether the record supports an inference the prosecution excused one or more of the African-American prospective jurors because of their race." (*Rhoades*, *supra*, 8 Cal.5th at p. 429.) Among these is " 'whether the defendant is a member of [the identified] group.' " (*Ibid*.) The court says this " 'especially relevant' " factor is not implicated in this case because all three defendants are Black men and the defense's *Batson* challenge concerned the prosecutor's strikes of Black women. (Maj. opn., *ante*, at p. 43, fn. 18.) But it blinks reality to ignore the " ' "concurrence of racial and sexual identity" ' " (*People v. Motton* (1985) 39 Cal.3d 596, 606 (*Motton*)) and the improper stereotypes that might cause a prosecutor to remove Black female jurors in a case involving Black male defendants. (See, e.g., *People v. Triplett* (2020) 48 Cal.App.5th 655, 683 (dis. stmt. of Liu, J.) [prosecutor struck a Black woman who, when asked if she knew anyone who had been treated badly by the police, said, " 'A Black woman in L.A. with young Black brothers, I have been harassed many times' " by police, but then "repeatedly and unequivocally" indicated that "she could be a fair juror and impartially consider police testimony"].)

Indeed, "[r]acial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of [a] forbidden stereotype." (*Powers v. Ohio* (1991) 499 U.S. 400, 416 (*Powers*).) Because "race prejudice stems from various causes and may manifest itself in different forms" (*ibid*.), the race of a defendant does not become irrelevant because an excused juror of the same race belongs to a different gender. As relevant here, "[t]he most commonly held

stereotype about African-American women in the context of jury selection is that they will not convict a Black male defendant because they will emotionally respond to him as a son or husband. . . . [¶] In the context of capital trials, this stereotype translates into the assumption that African-American women will not impose the death penalty against an African-American male defendant." (Brief of Amici Curiae National Congress of Black Women and Black Women Lawyers Association of Los Angeles, Inc., *Williams v. California*, No. 13-494, pp. 10–11; see Babcock, *A Place in the Palladium: Women's Rights and Jury Service* (1992) 61 U.Cin. L.Rev. 1139, 1147.)

Empirical studies demonstrate that Black women are the frequent target of prosecutors' peremptory challenges in capital cases and are struck disproportionately compared to other groups. (See, e.g., Baldus et al., *The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis* (2001) 3 U.Pa. J. Const. L. 3, 123 [young Black women experienced the highest strike rate by the prosecution followed by young Black men and Black middle-aged women]; Wright et al., *The Jury Sunshine Project: Jury Selection Data as a Political Issue* (2018) 4 U.Ill. L.Rev. 1407, 1427 [prosecutors removed Black women at about double the rate they removed White prospective jurors]; Eisenberg et al., *If It Walks Like Systematic Exclusion and Quacks Like Systematic Exclusion: Follow-Up on Removal of Women and African-Americans in Jury Selection in South Carolina Capital Cases, 1997–2014* (2017) 68 S.C. L.Rev. 373, 389 [same]; see also *People v. Harris* (2013) 57 Cal.4th 804, 887–889 (conc. opn. of Liu, J.) [discussing additional studies and experimental research on the disparate strikes of Black jurors].)

These findings are consistent with how often this court and other courts have confronted objections to the strikes of

Black women.  In some cases, the record reflects "precisely the sort of reliance on racial and gender stereotypes that *Batson* is intended to eliminate."  (*People v. Williams* (2013) 56 Cal.4th 630, 717 (dis. opn. of Liu, J.); see *id.* at pp. 651–652 (maj. opn.) [prosecutor struck five Black women; trial judge said " 'Black women are very reluctant to impose the death penalty' "]; see, e.g., *Battle*, *supra*, 11 Cal.5th at pp. 770, 774 [prosecutor struck two Black women in case involving Black male defendant]; *People v. Johnson*, *supra*, 8 Cal.5th at pp. 529, 531 (dis. opn. of Liu, J.) [prosecutor struck three Black women with "diverse backgrounds, occupations, and family circumstances" in case involving Black male defendant]; *Rhoades*, 8 Cal.5th at p. 424 [prosecutor excused all four Black women to reach the box]; *People v. Cunningham* (2015) 61 Cal.4th 609, 665 [prosecutor used three of eight challenges to strike Black women]; *People v. Chism* (2014) 58 Cal.4th 1266, 1338, 1344 (dis. opn. of Liu, J.) [prosecutor struck Black woman where first penalty phase jury of Black male defendant's trial hung because two Black female jurors refused to vote for death]; *People v. Elliott* (2012) 53 Cal.4th 535, 560–563 [prosecutor struck Black woman because she was " 'weak on death' " but did not engage her in same voir dire as non-Black prospective jurors raising similar concerns in their questionnaires]; *People v. Manibusan* (2013) 58 Cal.4th 40, 81 [prosecutor used three of eight peremptories to remove Black women]; *People v. Mai* (2013) 57 Cal.4th 986, 1050–1053 [prosecutor struck three Black women relying in part on questionable characterizations of their death penalty views]; *Thomas*, *supra*, 53 Cal.4th at pp. 794–796 [prosecutor struck six Black women in case with Black defendant where there was "no obvious reason" to strike all of the challenged Black women]; *People v. Taylor* (2010) 48 Cal.4th 574, 612, 616 [prosecutor

excused Black woman for, among other things, being "undecided" about the death penalty where seated juror indicated likewise]; *People v. Mills* (2010) 48 Cal.4th 158, 177–185 [prosecutor struck at least five Black women who entered the box]; *People v. Stanley* (2006) 39 Cal.4th 913, 937–943 [prosecutor struck five Black women based on their " 'sympathy for the defendant' "; trial judge said "[m]ost of these women that you excused by their answers and by the way they talked, it's arguable that they were sympathetic to the defendant, the defendant being black"]; *Bell*, *supra*, 40 Cal.4th at p. 595 [prosecutor struck two of three Black women in case with Black male defendant]; *People v. Young* (2005) 34 Cal.4th 1149, 1171 [prosecutor struck all three Black women from the panel]; *People v. Cleveland* (2004) 32 Cal.4th 704, 733–734 [prosecutor struck four Black women in case with Black male codefendants]; *People v. Boyette* (2002) 29 Cal.4th 381, 420–423 [prosecutor struck four Black women over concerns about their willingness to impose the death penalty where three indicated their willingness to do so]; *Wilson v. Beard* (3d Cir. 2005) 426 F.3d 653, 657, 669 [prosecutor struck at least six Black women and urged in jury selection training tape that young Black women " 'are very bad' " and to avoid older Black women " 'when you have [] a black defendant who's a young boy and they can identify as his . . . motherly type thing' "]; see also *J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127, 145, fn. 18 (*J.E.B.*) ["the majority of the lower court decisions extending *Batson* to gender involve the use of peremptory challenges to remove minority women"].)

To overlook the racial identity of the challenged jurors and defendants in these circumstances would be to ignore persistent stereotypes and their impermissible effects on jury selection. In

this case, as in others, the disproportionate challenge of Black women plausibly raises a concern that these jurors were removed based on "assumptions . . . which arise solely from the[ir] race," gender, or intersection of these identities. (*Batson*, *supra*, 476 U.S. at p. 98; see *J.E.B.*, *supra*, 511 U.S. at pp. 141–142; *Motton*, *supra*, 39 Cal.3d at p. 606.) The shared "[r]acial identity between the defendant[s] and the excused person[s] . . . may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred." (*Powers*, *supra*, 499 U.S. at p. 416.)

In reaching a contrary conclusion, today's opinion relies on the final composition of the jury, which included four Black women, and the fact that the prosecutor had sufficient peremptory challenges remaining to strike them at the time he accepted the jury. But these circumstances cannot bear the weight the court places on them.

Crucially, the prosecutor accepted the jury's composition only after the trial court had admonished counsel to be attentive to "the appearance of fairness" and "[t]he appearance of justice" in the exercise of their peremptory strikes. Up to that point, the prosecutor had continued to use half of his peremptory strikes — six out of twelve at the time of the *Batson* motion, then two out of four until the jury was accepted — to dismiss Black women. Indeed, it was only after the prosecutor struck six Black women, after the defense made a *Batson*/*Wheeler* motion, after the prosecutor declined to state his reasons for his strikes, after the prosecutor struck two additional Black women, after the defense accepted the jury three times, and after the court admonished counsel about the appearance of justice that the prosecutor accepted the jury as seated. In these circumstances,

the fact that the prosecutor could have removed *even more* Black women from the jury, in the face of the trial court's pointed admonition, does little to lessen the inference of discrimination arising from the pattern of strikes.

Today's opinion also notes that the prosecution "repeatedly excused jurors who were not members of the identified group rather than excusing a number of African-American women then in the box." (Maj. opn., *ante*, at p. 48.) But it is only in the most egregious, indiscreet, or oddly drawn cases that a prosecutor would use peremptory challenges to exclude only members of an identified group. Courts routinely find a prima facie case where the prosecutor had sufficient challenges remaining to strike seated jurors of the same group or struck members of other groups in addition to the challenged group. (See, e.g., *Turner, supra*, 63 F.3d at pp. 812–813 [collecting cases where the court found an inference of discrimination where "the prosecution struck some, but not all, of the minority venirepersons"].)

Finally, we have said "an appellate court may take into account 'nondiscriminatory reasons for a peremptory challenge that are apparent from and "clearly established" in the record [citations] and that necessarily dispel any inference of bias.' " (*Rhoades, supra*, 8 Cal.5th at p. 431; see *ibid.* ["when the record of a prospective juror's voir dire or questionnaire on its face reveals a race-neutral characteristic that any reasonable prosecutor trying the case would logically avoid in a juror, the inference that the prosecutor was motivated by racial discrimination loses force"].) Today's opinion identifies no such reasons, and I see none.

In concluding that defendants have made a prima facie case of discrimination, I express no view on whether they would have ultimately shown by a preponderance of the evidence that the prosecutor improperly dismissed one or more Black female jurors. The prosecutor may well have had race-neutral reasons for each strike, but we will never know. Instead, we are left with "uncertainty" where "a direct answer [could have been] obtained by asking a simple question." (*Johnson v. California, supra*, 545 U.S. at p. 172.) In this posture, the only inquiry before us is whether "an inference of discrimination" arises from the totality of circumstances in this case. (*Batson, supra*, 476 U.S. at p. 97.) This " 'low threshold' " is easily met here; the evidence is more than "sufficient to permit us to draw an inference that discrimination *may* have occurred." (*Battle, supra*, 11 Cal.5th at p. 773.)

"[I]t has been more than 30 years since this court has found any type of *Batson* error involving the removal of a Black juror. (See *People v. Snow* (1987) 44 Cal.3d 216.) This is despite the fact that '[t]he high court's opinion [in *Batson*] responded specifically to the pernicious history of African Americans being excluded from jury service, calling such exclusion "a primary example of the evil the Fourteenth Amendment was designed to cure." ' " (*People v. Johnson, supra*, 8 Cal.5th at p. 534 (dis. opn. of Liu, J.).) Today's decision extends this improbable streak and regrettably may feed the perception — held by two of the Black women jurors whom the prosecutor struck and by no fewer than six seated jurors in this case — that the death penalty is imposed randomly or disproportionately upon persons with lesser means. The incongruity between our *Batson* jurisprudence and what is widely known about racial inequality in our justice system has spurred legislative reform. (Assem.

Bill No. 3070 (2019–2020 Reg. Sess.); see Code Civ. Proc.,
§ 231.7.) But "[t]he duty to confront racial animus in the justice
system is not the legislature's alone." (*Peña-Rodriguez v.
Colorado* (2017) 580 U.S. __, __ [137 S.Ct. 855, 867].) "It is [past]
time that we, too, bring a greater sense of urgency to ferreting
out racial discrimination in the criminal justice system." (*People
v. Johnson*, at p. 536 (dis. opn. of Liu, J.).)

Because the passage of time makes remand to explore the
prosecutor's actual reasons for the contested strikes impractical
(see *Battle*, *supra*, 11 Cal.5th at p. 811 (dis. opn. of Liu, J.)), I
would reverse the judgment.

### III.

Today's opinion also concludes that the trial court did not
abuse its discretion by requiring defendants to wear stun belts
based on a few instances of cursing and profane gestures. I join
Justice Kruger in disagreeing with this conclusion. (Conc. opn.
of Kruger, J., *ante*, at pp. 1–8, 13–15.) The record must
demonstrate the "type of serious security threat at trial that
would justify the imposition of restraints under the 'manifest
need' standard." (*Mar*, *supra*, 28 Cal.4th at p. 1220.) We have
said that "verbal outbursts" — the conduct the court ultimately
relies on today — do not justify the use of a stun belt. (*Id.* at
p. 1223, fn. 6 ["a stun belt may not properly be used, over a
defendant's objection, to deter a defendant from making verbal
outbursts that may be detrimental to the defendant's own
case"].)

I would further hold that this error by the trial court was
not harmless beyond a reasonable doubt. In *Mar*, we
determined that "the relative closeness of the evidence, the
crucial nature of defendant's demeanor while testifying, and the

15

likelihood that the stun belt had at least some effect on defendant's demeanor" meant that "there [wa]s a reasonable probability that the error affected the outcome of defendant's trial." (*Mar*, *supra*, 28 Cal.4th at p. 1225.) Here, the court imposed the stun belts during the penalty phase retrial after the first penalty jury hung, and the second penalty jury deliberated for nine days before reaching death verdicts. The jury's perception of the defendants, one of whom was representing himself, would have been critical in weighing aggravating and mitigating circumstances. (See *People v. Jackson* (2014) 58 Cal.4th 724, 777 (*Jackson*) (conc. opn. of Liu, J.) ["Wearing a stun belt carries a substantial risk of altering a defendant's demeanor, and a defendant's demeanor is often one of the most important considerations for the jury in deciding whether a capital defendant deserves to live or die. (See *Riggins v. Nevada* (1992) 504 U.S. 127, 143–144 (conc. opn. of Kennedy, J.) . . . ."].)

A stun belt is "a device that . . . delivers an eight-second-long, 50,000-volt, debilitating electric shock when activated by a transmitter controlled by a court security officer." (*Mar*, *supra*, 28 Cal.4th at p. 1204.) " 'The shock contains enough amperage to immobilize a person temporarily and cause muscular weakness for approximately 30 to 45 minutes. The wearer is generally knocked to the ground by the shock and shakes uncontrollably. Activation may also cause immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. An electrical jolt of this magnitude causes temporary debilitating pain and may cause some wearers to suffer heartbeat irregularities or seizures.' " (*Id.* at p. 1215.)

The trial court read to defendants a form that explained the device's capability — that "when activated [it] is capable of

delivering an impulse of 50,000 volts, the result of which may be instant and complete immobilization of [the] body" — and informed defendants that it "could be remotely activated [if the wearer] make[s] sudden or hostile movements, [] tamper[s] with the belt, fail[s] to comply with verbal commands, [or makes] any overt acts of aggression or communication with persons in or around [his] immediate vicinity."

Awareness of this threat inflicts a type of "mental anguish that results from simply wearing the stun belt." (*Wrinkles v. State* (Ind. 2001) 749 N.E.2d 1179, 1195 [banning the use of stun belts in Indiana courtrooms altogether].) "Even when the jury is not aware that the defendant has been compelled to wear a stun belt, the presence of the stun belt may preoccupy the defendant's thoughts, make it more difficult for the defendant to focus his or her entire attention on the substance of the court proceedings, and affect his or her demeanor before the jury." (*Mar*, *supra*, 28 Cal.4th at p. 1219.) Thus, even in cases where the jury was not informed that the defendant was wearing a stun belt, courts, including ours, have found their improper use prejudicial. (See *id.* at p. 1223; *U. S. v. Durham* (11th Cir. 2002) 287 F.3d 1297, 1309 (*Durham*).)

This psychological effect is particularly concerning with respect to McClain, who was representing himself. (See *Mar*, *supra*, 28 Cal.4th at p. 1225, fn. 7 ["the greatest danger of prejudice arises from the potential adverse psychological effect of the device upon the defendant rather than from the visibility of the device to the jury"]; *Durham*, *supra*, 287 F.3d at p. 1306, fn. 7 ["fear of discharge may eviscerate the defendant's ability to take an active role in his own defense"].) "Wearing a stun belt is a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation

of his case. It is reasonable to assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the belt. A defendant is likely to concentrate on doing everything he can to prevent the belt from being activated, and is thus less likely to participate fully in his defense at trial." (*Durham*, at p. 1306; *id.* at p. 1309 [vacating conviction where stun belt impaired defendant's ability to "participate meaningfully" in his trial].) Just as "restraints can impair a defendant's ability to testify effectively" (*Jackson, supra*, 58 Cal.4th at p. 741), a defendant representing himself would experience the same " 'likelihood that the stun belt had at least some [prejudicial] effect on [his] demeanor' " (*id.* at p. 740). Here, we need not speculate as to whether the belt adversely affected McClain's demeanor or his ability to participate in his own case. McClain said during closing argument that if he "didn't have this belt on," he "would be able to express [himself] a lot more boisterous[ly]." (Cf. *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 472 (conc. opn. of Liu, J.).)

Moreover, the likelihood of prejudice arises not only from the "psychological effect of the device" (*Mar, supra*, 28 Cal.4th at p. 1225, fn. 7), but also from the " 'inherent[] prejudic[e]' " associated with the jury's discovery in this case that defendants were under the imposition of restraints (*Deck v. Missouri* (2005) 544 U.S. 622, 635). "[E]ven where the State does not specifically argue the point," the use of restraints "almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community — . . . nearly always a relevant factor in jury decisionmaking." (*Id.* at p. 633.)

Here, the trial court disclosed the use of the belts to the jury and, even worse, said the devices were placed on defendants

as "a security device to assure tranquility in the court, security for everyone," "based on things the court knows." (Accord, conc. opn. of Kruger, J., *ante,* at p. 10 [instead of giving the jury the standard admonition not to speculate on the reason for restraints, the trial court "told the jurors that the devices defendants wore were for courtroom security and suggested the court knew of undisclosed reasons warranting their use"].) Although "there is no indication the jury in this case ever saw the restraints" (*id.* at p. 12), I do not see why that matters where the jury was explicitly made aware of the restraints by the trial court in a prejudicial manner.

The trial court's statements occurred in a proceeding where the prosecution repeatedly argued defendants' dangerousness as a reason they should receive death instead of life imprisonment without parole. Among other statements, the prosecutor argued that "life without parole [would] give [Newborn] a chance to do something like this again, to somebody who is in custody, whether it be a guard, a nurse, a therapist or just a weaker fellow inmate. He is a very violent man, . . . a very uncontrollable man, . . . and a very dangerous man." The prosecutor also said, "McClain is a really dangerous man. He is a danger in here; he is a danger in the street, and he will be a danger in state prison. And that is why life without parole is not fair." The prosecutor asked "who else will die at their hands" and whether "based upon their past conduct, based upon the evidence that you've heard," if anyone could "guarantee that they won't harm again." In this context, the trial court's disclosure of the stun belts and accompanying explanation that the belts were "security device[s] to assure tranquility in the court, security for everyone," "based on things the court knows," are plainly prejudicial.

On this record, I cannot conclude that the use of the stun belts was harmless beyond a reasonable doubt at the penalty retrial. (See *Mar, supra,* 28 Cal.4th at p. 1225; *Stephenson v. Neal* (7th Cir. 2017) 865 F.3d 956, 959 [reversing and remanding to vacate defendant's sentence based on the "possibility that the defendant's having to wear the stun belt . . . contaminated the penalty phase of the trial"].)

I respectfully dissent.

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Holmes, McClain and Newborn

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S058734
**Date Filed:** January 31, 2022

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** J. D. Smith

_____

**Counsel:**

Eric S. Multhaup, under appointment by the Supreme Court, for Defendant and Appellant Lorenzo Newborn.

Debra S. Sabah Press and Charles J. Press, under appointments by the Supreme Court, for Defendant and Appellant Herbert McClain.

Karen Kelly, under appointment by the Supreme Court, for Defendant and Appellant Karl Holmes.

Edmund G. Brown, Jr., and Rob Bonta, Attorneys General, Dane R. Gillette and Lance E. Winters, Chief Assistant Attorneys General, Pamela C. Hamanaka and James William Bilderback II, Assistant Attorneys General, Sharlene A. Honnaka, Dana M. Ali, Jaime L. Fuster and Seth P. McCutcheon, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Eric S. Multhaup
35 Miller Avenue, #229
Mill Valley, CA 94941
(415) 381-9311

Karen Kelly
Attorney at Law
P.O. Box 6308
Modesto, CA 95357
(209) 571-1085

Debra S. Sabah Press
Attorney at Law
3571 Far West Boulevard, PMB 140
Austin, TX 78731
(510) 847-5933

Seth P. McCutcheon
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6133